1 ANDRÉ BIROTTE JR.
  United States Attorney
2 ROBERT E. DUGDALE
  Assistant United States Attorney
3 Chief, Criminal Division
  ROBYN K. BACON (Cal. Bar No. 251048)
4 Assistant United States Attorney
  Violent and Organized Crime Section
5     1500 United States Courthouse
      312 North Spring Street
6     Los Angeles, California 90012
      Telephone:  (213) 894-4667
7     Facsimile:  (213) 894-3713
      E-mail:     robyn.bacon@usdoj.gov
8
  Attorneys for Plaintiff
9 UNITED STATES OF AMERICA

```
                    FILED
          CLERK, U.S. DISTRICT COURT

                 JUN I 8 2013

          CENTRAL DISTRICT OF CALIFORNIA
          BY                     DEPUTY
```

10

11                UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 IN THE MATTER OF THE              No. CV 13-3933-JSL (VBK)
   EXTRADITION OF
                                     GOVERNMENT'S FILING OF REDACTED
14  BRANDI ANGELA BRANDT             COPY OF FORMAL EXTRADITION PAPERS
                                     AND REQUEST FOR EXTRADITION
15  A fugitive from the
    government of Australia.
16

17

18

19

20

21

22

23

24

25

26

27

28

                                  1

1    The fugitive, Brandi Angela Brandt, having been arrested

2   pursuant to an arrest warrant issued on May 28, 2013 by United

3   States Magistrate Judge Charles F. Eick and having come before the

4   Court for an initial appearance on May 30, 2013 before United States

5   Magistrate Judge Stephen J. Hillman, complainant United States of

6   America hereby (1) files this redacted copy of the original formal

7   extradition papers in this matter, and (2) requests the extradition

8   of the fugitive to Australia.

9       The government's unredacted Filing of Original Formal

10   Extradition Papers and Request for Extradition was filed previously.

11

12   Dated: June 18, 2013                    Respectfully submitted,

13                                           ANDRÉ BIROTTE JR.
                                             United States Attorney
14
                                             ROBERT E. DUGDALE
15                                           Assistant United States Attorney
                                             Chief, Criminal Division
16

17

18                                           ROBYN K. BACON
                                             Assistant United States Attorney
19
                                             Attorneys for Plaintiff
20                                           UNITED STATES OF AMERICA

21

22

23

24

25

26

27

28

DISTRICT OF COLUMBIA, ss:

## DECLARATION OF SUSAN BENDA

I, Susan Benda, declare and say as follows:

1.  I am an Attorney-Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C.  This office has responsibility for extradition requests within the Department of State, and I am familiar with the extradition case of Brandi Angela Brandt.  I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2.  In accordance with the provisions of the extradition treaty and protocol in full force and effect between the United States and Australia, the Embassy of Australia has submitted Diplomatic Note No. 115/2012 formally requesting the extradition of Brandi Angela Brandt.  A copy of the diplomatic note is attached to this declaration.

3.  The relevant and applicable treaty provisions in full force and effect between the United States and Australia are found in the Treaty on Extradition between the United States of America and Australia of May 14, 1974, which entered into force on May 8, 1976 (TIAS 8234), and the Protocol Amending the Treaty on Extradition between the United States of America and Australia of May 14, 1974, signed on September 4, 1990, which entered into force on December 21, 1992.  A copy of the Treaty and Protocol are attached to this declaration.

4.  In accordance with Article XVIII of the 1974 Extradition Treaty, as replaced by Article 14 of the 1990 Protocol, the Government of the United States represents the interests of Australia in any proceedings arising out of a request for extradition made by Australia, and Australia provides reciprocal representation on behalf of the United States in proceedings in Australia arising out of extradition requests made by the United States.

1206007911-1

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

...tify that Susan Benda, whose name is subscribed to the document hereunto annexed, was at the ti... ...cribing the same Attorney Adviser, Office of the Legal Adviser, Department of State, United States of ... ...nd that full faith and credit are due to her acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*

In testimony whereof, I, Hillary Rodham Clinton, Secretary of State, have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Assistant Authentication Officer, of the said Department, at the city of Washington, in the District of Columbia, this twenty-second day of June, 2012.

*Issued pursuant to ... V, State ... 15 1789,*
*1 Stat. 68-69; 22 ... 657; 2 ... 2651a; 5*
*USC 301; 28 USC ... t. seq.; ... 1443(f);*
*RULE 44 Federal ... Civil P ... e.*

_____
Secretary of State

By _____
Assistant Authentication Officer,
Department of State

-2-

5. The offenses for which extradition is sought are covered under Article II of the 1974 Extradition Treaty, as replaced by Article 1 of the 1990 Protocol.

6. The documents submitted by the Embassy of Australia in support of the extradition request were certified on April 30, 2012, by Jeffrey L. Bleich, Ambassador of the United States of America to Australia, in accordance with 18 U.S.C. § 3190. At the time of his certification, Ambassador Bleich was the principal diplomatic officer of the United States in Australia.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on June _____, 2012.

_____
SUSAN BENDA

Attachments:
1. Copy of Note
2. Copy of Treaty
3. Copy of Protocol



AUSTRALIA

Note No. 115/2012

2012 MAY -4 P 2: 34

The Embassy of Australia in Washington, D.C. presents its compliments to the United States

Department of State and has the honour to present a request for the extradition of Brandi Angela

BRANDT, a citizen of the United States of America, born on █████████

BRANDT'S extradition is sought so that she may be prosecuted in Australia for the following

offences:

- conspiracy to import a commercial quantity of cocaine contrary to section 307.1(1) and

  section 11.5 of the *Criminal Code Act 1995* (Cth) (Criminal Code), and

- dealing with money to the value of $130,760.00 that was proceeds of crime contrary to

  section 400.4(1) of the Criminal Code.

These offences are punishable under Australian law by imprisonment of more than one year.

This request is made in accordance with the *Treaty on extradition between Australia and the*

*United States of America* (as amended by the *Protocol amending the treaty on extradition*

*between Australia and the United States of America*) (the Treaty).

The duly authenticated documentation required in support of this extradition request is enclosed.

Pursuant to Article XVII of the Treaty, Australia requests the surrender, to the extent permitted

by the law of the United States of America, of all articles, documents, and evidence in the United

States connected with the offences for which BRANDT'S extradition is sought.


The following Australian official may be contacted in connection with this request for

extradition:

> Ms Veronica Blanpain
> Extradition Unit
> International Crime Cooperation Central Authority
> Attorney-General's Department
> 3-5 National Circuit
> BARTON  ACT  2600
> AUSTRALIA
>
> Ph:  + 61 2 6141 3228
> Fax: + 61 2 6141 5457
> Email: veronica.blanpain@ag.gov.au


The Government of Australia thanks the United States of America for its assistance in this

matter.


The Embassy of Australia in Washington, D.C. avails itself of this opportunity to express to the

United States Department of State the assurances of its highest consideration.



WASHINGTON DC

04 May 2012

# AUSTRALIA

## Extradition

*Treaty signed at Washington May 14, 1974;*
*Ratification advised by the Senate of the United States*
*of America December 1, 1975;*
*Ratified by the President of the United States of*
*America December 16, 1975;*
*Ratified by Australia December 22, 1975;*
*Ratifications exchanged at Canberra April 8, 1976;*
*Proclaimed by the President of the United States of*
*America May 5, 1976;*
*Entered into force May 8, 1976.*

---

### BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Treaty on Extradition between the United States of America and Australia was signed at Washington on May 14, 1974, the original of which Treaty is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty;

The Treaty was ratified by the President of the United States of America on December 16, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Australia;

The respective instruments of ratification were exchanged at Canberra on April 8, 1976;

It is provided in Article XXI of the Treaty that the Treaty shall enter into force thirty days after the exchange of instruments of ratification;

Now, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, to the end that it shall be observed and fulfilled with good faith on and after May 8, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

(957)                                    TIAS 8234

87-129 O - 77 - 61

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this fifth day of May in the year of our Lord one thousand nine hundred seventy-six and of the Independence of the United States of America the two hundredth.

[SEAL]

GERALD R. FORD

By the President:

JOSEPH JOHN SISCO
*Acting Secretary of State*

Case 2:13-cr-00883-JSL-VBK Document 19 Filed 06/26/15 Page 10 of 86 Page ID #:17

### TREATY ON EXTRADITION BETWEEN
### THE UNITED STATES OF AMERICA AND AUSTRALIA

The United States of America and Australia, desiring to make more effective the cooperation of the two countries for the reciprocal extradition of offenders, agree as follows:

ARTICLE I

Each Contracting Party agrees, under the conditions and circumstances established by this Treaty, reciprocally to deliver up persons found in its territory who have been charged with or convicted of any of the offenses mentioned in Article II of this Treaty committed within the territory of the other Contracting Party, or outside that territory under the conditions specified in Article IV of this Treaty.

ARTICLE II

(1) Persons shall be delivered up according to the provisions of this Treaty for any of the following offenses provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year or by death:

1. Murder or willful murder; assault with intent to commit murder.

2. Manslaughter.

3. Aggravated or willful wounding or injuring; assault occasioning actual bodily harm.

4. Unlawful throwing or application of any corrosive or injurious substances upon the person of another.

5. Rape; indecent assault, including unlawful sexual acts with or upon children.

6. Illegal abortion.

7. Procuring, or trafficking in, women or young persons for immoral purposes; living on the earnings of prostitution.

8. Abandoning or exposing a child when the life of that child is or is likely to be injured or endangered.

9.   Bigamy.

10.  Kidnapping; child stealing; abduction; false imprisonment.

11.  Robbery.

12.  Burglary; housebreaking or any similar offense.

13.  Larceny.

14.  Embezzlement.

15.  Obtaining any property, money or valuable securities
     by false pretenses or other form of deception.

16.  An offense against the law relating to bribery.

17.  Extortion.

18.  Receiving any property, money or valuable securities
     knowing the same to have been unlawfully obtained.

19.  Fraud by an agent, bailee, banker, factor or trustee,
     by a director or officer of a company or by a promoter
     of a company, whether existing or not.

20.  An offense relating to counterfeiting or forgery.

21.  Perjury; subornation of perjury; conspiring to defeat
     the course of justice.

22.  Arson.

23.  An act done with the intention of endangering the safety
     of any person traveling upon a railway or in any aircraft
     or vessel or other means of transportation.

24.  Any seizure or exercise of control, by force or violence
     or threat of force or violence, or by any other form of
     intimidation, of an aircraft.

25.  Piracy, by statute or by law of nations; revolt on
     board a vessel against the authority of the master of the
     vessel.

26.  Malicious injury to property.

27.  An offense against the bankruptcy laws.

28.  An offense against the laws relating to narcotics, dangerous drugs or psychotropic substances.

29.  Dealing in slaves.

(2)  Extradition shall also be granted for any other offenses that are made extraditable under the extradition laws of Australia and which are felonies under the laws of the United States of America.

(3)  Extradition shall also be granted for any offense against a federal law of the United States of America of which one of the above-mentioned offenses is a substantial element, even if transporting or transportation or the use of the mails or of interstate facilities is also an element of the specific offense.

(4)  Extradition shall also be granted for aiding, abetting, counseling or procuring the commission of, being an accessory before or after the fact to, or attempting or conspiring to commit, any of the offenses mentioned in the preceding paragraphs of this Article.

(5)  If extradition is requested for any offense mentioned in a preceding paragraph of this Article and that offense is punishable under the laws of both Contracting Parties by a term of imprisonment exceeding one year or by death, that offense shall be extraditable under the provisions of this Treaty whether or not the laws of both Contracting Parties would place that offense within the same category of offenses made extraditable by that preceding paragraph of this Article and whether or not the laws of the requested State denominate the offense by the same terminology.

## ARTICLE III

(1)   For the purposes of this Treaty, the territory of a Contracting Party means all the territory under the jurisdiction of that Contracting Party, including airspace and territorial waters, and also includes -

(a)   any vessel registered in any territory under the jurisdiction of that Contracting Party; and

(b)   any aircraft registered in any such territory provided that the aircraft is in flight when the relevant offense is committed.

(2)   For the purposes of this Treaty -

(a)   the territory under the jurisdiction of a Contracting Party includes the Territories for the international relations of which that Contracting Party is responsible;

(b)   an aircraft shall be considered in flight from the moment when the power is applied for the purpose of take-off until the moment when the landing run ends.

## ARTICLE IV

When the offense for which extradition has been requested has been committed outside the territory of the requesting State -

(a)   if the United States of America is the requested State - the executive authority of the United States of America; or

(b)   if Australia is the requested State - the Attorney-General of Australia,

shall have the power to grant the extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances.

ARTICLE V

(1)  Neither of the Contracting Parties shall be bound to deliver up its own nationals under this Treaty but the executive authority of each Contracting Party shall have the power to deliver them up if, in its discretion, it considers that it is proper to do so.

(2)  For the purposes of this Article --

(a)  a reference to the executive authority of a Contracting Party shall, in the case of Australia, be construed as a reference to the Attorney-General of Australia;

(b)  Australian protected persons shall be deemed to be nationals of Australia; and

(c)  the nationality of a person shall be determined to be that which he held at the time when he was charged with the offense for which his extradition is requested.

ARTICLE VI

Extradition shall be granted only if the evidence is found sufficient, according to the laws in the territory where the person whose extradition is requested is found, either to justify his trial or committal for trial if the offense with which he is charged or its equivalent had been committed in that territory or to prove that he is the identical person convicted by the courts of the requesting State.

ARTICLE VII

(1)   Extradition shall not be granted in any of the following circumstances:

(a)   when the person whose extradition is requested is being proceeded against, has been tried and discharged or punished, or has been pardoned, in the territory of the requested State for the offense for which his extradition is requested;

(b)   when the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State; or

(c)   when the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of a political character.

(2)   If any question arises whether a case comes within the provisions of subparagraph (c) of paragraph (1) of this Article, the requested State shall decide that question.

ARTICLE VIII

If, under the law of the requesting State, an offense for which the extradition of a person is requested, or any other offense for which he may be detained or tried under paragraph (1) of Article XIV, is subject to a penalty of death but the law of the requested State does not provide for such a penalty in a similar case, the requested State may recommend to the requesting State that any punishment imposed for any of those offenses be a less severe punishment.

ARTICLE IX

When the person whose extradition is requested is being
proceeded against or is serving a sentence in the territory of
the requested State for an offense other than that for which
extradition has been requested, his surrender may be deferred
until the conclusion of the proceedings and the full execution
of any punishment that may be or may have been imposed on him.

ARTICLE X

The determination that extradition based upon the request
therefor should or should not be granted shall be made in
accordance with the law of the requested State and the person whose
extradition is sought shall have the right to use such remedies
and recourses as are provided by that law.

ARTICLE XI

(1)  The request for extradition shall be made through the
diplomatic channel.

(2)  The request shall be accompanied by a description of
the person sought, a statement of the facts of the case, the text
of the applicable laws of the requesting State including the law
defining the offense, the law prescribing the punishment for the
offense and the law relating to the limitation of the legal
proceedings.

(3)  When the request relates to a person who has not yet been
convicted, it must also be accompanied by a warrant of arrest issued
by a judge or other judicial officer of the requesting State and
by such evidence as, according to the laws of the requested State,

would justify his trial or committal for trial if the offense had
been committed there, including evidence proving the person requested
is the person to whom the warrant of arrest refers.

(4) When the request relates to a person already convicted, it
must be accompanied by the judgment of conviction and sentence, if any,
passed upon him in the territory of the requesting State, by a statement,
if applicable, showing how much of the sentence has not been served
and by evidence proving that the person requested is the person to
whom the judgment refers.

(5) The warrant of arrest and deposition or other evidence,
given under oath or affirmed, and the judicial documents establishing
the existence of the conviction, or certified copies of those
documents, shall be admitted in evidence in the examination of the
request for extradition when -

(a) in the case of a request by Australia - those
documents or certified copies bear the signature, or are
accompanied by the attestation, of a judge, magistrate or
officer of Australia or are authenticated by the official
seal of the Attorney-General and, in any case, are certified
by the principal diplomatic or consular officer of the United
States of America in Australia; or

(b) in the case of a request by the United States of
America - the warrant, if any, bears an original signature,
or the other documents are certified, by a judge, magistrate
or officer of the United States of America and, in any case, are
authenticated by the oath of a witness or sealed with the official

seal of the Department of State on behalf of the Secretary of
State or of the Department of Justice on behalf of the
Attorney General.

### ARTICLE XII

(1)  In case of urgency a Contracting Party may apply for the
provisional arrest of the person sought pending the presentation of
the request for extradition through the diplomatic channel.

(2)  The application shall contain a description of the person
sought, an indication of intention to request the extradition of
the person sought and a statement of the existence of a warrant of
arrest or a judgment of conviction against that person, and such
further information, if any, as would be necessary to justify the
issue of a warrant of arrest had the offense been committed, or the
person sought been convicted, in the territory of the requested
State.

(3)  On receipt of such an application the requested State
shall take the necessary steps to secure the arrest of the person
claimed.

(4)  A person arrested upon such an application shall be set at
liberty upon the expiration of forty-five days from the date of his
arrest if a request for his extradition accompanied by the documents
specified in Article XI has not been received.

(5)  Paragraph (4) of this Article shall not prevent the
institution of proceedings with a view to extraditing the person
sought if the request is subsequently received.

ARTICLE XIII

(1)  If the requested State requires additional evidence or information to enable it to decide on the request for extradition, that State may request that such evidence or information be furnished within such period as it specifies.

(2)  If the person sought is under arrest and the additional evidence or information submitted as aforesaid is not sufficient or if such evidence or information is not received within the period specified by the requested State, he shall be discharged from custody.

(3)  The discharge of a person from custody under paragraph (2) of this Article shall not bar the requesting State from submitting another request in respect of the same offense.

ARTICLE XIV

(1)  A person extradited under this Treaty may be detained, tried or punished in the territory of the requesting State for any offense mentioned in Article II for which the person could be convicted upon proof of the facts upon which the request for extradition was based.

(2)  Except as provided in paragraph (1) of this Article, a person extradited under this Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted, or be extradited by that State to a third State, unless –

(a)  he has left the territory of the requesting State after his extradition and has voluntarily returned to it;

(b)  he has not left the territory of the requesting

State within thirty days after being free to do so; or

(c)  the offense concerned is one for which the requested

State has consented to his detention, trial or punishment or

to his extradition to a third State and is an offense mentioned

in Article II.

(3)  A request for the consent of the requested State under

subparagraph (c) of paragraph (2) of this Article shall be

accompanied by such information and documents as are requested

by that State.

(4)  This Article does not apply to offenses committed after the

extradition.


ARTICLE XV

A requested State, upon receiving two or more requests for

the extradition of the same person either for the same offense, or

for different offenses, shall determine to which of the requesting

States it will extradite the person sought, taking into consideration

the circumstances and particularly the possibility of a later

extradition between the requesting States, the seriousness of each

offense, the place where the offense was committed, the nationality

and residence of the person sought, the dates upon which the requests

were received and the provisions of any extradition agreements

between the requested State and the other requesting State or States.

## ARTICLE XVI

(1)   The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2)   Where extradition of a person for an offense is granted, the person shall be conveyed by the appropriate authorities of the requested State to a port or airport in the territory of that State agreed between that State and the requesting State.

(3)   If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as is prescribed by the laws of that State, he may be set at liberty, and the requested State may subsequently refuse to extradite that person for the same offense.

(4)   Australia is not required to extradite a person before the expiration of fifteen days after the date on which he has been held judicially to be liable to extradition, or, if proceedings for a writ of habeas corpus have been brought, before the expiration of fifteen days after the final decision of the competent court has been given.

## ARTICLE XVII

(1)   To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles found in the requested State that have been acquired as a result of the offense or may be required as evidence shall, if the requesting State so requests, be surrendered if extradition is granted.

(2)  Subject to the qualifications of paragraph (1) of this
Article, the above-mentioned articles shall, if the requested State
so requests, be surrendered to the requesting State even if the
extradition, having been agreed to, cannot be carried out owing
to the death or escape of the person sought.

(3)  Where the law of the requested State or the rights of
third parties so require, any articles so surrendered shall be
returned to the requested State free of charge if that State so
requests.

ARTICLE XVIII

(1)  Expenses related to the transportation of the person sought
to the requesting State shall be paid by the requesting State.

(2)  The requested State shall make all necessary arrangements
for, and meet the cost of, the representation of the requesting State
in any proceedings arising out of a request for extradition.

(3)  No pecuniary claim, arising out of the arrest, detention,
examination and surrender of persons sought under the terms of this
Treaty, shall be made by the requested State against the requesting
State.

ARTICLE XIX

(1)  The right to transport through the territory of one of the
Contracting Parties a person surrendered to the other Contracting
Party by a third State shall be granted on request made through
the diplomatic channel.

(2)  In the case of a national of the requested State, the
request shall establish that conditions are present which would
warrant extradition of the person by the State of transit.

(3)  The request may be refused if reasons of public order are opposed to the transit.

(4)  Permission for the transit of a person surrendered shall include authorization for accompanying officials to hold that person in custody or request and obtain assistance from authorities in the State of transit in maintaining custody.

(5)  The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

### ARTICLE XX

This Treaty applies to offenses mentioned in Article II committed before, on or after the date on which this Treaty enters into force, provided that no extradition shall be granted for an offense committed before that date which was not an offense under the laws of both Contracting Parties at the time of its commission.

### ARTICLE XXI

(1)  This Treaty is subject to ratification and the instruments of ratification shall be exchanged in Canberra as soon as possible.

(2)  This Treaty shall enter into force thirty days after the exchange of instruments of ratification. [1]

(3)  This Treaty may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

(4)  This Treaty shall terminate and replace, as between the Contracting Parties to the present Treaty, the Treaty on Extradition between the United States and Great Britain of December 22, 1931, [2] as made applicable to Australia.

---

[1] May 8, 1976.
[2] TS 849; 47 Stat. 2122.

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE at Washington this fourteenth day of May, 1974.


FOR THE UNITED STATES OF AMERICA:

*Kenneth Rush*


FOR AUSTRALIA:

*Patrick Shaw*

| 102D CONGRESS 2d Session | SENATE | TREATY DOC. 102-23 |
| --- | --- | --- |

## PROTOCOL AMENDING THE 1974 EXTRADITION TREATY WITH AUSTRALIA

### MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE PROTOCOL AMENDING THE TREATY ON EXTRADITION BE-
TWEEN THE UNITED STATES OF AMERICA AND AUSTRALIA,
SIGNED AT SEOUL ON SEPTEMBER 4, 1990



FEBRUARY 19, 1992.—Protocol was read the first time, and together with
the accompanying papers, referred to the Committee on Foreign Rela-
tions and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1992

59-118

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *February 19, 1992.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Protocol Amending the Treaty on Extradition between the United States of America and Australia, signed at Seoul on September 4, 1990. I also transmit for the information of the Senate the report of the Department of State with respect to the Protocol.

The Protocol supplements and amends the Treaty on Extradition between the United States of America and Australia, signed at Washington on May 14, 1974. It is designed to update and standardize the conditions and procedures for extradition between the United States and Australia. Most significant, it removes an outdated list of extraditable offenses from the 1974 Treaty and expands upon the dual criminality approach contained in that Treaty. The Protocol also provides a legal basis for temporarily surrendering prisoners to stand trial for crimes against the laws of the requesting State. The provisions in this Protocol follow generally the form and content of extradition treaties recently concluded by the United States.

This Protocol will make a significant contribution to international cooperation in law enforcement. I recommend that the Senate give early and favorable consideration to the Protocol and give its advice and consent to ratification.

GEORGE BUSH.

(III)

# LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, February 13, 1992.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Protocol Amending the Treaty on Extradition between the United States of America and Australia, signed at Seoul on September 4, 1990. I recommend that this Protocol be transmitted to the Senate for its advice and consent to ratification.

The provisions of this Protocol follow generally the form and content of extradition treaties recently concluded by the United States. It represents a concerted effort by the Department of State and the Department of Justice to modernize the legal tools available for the extradition of serious offenders such as narcotics traffickers and terrorists.

Upon entry into force, this Protocol will supplement and amend the 1974 Treaty on Extradition between the United States of America and Australia, signed at Washington on May 14, 1974.

Article 1 of the Protocol replaces Article II of the 1974 Treaty in its entirety. It rearticulates the dual criminality approach contained in the 1974 Treaty which is used to determine whether a particular offense is extraditable and eliminates the outdated list of extraditable offenses contained in the 1974 Treaty. This modern extradition practice emphasizes extradition based on underlying criminal conduct rather than the particular designation of the offense contained in our respective criminal codes. A dual criminality clause permits extradition for any conduct that is punishable in both States by imprisonment or other detention for at least one year. Inclusion of a dual criminality clause obviates the need to renegotiate or supplement the Treaty as offenses, such as computer-related crimes or money laundering, become punishable under the laws of both States.

Article 1 of the Protocol also requires extradition for conspiring, attempting or participating in the commission of an offense under the Treaty, as amended.

An offense is extraditable under Article 1 of the Protocol, notwithstanding any interstate transportation or mail-use elements required to establish U.S. Federal jurisdiction. This provision will allow the United States to obtain extradition for such offenses even though Australian law does not include analogous jurisdictional elements for similar underlying criminal behavior.

Article 1 further requires extradition for extraterritorial offenses so long as the law of the requested State would provide for extra-

territorial jurisdiction under similar circumstances. The requested State is also given the discretion to grant extradition for extraterritorial offenses in all other cases.

Article 2 of the Protocol deletes Articles III and IV of the 1974 Treaty concerning territorial jurisdiction which is now covered in more general terms under Article I of the Protocol.

Article 3 of the Protocol replaces Article V(2) of the 1974 Treaty. The Article, as amended, would continue to permit the requested State to grant or deny extradition of its nationals but, in cases where extradition is denied, would provide a mechanism for the requesting State to require submission to prosecution by the requested State, to the extent permitted by its laws, of all offenses for which extradition has been sought.

Article 4 of the Protocol deletes Article VI of the 1974 Treaty concerning the standard of proof required to support extradition. This concept is now covered by Article 7 of the Protocol.

Article 5 of the Protocol replaces Article VIII of the 1974 Treaty and permits the requested State to deny extradition for a capital offense, if the requesting State fails to provide sufficient assurance that the death penalty will not be imposed or carried out.

Article 6 of the Protocol replaces Article IX of the 1974 Treaty. It allows the requested State to postpone extradition proceedings or surrender if the fugitive who is the subject of an extradition request is being prosecuted or is serving a sentence in the requested State. Under this provision the requested State has the discretion to grant extradition and surrender the fugitive temporarily to the requesting State for the purpose of early prosecution in that State. This provision will allow a person serving a long sentence in the requested State to be tried promptly in the requesting State and returned to the requested State to complete his sentence. This alternative of temporary surrender is routinely included in our modern extradition treaties.

Article 7 replaces Article XI of the 1974 Treaty and specifies the procedures by which extradition is to be accomplished. The procedures provided therein are similar to those found in other modern extradition treaties.

Articles 8 replaces Article XII of the 1974 Treaty. It provides for the provisional arrest and detention of a fugitive for no more than 60 days pending receipt of a fully documented extradition request in conformance with Article XI of the Treaty, as amended. The discharge of a fugitive from custody does not prejudice subsequent rearrest and extradition upon later receipt of the extradition request and supporting documents.

Article 9 of the Protocol supplements and amends Article XIII of the 1974 Treaty. It continues the mechanism for the submission of additional information whenever the requested State considers the information provided with the request to be insufficient. Article XIII, as amended, would also permit expedited surrender without formal proceedings where the person sought consents to surrender after having been advised by the competent authority of his or her right to formal extradition proceedings.

Article 10 replaces Article XIV of the 1974 Treaty concerning the rule of speciality. This article provides, subject to specific exceptions, that a person extradited under the Treaty, as amended, may

not be detained, tried, or punished for an offense other than that for which extradition has been granted without the consent of the requested State; nor may he be extradited without the consent of the requested State to a third State for any offense committed before his surrender. This limitation only applies until such time as the person leaves the territory of the requesting State and voluntarily returns or fails to leave within 15 days of being free to do so.

Article 11 of the Protocol replaces Article XV of the 1974 Treaty and sets forth a non-exclusive list of factors to be considered by the requested State in determining to which State to surrender a person sought by more than one State.

Article 12 of the Protocol replaces Article XVI of the 1974 Treaty. It requires the requested State to notify the requesting State promptly of its decision on extradition and, if it denies extradition, in whole or in part, to provide an explanation as well as copies of judicial decisions upon request. If extradition is granted, the fugitive must be removed from the territory of the requested State within the time prescribed by the law of the requested State, or the person may be released from custody and a subsequent request for his extradition may be refused.

Article 13 of the Protocol replaces Article XVII of the 1974 Treaty and provides for the seizure and ultimate surrender to the requesting State of all items connected with the offense for which extradition is sought. This obligation is subject to the rights of third parties. Before surrender, the requested State may require assurances that the objects be returned.

Article 14 of the Protocol replaces the text of Article XVIII of the 1974 Treaty and provides that the requested State shall represent the requesting State in any proceedings in the requested State arising from a request for extradition and bear all costs other than those arising from the translation of documents and transportation of the fugitive.

Article 15 replaces Article XIX of the 1974 Treaty and governs the transit through the territory of one of the contracting States of a person being surrendered to the other contracting State by a third State.

Article 16 of the Protocol stipulates that the Protocol applies to offenses committed before as well as after its entry into force.

Article 17 provides that the Protocol will enter into force immediately upon the exchange of written notification that both Parties have complied with their respective requirements for entry into force.

A Technical Analysis explaining in detail the provisions of the Protocol is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Protocol by the Senate at an early date.

Respectfully submitted,

LAWRENCE S. EAGLEBURGER.

PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA
AND
AUSTRALIA
OF MAY 14, 1974

The United States of America and Australia;

Desiring to make more effective the Extradition Treaty between

the Contracting Parties signed at Washington May 14, 1974

(hereinafter referred to as "the Treaty");

Have agreed as follows:

(1)

2

- 2 -

ARTICLE 1

The text of Article II of the Treaty is replaced by the following:

"(1)  An offence shall be an extraditable offence if it is punishable under the laws in both Contracting Parties by deprivation of liberty of more than one year, or by a more severe penalty.  However, if the request for extradition relates to a person convicted of such an offence who is wanted for the enforcement of a sentence of imprisonment, the executive authority of the requested State shall have authority to refuse extradition if a period of less than six months of imprisonment remains to be served.

(2)  The following offences shall be extraditable if they meet the requirements of paragraph (1): conspiring to commit, attempting to commit, aiding or abetting, counselling or procuring the commission of, or being an accessory after the fact to, any offence described in that paragraph.

(3)  For the purpose of this Article, an offence shall be an extraditable offence:

(a) whether or not the laws in the Contracting Parties place the offence within the same category of offences or describe the offence by the same terminology; and

8

- 3 -

(b) whether or not the offence is one for which
United States federal law requires proof of
interstate transportation, or use of the mails,
or of other facilities affecting interstate or
foreign commerce, such matters being merely for
the purpose of establishing jurisdiction in a
United States federal court.

(4) If the offence has been committed outside the
territory of the requesting State, extradition shall be
granted if the laws in the requested State provide for the
punishment of an offence committed outside of its territory
in similar circumstances. If the laws in the requested
State do not so provide, the executive authority of the
requested State may, in its discretion, grant extradition.

(5) Subject to the laws in the requested State, if
extradition has been granted for an extraditable offence,
it shall also be granted for any other offence specified in
the request even if the latter offence is punishable by
deprivation of liberty of one year or less, provided that
all other requirements of extradition are met."

ARTICLE 2

Article III and Article IV of the Treaty are deleted.

4

- 4 -

### ARTICLE 3

The text of paragraph 2 of Article V of the Treaty is replaced
by the following:

"If the requested State refuses to extradite a national of that
State on the basis of nationality it shall, if the requesting
State so requests and the laws of the requested State allow,
submit the case to the competent authorities in order that
proceedings for the prosecution of the person may be undertaken
in respect of all offences for which the extradition has been
requested."

### ARTICLE 4

Article VI of the Treaty is deleted.

### ARTICLE 5

The text of Article VIII of the Treaty is replaced by the
following:

"If, under the law of the requesting State, an offence for
which the extradition of a person is requested is subject to a

6

- 5 -

penalty of death, the requested State may refuse the
extradition unless the requesting State gives an undertaking
that the death penalty will not be imposed or, if imposed, will
not be carried out."


ARTICLE 6


The text of Article IX of the Treaty is replaced by the
following:

"(1) If the extradition request is granted in the case of a
person who is being prosecuted or is serving a sentence in
the territory of the requested State, the requested State
may temporarily surrender the person sought to the
requesting State for the purpose of prosecution. The
person so surrendered shall be kept in custody in the
requesting State and shall be returned to the requested
State after the conclusion of the proceedings against that
person, in accordance with conditions to be mutually
determined in writing between the Contracting Parties.
(2)  The requested State may postpone the extradition
proceedings against, or the surrender of, any person who is
being prosecuted or who is serving a sentence in that

6

- 6 -

State. The postponement may continue until the prosecution of

the person sought has been concluded and any sentence has been

served."

ARTICLE 7

The text of Article XI of the Treaty is replaced by the

following:

"(1) All requests for extradition shall be made through

the diplomatic channel.

(2) The request for extradition shall be supported by:

(a) documents, statements, or other types of

information which describe the identity and

probable location of the person sought;

(b) a description of the conduct constituting the

offence;

(c) a statement of the law describing the

essential elements of the offence for which

extradition is requested; and

(d) a statement of the law describing the

punishment for the offence and the law relating

to the limitation of legal proceedings.

(3) A request for the extradition of a person who is

sought for prosecution or who has been found guilty in his

absence shall also be supported by:

- 7 -

> (a) a copy of the warrant or order of arrest
> issued in the requesting State for the arrest of
> the person for the offence;
> (b) a copy of the charging document, if any; and
> (c) a description of the facts, by way of
> affidavit, statement, or declaration, setting
> forth reasonable grounds for believing that an
> offence has been committed and that the person
> sought committed it.

(4) A request for extradition of a person who has been
found guilty of the offence for which extradition is
sought, other than a person who has been found guilty in
his absence, shall also be supported by:

> (a) a copy of the judgment of conviction, if
> available, or a statement by a judicial authority
> that the person has been found guilty;
> (b) information establishing that the person
> sought is the person to whom the finding of guilt
> refers;
> (c) a copy of the sentence imposed, if the person
> has been sentenced, and a statement establishing
> to what extent the sentence has been carried out;
> and
> (d) if the person has been found guilty but no
> sentence has been imposed, a statement affirming
> that it is intended to impose a sentence.

- 8 -

(5)  The documents which accompany an extradition request shall be received and admitted as evidence in extradition proceedings if:

(a) in the case of a request from the United States, they

(i) purport to be signed or certified by a judge, magistrate, or officer in or of the United States; and

(ii) purport to be authenticated by the oath or affirmation of a witness or to be sealed with an official or public seal of the requesting State or of a Minister of State, or of a Department or officer of the Government of the requesting State;

(b) in the case of a request from Australia, they are certified by the principal diplomatic or consular officer of the United States resident in Australia, as provided by the extradition laws of the United States; or

(c) they are certified or authenticated in any other manner accepted by the law of the requested State."

ARTICLE 8

The text of Article XII of the Treaty is replaced by the following:

- 9 -

"(1)  In case of urgency, either Contracting Party may request the provisional arrest of the person sought pending presentation of the request for extradition.  A request for provisional arrest may be transmitted through the diplomatic channel or directly between the Department of Justice in the United States and the Attorney-General's Department in Australia.  The facilities of the International Criminal Police Organisation (Interpol) may be used to transmit such a request.

(2)  The application for provisional arrest shall contain

    (a)  a description of the person sought;

    (b)  the location of the person sought, if known;

    (c)  a brief statement of the facts of the case, including, if possible, the time and location of the offence;

    (d)  a description of the laws violated or alleged to have been violated and, where applicable, the penalty which may be imposed;

    (e)  a statement of the existence of a warrant of arrest or finding of guilt or judgment of conviction against the person sought; and

    (f)  a statement that a request for the extradition of the person sought will follow.

(3)  On receipt of the application, the requested State shall take appropriate steps to secure the arrest of the person sought.  The requesting State shall be notified

without delay of the disposition of its application, and the reasons for any denial.

(4) A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of arrest pursuant to the application of the requesting State if the executive authority of the requested State has not received the formal request for extradition and the supporting documents required in Article XI.

(5) The fact that the person sought has been discharged from custody pursuant to paragraph (4) of this Article shall not prejudice the subsequent rearrest and extradition of that person if the extradition request and supporting documents are received at a later date.

ARTICLE 9

Article XIII of the Treaty is amended by deleting the words "evidence or" wherever they occur in Article XIII(1) and Article XIII(2), and by adding the following:

"(4) If the person sought, after being personally advised by the competent authority of the requested State of his right to formal extradition proceedings, consents to

- 11 -

surrender to the requesting State, the requested State may
surrender the person as expeditiously as possible and
without further proceedings."

ARTICLE 10

The text of Article XIV of the Treaty is replaced by the
following:

"(1) A person extradited under this Treaty may not be
detained, tried, or punished in the requesting State except
for:

(a) the offence for which extradition is granted
or any other offence of which the person could be
convicted on proof of the conduct constituting
the extradition offence provided that the offence
carries the same or a lesser punishment;

(b) any offence committed after the extradition;
or

(c) any offence for which the executive authority
of the requested State consents to the person's
detention, trial or punishment. For the purposes
of this subparagraph, the requested State may
require the submission of the documents specified
in Article XI.

(2) A person extradited under this Treaty by a Contracting
Party may not be extradited to a third State for an offence

- 12 -

committed prior to his surrender unless that Contracting
Party consents.

(3) Paragraphs (1) and (2) of this Article shall not
prevent the detention, trial, or punishment of an
extradited person, or the extradition of that person to a
third State, if:

> (a) that person leaves the territory of the
> requesting State after extradition and
> voluntarily returns to it; or
>
> (b) that person does not leave the territory of
> the requesting State within fifteen days of the
> day on which the person is free to do so."

ARTICLE 11

The text of Article XV of the Treaty is replaced by the
following:

"If the requested State receives requests from the other
Contracting Party and from any other State or States for the
extradition of the same person, either for the same offence or
for a different offence, the executive authority of the
requested State shall determine to which State it will surrender
the person.  In making its decision, the requested State shall
consider all relevant factors, including but not limited to:

  (a) whether the requests were made pursuant to treaty;

  (b) the place where each offence was committed;

13

- 13 -

(c) the respective interests of the requesting States;

(d) the gravity of the offences;

(e) the nationality of the victim;

(f) the possibility of further extradition between the requesting States; and

(g) the chronological order in which the requests were received from the requesting States."

ARTICLE 12

The text of Article XVI of the Treaty is replaced by the following:

"(1)  The requested State shall promptly notify the requesting State of its decision on the request for extradition.

(2)  If the request is denied in whole or in part, the requested State shall provide information as to the reasons for the denial of the request.  The requested State shall provide copies of pertinent judicial decisions on request.

(3)  If the request for extradition is granted, the competent authorities of the Contracting Parties shall arrange for the time and place of the surrender of the person sought.

(4)  If the person sought is not removed from the territory of the requested State within the time prescribed by the law of that State, that person may be discharged from

- 14 -

custody, and the requested State may subsequently refuse
extradition for the same offences."

ARTICLE 13

The text of Article XVII of the Treaty is replaced by the
following:

"(1)  To the extent permitted under its laws, the requested
State may seize all articles, documents, and evidence
connected with the offence in respect to which extradition
is or is to be sought and surrender those items to the
requesting State if extradition is subsequently granted.
The items mentioned in this Article may be surrendered even
when extradition cannot be effected due to the death,
disappearance, or escape of the person sought.

(2)  The requested State may require that the surrender of
any property be subject to satisfactory assurances from the
requesting State that the property will be returned to the
requested State as soon as practicable.  The requested
State may also defer surrender of any property if it is
needed as evidence in the requested State.

(3)  The rights of third parties in any property shall be
duly respected."

- 15 -

ARTICLE 14

The text of Article XVIII of the Treaty is replaced by the following:

"(1)  The requested State shall advise, assist, and otherwise represent the interests of the requesting State in any proceedings arising out of a request for extradition.

(2)  The requesting State shall bear the expenses related to any translation of documents and the transportation of the person surrendered.  The requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

(3)  Neither State shall make any pecuniary claim against the other arising out of the arrest, detention, examination, or surrender of the person sought under this Treaty."

ARTICLE 15

The text of Article XIX of the Treaty is replaced by the following:

"(1)  Either Contracting Party may authorise transportation through its territory of a person surrendered to the other State by a third State. A request for transit shall contain a description of the person being transported and a brief

16

statement of the facts of the case. A person in transit shall be held in custody during the period of transit.

(2) No authorisation is required where air transportation is used and no landing is scheduled on the territory of the other Contracting Party. If an unscheduled landing occurs on the territory of the other Contracting Party, the other Contracting Party may require the request for transit as provided in paragraph 1. That Contracting Party shall detain the person being transported until the request for transit is received and the transit is effected, so long as the request is received within 96 hours of the unscheduled landing."

## ARTICLE 16

Notwithstanding Article XX of the Treaty, this Protocol shall apply in all cases in which the request for extradition is made after its entry into force regardless of whether the offence was committed before or after that date.

- 17 -

## ARTICLE 17

This Protocol shall enter into force on the date on which the Contracting Parties have exchanged written notification that they have complied with their respective requirements for the entry into force of this Protocol.


IN WITNESS WHEREOF, the undersigned, being duly authorised thereto by their respective Governments, have signed this Protocol.

DONE at Seoul, this 4th day of September, 1990

FOR THE UNITED STATES
OF AMERICA:

FOR AUSTRALIA:

Certificate to be Attached to Documentary Evidence Accompanying
Requisitions in the United States for Extradition

## AMERICAN FOREIGN SERVICE

Canberra, Australia, April 30, 2012

I, Jeffrey L. Bleich, Ambassador of the United States of America at Canberra, Australia hereby certify that the annexed papers, being official documents provided by the Government of Australia proposed to be used upon an application for the extradition from the United States of America of Brandi Angela Brandt, charged with the crimes of conspiring with Wayne Cleveland, Craig Nicholson and divers other persons between about 24 July 2007 and about 2 December 2007 to import a commercial quantity of a substance being a border controlled drug, namely cocaine, contrary to section 307.1(1) and section 11.5 of the *Criminal Code Act 1995* (Cth) (*Criminal Code*) and dealing with money to the value of $100,000 or more, namely $130,760, that was proceeds of crime, believing the said money to be proceeds of crime, between about 24 July 2007 and about 7 November 2007 contrary to section 400.4(1) of the *Criminal Code*, alleged to have been committed in Australia, are properly and legally authenticated so as to entitle them to be received in evidence or similar purposes by the tribunals of Australia, as required by Title 18, United States Code, section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed 30th day of April, 2012.

Jeffrey L. Bleich.

Ambassador

Embassy of the United States of America



I, Anastasia Karen Diane Harmer, Assistant Secretary of the International Crime Cooperation Central Authority, International Crime Cooperation Division, Attorney-General's Department, an officer in and of the Commonwealth of Australia, hereby certify that the documents attached to this certificate relate to the request for extradition from the United States of America to the Commonwealth of Australia of Brandi Angela Brandt

AND

I further certify that the seal affixed to this certificate is the seal of the Attorney-General of the Commonwealth of Australia, who is a Minister of State of the Commonwealth of Australia

AND

I further certify that the above-mentioned seal of the Attorney-General authenticates everything attached to this certificate.

Given under my hand and the official seal of the Attorney-General of the Commonwealth of Australia affixed to the tape binding all the attached documents.

Anna Harmer
Assistant Secretary
International Crime Cooperation Central Authority
International Crime Cooperation Division
Attorney-General's Department
an officer in and of the Commonwealth of Australia



## REQUEST FOR THE EXTRADITION TO AUSTRALIA
## FROM THE UNITED STATES OF AMERICA OF
## BRANDI ANGELA BRANDT

I, Jason Dean Clare, Minister for Justice, a Minister of State of the Commonwealth of Australia, on behalf of the Government of Australia, hereby request that Brandi Angela Brandt, who is accused in New South Wales, a State of the Commonwealth of Australia, of the following offences:

- between about 24 July 2007 and about 2 December 2007 at Sydney in the State of New South Wales and elsewhere, Brandt conspired with Wayne Cleveland, Craig Nicholson and divers other persons to import a commercial quantity of a substance being a border controlled drug, namely cocaine, contrary to section 307.1(1) and section 11.5 of the *Criminal Code Act 1995* (Cth), and

- between about 24 July 2007 and about 7 November 2007 at Sydney in the State of New South Wales and elsewhere, Brandt did deal with money to the value of $100,000.00 or more, namely $130,760.00, that was proceeds of crime, believing the said money to be proceeds of crime contrary to section 400.4(1) of the *Criminal Code Act 1995* (Cth)

be returned to Australia to be dealt with according to law.

Dated this  12  day of  *April*  2012.

_____

JASON CLARE MP
MINISTER FOR JUSTICE

CMO 12\130

REQUEST FOR THE EXTRADITION OF

BRANDI ANGELA BRANDT

FROM THE UNITED STATES OF AMERICA

TO AUSTRALIA

## AFFIDAVIT OF PROSECUTOR

On the 23rd day of March 2012, I, Kong Hang Huen, Solicitor, of Level 7, 66-68 Goulburn Street, Sydney, in the State of New South Wales make oath and say:

1.   I am employed as a Legal Officer in the Office of the Director of Public Prosecutions for the Commonwealth of Australia.  Subject to the direction and control of the Director, I am responsible for the carriage of the prosecution of Brandi Angela BRANDT (hereinafter referred to as 'BRANDT').

**Qualifications of the Deponent**

2.   I was admitted to practice as a Solicitor of the Supreme Court of New South Wales on 25 August 2006.   New South Wales is a State of the Commonwealth of Australia.  I hold a bachelor of laws degree from the University of Western Sydney.

3.   I have been employed as a Solicitor in the Sydney Office of the Director of Public Prosecutions for the Commonwealth of Australia and have been prosecuting matters on behalf of the Director since February 2010.   My current duties include the prosecution of persons charged with offences against the laws of the Commonwealth of Australia, including but not limited to offences against the *Criminal Code Act 1995* (Commonwealth) ('the *Criminal Code*').  Based on my training and experience, I am well acquainted with the provisions of the *Criminal Code* and other laws of the Commonwealth of Australia relating to criminal law and procedure.

**Offences for which Extradition is Sought**

4.   The extradition of BRANDT from the United States of America is sought for the prosecution of the following offences ('the offences'):

1.   Between about 24 July 2007 and about 2 December 2007 at Sydney in the State of New South Wales and elsewhere, BRANDT conspired with Wayne CLEVELAND; Craig NICHOLSON and divers other persons to import a commercial quantity of a substance being a border controlled drug, namely cocaine, contrary to section 307.1(1) and section 11.5 of the *Criminal Code*.

2.   Between about 24 July 2007 and about 7 November 2007 at Sydney in the State of New South Wales and elsewhere, BRANDT did deal with

money to the value of $100,000.00 or more, namely $130,760.00, that was proceeds of crime, believing the said money to be proceeds of crime contrary to section 400.4(1) of the *Criminal Code*.

**Warrant of Arrest**

5.  On 31 March 2011 a warrant was issued for the arrest of BRANDT by an authorised officer of the Local Court at Sydney, New South Wales. The warrant remains in force as at the date of this affidavit.

6.  A copy of the warrant is annexed to the affidavit of Federal Agent Gregory Adam Hinds sworn 23 March 2012 ('the Investigator's affidavit') and marked 'Annexure A'.

**Charging Document**

7.  On 27 January 2011 a Court Attendance Notice was issued by Federal Agent Corin Lee Bradfield. A copy of the Court Attendance Notice is annexed and marked 'Annexure KH1'.

**Summary of the Conduct Constituting the Offences for which Extradition is Sought**

8.  The offences arise out of BRANDT's involvement in a conspiracy to import cocaine into Australia.

9.  On 2 December 2007 Australian Customs Service (ACS) officers at Sydney Airport seized a package containing 12 blocks of the border controlled drug cocaine from a rubbish bin onboard a United Airlines flight UA839 from Los Angeles. The total weight of the powder in the 12 blocks was 5,393.1 grams (approximately 11.8 pounds). The weight of the pure cocaine in the 12 blocks was 2,865.1 grams (approximately 6.3 pounds).

10. Between July 2007 and November 2007 various Australian and American citizens remitted in excess of AUD250000 to the United States in a number of transactions, predominantly to BRANDT and Rusty Setser. It is alleged that the money the subject of the transactions represented the proceeds of crime.

**Detailed Statement of the Acts and Omissions Alleged against BRANDT in respect of the Offences**

11. A more detailed description of the conduct constituting the offences for which extradition is sought is annexed to the Investigator's affidavit and marked 'Annexure B'.

**Offence and Penalty Provisions**

<u>Conspiracy to import a commercial quantity of a border controlled drug – ss 11.5 and 307.1(1) of the *Criminal Code*</u>

12.     Section 11.5 of the *Criminal Code* provides:

> "11.5(1)  A person who conspires with another person to commit an offence punishable by imprisonment for more than 12 months, or by a fine of 200 penalty units or more, is guilty of the offence of conspiracy to commit that offence and is punishable as if the offence to which the conspiracy relates had been committed.
>
> (2)  For the person to be guilty:
>
> (a)   the person must have entered into an agreement with one or more persons; and
>
> (b)  the person and at least one other party to the agreement must have intended that an offence would be committed pursuant to the agreement; and
>
> (c)  the person or at least one other party to the agreement must have committed an overt act pursuant to the agreement.
>
> (2A)   Subsection (2) has effect subject to subsection (7A).
>
> (3)   A person may be found guilty of conspiracy to commit an offence even if:
>
> (a) committing the offence is impossible; or
>
> (b) the only other party to the agreement is a body corporate; or
>
> (c) each other party to the agreement is at least one of the following:
>
>> (i)      a person who is not criminally responsible;
>> (ii)     A person for whose benefit or protection the offence exists; or
>
> (d) Subject to paragraph (4)(a), all other parties to the agreement have been acquitted of the conspiracy.
>
> (4)   A person cannot be found guilty of conspiracy to commit an offence if:
>
> (a)  all other parties to the agreement have been acquitted of the conspiracy and a finding of guilt would be inconsistent with their acquittal; or
>
> (b)   he or she is a person for whose benefit or protection the offence exists.

(5)  A person cannot be found guilty of conspiracy to commit an offence if, before the commission of an overt act pursuant to the agreement, the person;

(a)  withdrew from the agreement; and

(b)  took all reasonable steps to prevent the commission of the offence.

(6)  A court may dismiss a charge of conspiracy if it thinks that the interests of justice require it to do so.

(7)  Any defences, procedures, limitations or qualifying provisions that apply to an offence apply also to the offence of conspiracy to commit that offence.

(7A)  Any special liability provisions that apply to an offence apply also to the offence of conspiracy to commit that offence.

(8)  Proceedings for an offence of conspiracy must not be commenced without the consent of the Director of Public Prosecutions.  However, a person may be arrested for, charged with, or remanded in custody or on bail in connection with, an offence of conspiracy before the necessary consent has been given."

13.    Section 307.1(1) of the *Criminal Code* provides:

"A person commits an offence if:

(a) the person imports or exports a substance; and
(b) the substance is a border controlled drug or border controlled plant; and
(c) the quantity imported or exported is a commercial quantity.

Penalty:  Imprisonment for life or 7,500 penalty units, or both."

14.    Section 314.4 of Division 314 of the *Criminal Code* contains a table which lists border controlled drugs and sets out quantities.  Item 35 of that table lists cocaine as a border controlled drug and specifies 2.0 kilograms as the commercial quantity.

15.    Subsection 4AA(1) of the *Crimes Act 1914* (Commonwealth) ('the *Crimes Act*') provides that:

"In a law of the Commonwealth or a Territory Ordinance, unless the contrary intention appears: penalty unit means $110".

16.    The maximum penalty for an offence of conspiracy to import a commercial quantity of a border controlled drug is imprisonment for life or a fine of $825,000 or both.

Dealing with the proceeds of crime worth $100,000 or more – s.400.4(1) of the *Criminal Code*

17.    Section 400.4(1) of the *Criminal Code* provides;

(1) A person is guilty of an offence if:

  (a) the person deals with money or other property; and

  (b) either:

(i) the money or property is, and the person believes it to be, proceeds of crime; or

(ii) the person intends that the money or property will become an instrument of crime; and

  (c) at the time of the dealing, the value of the money and other property is $100,000 or more.

Penalty:  Imprisonment for 20 years, or 1,200 penalty units, or both.

...

(4)  Absolute liability applies to paragraphs 1(c), (2)(d) and (3)(d).

18.    *"Proceeds of Crime"* is defined in section 400.1 of the *Criminal Code* as:

*"Proceeds of Crime* means any money or other property that is derived or realised, directly or indirectly, by any person from the commission of an offence that may be dealt with as an indictable offence (even if it may, in some circumstances, be dealt with as a summary offence)."

*"Dealing with money or other property"* is defined in section 400.2 of the *Criminal Code* as:

"(1)  For the purposes of this Division, a person *deals with money or other property* if:

  (a)   the person does any of the following:

      (i)     receives, possesses, conceals or disposes of money or other property;

      (ii)    imports money or other property into, or exports money or other property from, Australia;

      (iii)   engages in a banking transaction relating to money or other property; and

  (b)   the money or other property is proceeds of crime, or could become an instrument of crime, in relation to an offence that is:

      (i)     a Commonwealth indictable offence; or

      (ii)    or a foreign indictable offence; or

      (iii)   ...

In section 400.1 of the *Criminal Code*:

*Commonwealth indictable offence* means an offence against a law of the Commonwealth, or a law of a Territory (other than the Australian

Capital Territory and the Northern Territory), that may be dealt with as an indictable offence (even if it may, in some circumstances, be dealt with as a summary offence).

***Export money or other property***, from Australia, includes transfer money or other property from Australia by an electronic communication.

18. The importation of a border controlled substance, namely cocaine, is an indictable offence against a law of the Commonwealth.

19. The penalty applicable for an offence against section 400.4(1) of the *Criminal Code* involving dealing in money, believing that the money is from the proceeds of a crime and at the time of dealing the value of the money is $100,000.00 or more, is imprisonment for 20 years or 1,200 penalty units ($132,000.00), or both.

20. Section 400.15 of the *Criminal Code* provides:

(1) A person does not commit an offence against this Division unless:

(a) the conduct constituting the alleged offence occurs:
(i) wholly or partly in Australia; or
(ii) wholly or partly on board an Australian aircraft or an Australian ship; or

(b) the conduct constituting the alleged offence occurs wholly outside Australia (but not on board an Australian aircraft or an Australian ship) and the money or other property:
(i) is proceeds of crime; or
(ii) is intended to become an instrument of crime; or
(iii) is at risk of becoming an instrument of crime;
in relation to a Commonwealth indictable offence, a State indictable offence, an Australian Capital Territory indictable offence or a Northern Territory indictable offence; or

(c) the conduct constituting the alleged offence occurs wholly outside Australia and:
(i) at the time of the alleged offence, the person is an Australian citizen; or
(ii) at the time of the alleged offence, the person is a resident of Australia; or
(iii) at the time of the alleged offence, the person is a body corporate incorporated by or under a law of the Commonwealth or of a State or Territory; or

(d) all of the following conditions are satisfied:
(i) the alleged offence is an ancillary offence;
(ii) the conduct constituting the alleged offence occurs wholly outside Australia;
(iii) the conduct constituting the primary offence to which the ancillary offence relates occurs, or is intended by the person to

occur, wholly or partly in Australia or wholly or partly on board an Australian aircraft or an Australian ship.

**Consent to Prosecute for Conspiracy**

21. Section 11.5(8) of the *Criminal Code* requires the consent of the Director of Public Prosecutions before a prosecution for an offence of conspiracy may be commenced. On 10 November 2010 the Director consented to the prosecution of BRANDT for the offence of conspiracy to import a commercial quantity of a border controlled drug. A copy of the consent signed by the Director of Public Prosecutions is annexed and marked 'KH2'.

**Essential Elements of the Offence of Conspiracy to Import a Commercial Quantity of a Border Controlled Drug**

22. To establish the commission of the offence against sections 11.5 and 307.1(1) of the *Criminal Code*, the Prosecution must prove the following elements beyond reasonable doubt:

    1. that BRANDT entered into an agreement with one or more other persons to import a border controlled drug;
    2. when BRANDT entered into that agreement she intended that the importation of a border controlled drug would be committed pursuant to the agreement;
    3. at least one other party to the agreement intended that the importation of a border controlled drug would be committed pursuant to the agreement; and
    4. the amount of the border controlled drug which would be imported under the agreement was, in fact, a commercial quantity of the border controlled drug.

23. It is also necessary as a precondition of guilt for the Prosecution to prove beyond reasonable doubt that at least one party to the agreement carried out an overt act in furtherance of the agreement.

**Essential Elements of the Offence of Dealing with the Proceeds of Crime Worth $100,000 or More**

24. To establish the commission of the offence pursuant to section 400.4(1) of the *Criminal Code*, the Prosecution must prove the following elements beyond reasonable doubt:

    1. that BRANDT intentionally received, possessed, concealed or disposed of money;
    2. that the money received, possessed, concealed or disposed of by BRANDT was derived or realised, directly or indirectly, from the commission of an offence against a law of the Commonwealth that may

be dealt with as an indictable offence. The Prosecution must also establish that BRANDT believed the money was derived or realised, directly or indirectly, from the commission of an offence; and

3. that the money received, possessed, concealed or disposed of by BRANDT, at the time of the conduct in 1 and 2 was valued at $100,000 or more. The Prosecution is not required to establish that BRANDT knew that the money was $100,000 or more as this element of the offence is one of absolute liability, that is, there is no defence of mistake of fact available.

## Reasonable Grounds for Believing that the Offences Have Been Committed

25.   It is my opinion that the detailed Statement of Conduct, as set out in the Investigator's affidavit and marked 'Annexure B', sets forth reasonable grounds for believing that the offences referred to in the arrest warrant, the elements of which are set out in paragraphs 22 to 24 above, have been committed by BRANDT.

26.   The evidence establishes that BRANDT was a party to the conspiracy to import a commercial quantity of cocaine and that at least the following overt acts, amongst others, were committed in furtherance of the conspiracy:

1. on 25 July 2007 Jesse POLOCK transferred AUD4,525 to BRANDT in the United States via Western Union;
2. on 12 September 2007 Melissah LLOYD transferred AUD4,775 to BRANDT in the United States via Western Union;
3. on 19 September 2007 Jesse POLOCK transferred AUD8000 to BRANDT in the United States via Western Union;
4. on 27 September 2007 and 28 September 2007, Christopher SCHALBERG transferred a total of AUD41,810 to BRANDT in the United States in six separate transactions via various banks;
5. on 14 October 2007 Rusty SETSER sent the following text message to BRANDT: "Ma I am going down south to get boardbag! Love u.";
6. on 4 November 2007 BRANDT arrived in Sydney on flight QF50 from Los Angeles, checking into the Swiss Grand Hotel at Bondi Beach;
7. between 5 November 2007 and 7 November 2007 BRANDT transferred a total of AUD71,650 to herself in the United States in eight separate transactions via various banks;
8. on 7 November 2007 BRANDT departed Sydney for Los Angeles on flight QF15;
9. on 26 November 2007 BRANDT made three telephone calls to the Marina Del Rey Holiday Inn, interspersed with six calls to Rusty SETSER;
10. on 29 November 2007 BRANDT purchased an air ticket to fly to Australia on UA839 departing Los Angeles on 30 November 2007 and arriving in Sydney on 2 December 2007;
11. on 2 December 2007, BRANDT arrived in Sydney from Los Angeles on flight UA839, along with Geoffrey BORG and Macarthur SMITH;

12. BRANDT had indicated on her incoming passenger card that she was to stay at the Swiss Grand Hotel for six days on a holiday to visit friends;

13. on 2 December 2007 and 3 December 2007, BRANDT made a number of telephone calls from her room in the Swiss Grand Hotel;

14. on 3 December 2007 a booking was made for BRANDT to depart Sydney on flight QF0011;

15. on 3 December 2007, BRANDT and Wayne CLEVELAND walked through the foyer of the Swiss Grand Hotel and left separately; and

16. on 3 December 2007 BRANDT was driven to the Sydney Airport where she departed for Los Angeles on flight QF11.

27.   The evidence also establishes that BRANDT dealt with the proceeds of crime in the following transactions:

1. on 25 July 2007 Jesse POLOCK transferred AUD4,525 to BRANDT in the United States via Western Union;

2. on 12 September 2007 Melissah LLOYD transferred AUD4,775 to BRANDT in the United States via Western Union;

3. on 19 September 2007 Jesse POLOCK transferred AUD8,000 to BRANDT in the United States via Western Union;

4. on 27 September 2007 Christopher SCHALBERG transferred AUD6,968 to BRANDT in the United States via the ANZ Bank;

5. on 27 September 2007 Christopher SCHALBERG transferred AUD6,968 to BRANDT in the United States via the Commonwealth Bank of Australia;

6. on 28 September 2007 Christopher SCHALBERG transferred AUD 6,968 to BRANDT in the United States via the Commonwealth Bank of Australia;

7. on 28 September 2007 Christopher SCHALBERG transferred AUD6,970 to BRANDT in the United States via Westpac Bank;

8. on 28 September 2007 Christopher SCHALBERG transferred AUD6,968 to BRANDT in the United States via the ANZ Bank;

9. on 28 September 2007 Christopher SCHALBERG transferred AUD6,968 to BRANDT in the United States via the Commonwealth Bank of Australia;

10. on 5 November 2007 BRANDT transferred AUD9,500 to herself in the United States via the Commonwealth Bank of Australia;

11. on 5 November 2007 BRANDT transferred AUD10,500 to herself in the United States via the Bank of China;

12. on 5 November 2007 BRANDT transferred AUD10,500 to herself in the United States via Westpac Bank;

13. on 5 November 2007 BRANDT transferred AUD8,300 to herself in the United States via Travelex;

14. on 6 November 2007 BRANDT transferred AUD8,300 to herself in the United States via the Commonwealth Bank of Australia;

15. on 7 November 2007 BRANDT transferred AUD7,200 to herself in the United States via the Commonwealth Bank of Australia;

16. on 7 November 2007 BRANDT transferred AUD8,100 to herself in the United States via Travelex; and

17. on 7 November 2007 BRANDT transferred AUD9,250 to herself in the United States via the ANZ Bank.

## Statement of Time Limit on the Institution of Proceedings for the Offences

28.   Section 15B of the *Crimes Act* states (as relevant):

(1)   Subject to subsection (1B), a prosecution of an individual for an offence against any law of the Commonwealth may be commenced as follows:

(a)   if the maximum penalty which may be imposed for the offence in respect of an individual is, or includes, a term of imprisonment of more than 6 months in the case of a first conviction—at any time

(b)   in any other case - at any time within one year after the commission of the offence

29.   Subsection (1B) is not relevant to the prosecution of BRANDT as the maximum penalty for each of the offences for which extradition is sought is imprisonment for more than 6 months. Therefore, there is no time limit on the institution of proceedings for the offences.

## Status of the *Criminal Code* and the *Crimes Act*

30.   The *Criminal Code* and *Crimes Act* are both Acts of the Parliament of the Commonwealth of Australia and as such are laws of the Commonwealth of Australia and have operation throughout the Commonwealth of Australia including the State of New South Wales.

31.   The provisions of the *Criminal Code* and *Crimes Act* set out above are as they stood in force at the time of the commission of the offences.

## Double Jeopardy

32.   BRANDT has not previously been charged with the offences for which her extradition is sought and is not entitled to be discharged under any rule of law relating to previous acquittal or conviction.

SWORN by the Deponent
at Sydney, in the State of New South Wales
on the 23rd day of March 2012

Kong Hang Huen
Deponent

Before me:

Graeme Curran

Magistrate

Magistrate of the State of New South Wales

**"KH1"**

The attached two pages is the annexure marked "KH1" referred to in the affidavit of Kong Hang Huen sworn at Sydney on the 23rd day of March 2012 before me:

Graeme Curran,
Magistrate

.....................................................
Magistrate of the State of New South Wales



**Court Attendance Notic
(CDPP Cop**

## Details of Court Listing

The Court Attendance Notice has been listed before the Local Court on:

| Date | 22 March 2011 | Time | 0900 |
|---|---|---|---|
| Place | | Downing Center Local Court, 143-147 Liverpool Street, Sydney New South Wales | |

## Details of Defendant

| Defendant | Brandi BRANDT | |
|---|---|---|
| Address | | |
| Date of Birth | | Sex | Female |

## Details of Prosecutor

| Prosecutor | | Commonwealth Director of Public Prosecutio |
|---|---|---|
| Department/Organisation | | Commonwealth Director of Public Prosecutio |
| Address | Level 7, 66-68 Goulburn Street, Sydney, NSW | Telephone | (02) 9321 1100 |
| Date of Issue of Court Attendance Notice | | 27 January 2011 |

| Details of Offence | Sequence Number |
|---|---|
| Description of Offence | Brandi Brandt between about 24 July 2007 and about 2 December 2007 at Sydney in the State of New South Wales and elsewhere conspired with Wayne Cleveland, Craig Nicholson and divers other persons to import a commercial quantity of a substance being a border controlled drug, namely cocaine. |
| Time and date of Offence | 24 July 2007 and about 2 December 2007 |
| Place of Offence | Sydney Kingsford Smith Airport, Sydney New South Wal |
| Short Particulars | Conspire with others to import commercial quantity of border controlled drug |
| Statutory Provision Describing Offence | 307.1 Criminal Code Act 1995 by virtue of section 11 .5 the Criminal Code Act 1995. |
| Law Part Code | 58454, 41450 |

**AFP**
AUSTRALIAN FEDERAL POLICE

## Details of Court Listing

The Court Attendance Notice has been listed before the Local Court on:

| Date | 22 March 2011 | Time | 0900 |
|---|---|---|---|
| Place | | Downing Center Local Court, 143-147 Liverpool Street, Sydney New South Wales | |

## Details of Defendant

| Defendant | Brandi BRANDT |
|---|---|
| Address | ███████████  ███  ██████████ |
| | Sex | Female |
| Date of Birth | ████ ██████ ████ |

## Details of Prosecutor

| Prosecutor | Commonwealth Director of Public Prosecutions |
|---|---|
| Department/Organisation | Commonwealth Director of Public Prosecutions |
| Address | Level 7, 66-68 Goulburn Street, Sydney, NSW | Telephone | (02) 9321 1100 |
| Date of Issue of Court Attendance Notice | 27 January 2011 |

## Details of Offence

Sequence Number

| Description of Offence | Brandi Brandt, between about 24 July 2007 and about 7 November 2007, at Sydney in the State of New South Wales and elsewhere, did deal with money to the value of $100,000.00 or more, namely, $130,760.00, that was proceeds of crime, believing the said money to be proceeds of crime. |
|---|---|
| Time and date of Offence | Between about 24 July 2007 and 07 November 2007 |
| Place of Offence | Sydney, NSW and elsewhere. |
| Short Particulars | Dealing in proceeds of crime – money or property worth $100,000 or more |
| Statutory Provision Describing Offence | s400.4(1)Criminal Code Act 1995 |
| Law Part Code | 50446 |

**"KH2"**

The attached one page is the annexure marked "KH2" referred to in the affidavit of Kong Hang Huen sworn at Sydney on the 23rd day of March 2012 before me:

Graeme Curran

Magistrate

..............................................
Magistrate of the State of New South Wales

**COMMONWEALTH OF AUSTRALIA**

**CRIMINAL CODE 1995**

**CONSENT UNDER SUBSECTION 11.5(8) TO PROCEEDINGS FOR AN OFFENCE OF CONSPIRACY**

I, Christopher Bruce Craigie SC, Director of Public Prosecutions, consent to the commencement of proceedings against **Brandi Angela Brandt** and **Rusty Steven Setser** for an offence of conspiracy under subsection 11.5 (1) of the Criminal Code 1995 and section 307.1(1) of the Criminal Code Act 1995 (Cth) as follows:

PARTICULARS OF OFFENCE:

That between about 24 July 2007 and about 2 December 2007 at Sydney in the State of New South Wales and elsewhere, the above named conspired with each other, Wayne Cleveland, Craig Nicholson and divers other persons to import a commercial quantity of a substance being a border controlled drug, namely cocaine.

Dated this   *10th*   day of *November* 2010.

Christopher Bruce Craigie SC
Director of Public Prosecutions

REQUEST FOR THE EXTRADITION OF

BRANDI ANGELA BRANDT

FROM THE UNITED STATES OF AMERICA

TO AUSTRALIA

AFFIDAVIT OF INVESTIGATOR

1.    On the 23rd day of March 2012, I, Gregory Adam HINDS, Federal Agent of 110 Goulburn Street, Sydney South in the State of New South Wales make oath and say:

a.    I am a Federal Agent employed by the Australian Federal Police (AFP). I am attached to the Serious and Organised Crime Section of the AFP, Sydney, New South Wales. New South Wales is a State of the Commonwealth of Australia.

b.    I have conduct of the investigation into the alleged offences committed by Brandi Angela BRANDT, referred to below. Brandi Angela BRANDT is hereinafter referred to as 'BRANDT'.

**Qualifications of the Deponent**

2.    I joined the AFP in 1999. Since then I have been involved in numerous investigations into offences against laws of the Commonwealth of Australia, including narcotics and money laundering offences against the *Criminal Code Act 1995* (Commonwealth) ('the *Criminal Code*'). During this period I have also been responsible for the preparation of numerous briefs of evidence for the prosecution of such offences by the Office of the Director of Public Prosecutions for the Commonwealth of Australia.

**Offences for which Extradition is Sought**

3.    The extradition of BRANDT from the United States of America is sought for the prosecution of the following offences ('the offences'):

a.    Between about 24 July 2007 and about 2 December 2007 at Sydney in the State of New South Wales and elsewhere, BRANDT conspired with Wayne Cleveland, Craig Nicholson and divers other persons to import a commercial quantity of a substance being a border controlled drug, namely cocaine, contrary to section 307.1(1) and section 11.5 of the *Criminal Code*.

b.    Between about 24 July 2007 and about 7 November 2007 at Sydney in the State of New South Wales and elsewhere, BRANDT did deal with money to the value of $100,000.00 or more, namely $130,760.00, that was proceeds of crime,

believing the said money to be proceeds of crime contrary to section 400.4(1) of the *Criminal Code.*

**Warrant of Arrest**

4.  On 31 March 2011 a warrant was issued for the arrest of BRANDT by an authorised officer of the Local Court at Sydney, New South Wales. The warrant remains in force as at the date of this affidavit.

5.  A copy of the warrant is annexed to this affidavit and marked 'Annexure A'.

**Summary of the Conduct Constituting the Offences for which Extradition is Sought**

6.  The offences arise out of BRANDT's involvement in the importation into Australia of a commercial quantity of cocaine.

7.  On 2 December 2007 Australian Customs Service (ACS) officers at Sydney Airport seized a package containing 12 blocks of the border controlled drug cocaine from a rubbish bin onboard a United Airlines flight UA839 from Los Angeles. The total weight of the powder in the 12 blocks was 5,393.1 grams (approximately 11.8 pounds). The weight of the pure cocaine in the 12 blocks was 2,865.1 grams (approximately 6.3 pounds). It is alleged that BRANDT was a party to a conspiracy to import the cocaine to Australia.

8.  Between July 2007 and November 2007 various Australian and American citizens remitted in excess of AUD250,000 to the United States in a number of transactions, predominantly to BRANDT and Rusty Setser. It is alleged that the money the subject of the transactions represented the proceeds of crime.

**Detailed Statement of the Acts and Omissions Alleged Against BRANDT In Respect of the Offences**

9.  A detailed statement of the acts and omissions alleged against BRANDT in respect to the offences is annexed hereto and marked as 'Annexure B'.

**Location of BRANDT**

10.  BRANDT is currently believed to reside at ███████████████████████
███████████████████.

**Nationality, Description and Identity of BRANDT**

11.  BRANDT was born on ███████████████ and is a citizen of the United States of America. She is 43 years of age, 165 cm tall with long brown hair and a fair complexion. BRANDT is the holder of US passport number ██████████

12.  Between 5 November 2007 to 7 November 2007, BRANDT made a number of overseas money remittances in Sydney, and whilst these remittances were

conducted, the bio-data page of her passport, which includes her photo, was photocopied.

13.    On 3 December 2007, in the course of conducting surveillance on BRANDT in Sydney, a number of photographs were taken of her by the AFP.

14.    On 15 April 2011, I requested a photograph of BRANDT, born 2 November 1968, from the Drug Enforcement Administration Canberra Country Office in Canberra, Australia. This was provided on 4 May 2011.

15.    The photograph of BRANDT provided was taken on 2 November 2010 and is annexed and marked as 'Annexure C'.

16.    I have seen the photographs referred to in paragraphs 12-13 and can say that they are photographs of BRANDT, being the same person as that depicted in 'Annexure C'.


SWORN by the Deponent
at Sydney, in the State of New South Wales
on the 23rd day of March 2012

_____
Deponent


Before me:

_____          Graeme Curran
Magistrate of the State of New South Wales          Magistrate

**"A"**

The attached one page is the annexure marked "A" referred to in the affidavit of Gregory Adam Hinds sworn at Sydney on the 23rd day of March 2012 before me:

.....................................................   Graeme Curran
Magistrate of the State of New South Wales   Magistrate

Warrant ID Number: Year/Batch/Reference Number: 2011 / 59, 2

## ARREST WARRANT
## Criminal Procedure Act 1986

TO all Police Constables in the State of New South Wales.

This is a warrant to arrest :

| | | | |
|---|---|---|---|
| Defendant: | **Brandi BRANDT** | Date of Birth: | ███ |
| Address: | ██████████████ | CNI No: | |

| | | | |
|---|---|---|---|
| Hearing Date: | | Place of Hearing: | Local Court Level 4 Downing Centre |
| Magistrate: | | Charge (H) Number: | |

(Note: Only one H number may be included on a single warrant)

| Seq No. | Short Description of Offence | Date of Offence | Place of Offence |
|---|---|---|---|
| 001 | Dealing in proceeds of crime -- money or property worth $100,000 or more of crime <br><br> Law Part code 50446 | Between about 24/7/07 and about 7/11/07 | Sydney |
| 002 | Conspire with others to import commercial quantity of border controlled drug <br><br> Law code 58454, 41450 | Between about 24/7/07 and about 2/12/07 | Sydney |

**Reason for arrest:**

Court Attendance Notices have been filed in the Registry for the above offences. This warrant has been issued by an authorised officer upon application of  Federal Agent Corin Lee Bradfield, Australian Federal Police, 8837 5152  prior to court listing. This warrant is issued under section 181(2) of the Criminal Procedure Act 1986.
CAN(s) filed at Local Court 4 Downing Centre Sydney Court House on 31.3.2011.

I COMMAND YOU to apprehend and bring the defendant before a Local Court to answer the said offence.

Dated: 31/3/2011
In the Local Court at Downing Centre
Liverpool St, Sydney
in the said State.

Authorised Officer
(L. Norman)

**"B"**

The attached 13 pages is the annexure marked "B" referred to in the
affidavit of Gregory Adam Hinds sworn at Sydney on the 23rd day of
March 2012 before me:

Graeme Curran

Magistrate

.....................................................

Magistrate of the State of New South Wales

**ANNEXURE B**

**STATEMENT OF ACTS AND OMISSIONS ALLEGED AGAINST
BRANDI ANGELA BRANDT**

Background

1.  On 2 December 2007 Australian Customs and Border Protection Service (Customs) officers at Sydney Airport seized a package containing twelve blocks of cocaine from a rubbish bin on board United Airlines flight UA839 from Los Angeles. The package contained 5,393.1 grams (approximately 11.8 pounds) of cocaine with a pure weight of 2,865.1 grams (approximately 6.3 pounds).

2.  Following detection of the importation, the Australian Federal Police (AFP) commenced an investigation codenamed Operation Loment. The investigation centred around allegations that employees of an airline catering company, Gate Gourmet, used their access to aeroplanes arriving at Sydney International Airport from the United States to remove narcotics that had been concealed on the planes by couriers travelling on the incoming flights.

3.  Operation Loment involved extensive analysis of telephone Call Charge Records (CCRs), international money remittance records, and electronic and physical surveillance of a number of persons in Australia and the United States suspected of being involved in the importation of cocaine into Australia.

4.  The Australian syndicate members identified included the principal, Wayne Cleveland, Cleveland's stepfather, Wayne Williams, couriers Geoffrey Borg and Macarthur Smith, and Craig Nicholson, Jose Alquillera and Matthew Hay. Nicholson, Alquillera and Hay were employees of the airline catering company, Gate Gourmet, which serviced flights at Sydney airport. Further, it is alleged that Cleveland utilised the assistance of other Australian citizens such as his de-facto wife Melissah Lloyd, Jesse Polock, Benjamin Cicolini and Christopher Meagher to remit overseas the proceeds from the drug imports.

5.  The United States of America (USA) suspects identified included cocaine supplier Rusty Steven Setser (Setser), his partner and money remitter Brandi Angela BRANDT (BRANDT), and money remitters Christopher Schalberg (Schalberg) and Kelvin Pickering (Pickering).

6.  Information lawfully obtained by the AFP as a result of the investigation indicated that between July 2007 and October 2007 at least four importations of narcotics from the United States to Sydney were conducted by the syndicate.

7.  The evidence obtained during the investigation established links between the USA suspects. For example, information provided by BRANDT to the Commonwealth Bank of Australia on money remittance forms and Setser's California drivers licence showed that they both resided (at that time) at ███████████ Text messages downloaded from Setser's mobile telephone by Customs officers were also indicative of Setser being in a relationship with BRANDT.

8.  Schalberg used an address of ████████████████████████ as payer on money remittance forms. Setser used that address as consignor on a package he sent to Schalberg in Australia which was examined by Customs. Schalberg also provided an address of ████████████████████ to a car rental

service and to the ANZ Bank on a money remittance form.  Analysis of Schalberg's mobile telephone by Customs officers revealed a number of messages to and from 'R' (alleged to be Setser).

9.  Schalberg rented premises at 7/126 Ramsgate Avenue, Bondi, New South Wales, Australia for a six month period from 27 August 2007.  An address of 7/126 Ramsgate Avenue, Tamarama, was also used by Pickering on his incoming passenger card, and on a remittance form when sending money to Schalberg.  Bondi and Tamarama are adjoining suburbs of Sydney.

10.  The investigation established that between July 2007 and November 2007 a number of money remittances were made by persons in Sydney to Los Angeles.  It is alleged that these remittances were made by way of attending either a bank or money transfer agency, handing over the cash and providing instructions and details of the recipient.  The majority of these remittances were made to BRANDT and Setser.  The remittances were made following the arrival of various persons on United Airlines flights from California, USA.  The total amount of the transactions involving BRANDT was AUD130,760.  The total amount of the transactions involving Setser was AUD138,205.  Schalberg was involved in a number of remittances totalling AUD102,805.

11.  It is alleged that the money the subject of those remittances was the proceeds of crime derived from prior undetected importations of narcotics which occurred on 23 July 2007, 16 September 2007, 23 September 2007 and 16 October 2007. These dates coincided with the arrival of Schalberg, Polock and Setser on United Airlines flights to Sydney.  Each of those flights was serviced by Alquillera.

12.  It is alleged that narcotics were imported on each of those flights, removed by Alquillera, sold by the syndicate and part of the proceeds remitted to associates in the USA, including Setser and BRANDT.  This is supported by the following:

    a.  That Nicholson and Alquillera serviced the UA839 flights containing narcotics on 2 December 2007 and 20 September 2009 respectively;

    b.  Call charge records show that between 23 July 2007 and 27 July 2007 there was constant telephone contact between Cleveland, Polock and Schalberg;

    c.  Call charge records show that between 16 September 2007 and 20 October 2007 there was constant telephone contact between Polock, Cleveland, Setser, Nicholson, Williams and Alquillera;

    d.  A text message from 'R' (alleged to be Setser) to Schalberg on 8 September 2007 stating "Thank you brother! Over all job well done! Time to come home and enjoy! Then u know what all over again! This time we get ours brother. It is going to be nice, can't wait, then we really get to enjoy brother, reward ourselves with a few nice toys whatever that maybe! I know what mine r going to be! And u are helping with in our new pad don't trip. From R."

    e.  Text messages between Setser and Cleveland between 4 October 2007 and 14 October 2007 (see paragraph 29 below); and

    f.  A lawfully intercepted conversation where Cleveland states to Nicholson on 29 August 2009 "I just don't want to get silly I don't want to get greedy that's why we've lasted so long mate".

13.  BRANDT and Setser are alleged to have been parties to the conspiracy to import a commercial quantity of a border controlled drug, namely cocaine, which culminated in the importation seized on 2 December 2007.  BRANDT, Setser and Schalberg are also alleged to have committed money laundering offences prior to the importation on 2 December 2007.

14. A number of persons have been arrested, charged, and convicted in Australia with various offences of conspiracy to import cocaine and money laundering as a result of Operation Loment.

Charge 1 – Conspiracy to Import a Commercial Quantity of Border Controlled Drugs

15. At about 8.50 am on 2 December 2007, Customs officers conducted a search of United Airlines flight UA839 at Sydney International Airport and located twelve blocks of compressed white powder in the rubbish bin of a toilet at the rear of the aircraft. Flight UA839 arrived at Sydney from Los Angeles.

16. A short time later, AFP officers attended and seized the blocks of powder. The seizure consisted of a total net weight of off-white powder of 5,393.1 grams (approximately 11.8 pounds). Samples of the powder were analysed by the National Measurement Institute. Percentages of cocaine were detected and a total weight of pure cocaine was calculated as 2,865.1 grams (approximately 6.3 pounds).

17. The AFP investigation into the importation on 2 December 2007 revealed a series of occurrences and activities that preceded the importation.

18. Between July 2007 and November 2007 a series of overseas money remittances, totalling in excess of AUD250,000, were made by various citizens of Australia and the USA from Sydney to persons in the USA. The majority of these remittances were made to BRANDT and Setser in the USA.

19. The United Airlines flights on which the US citizen-targets of the investigation arrived at Sydney International Airport were serviced by Alquillera and Nicholson.

20. On 23 July 2007, Schalberg arrived in Sydney on United Airlines flight UA863 from San Francisco, California, USA and departed on 10 September 2007 on United Airlines flight UA840 to Los Angeles.

21. Records obtained from Western Union show that between 31 July 2007 and 10 September 2007, Schalberg made seven remittances totalling AUD55,250 to Setser in the USA.

22. Western Union records also show that on 25 July 2007 Polock made two remittances of AUD4,525 each to BRANDT and Setser in the USA.

23. A download of Schalberg's mobile telephone by Customs officers obtained on his arrival at Sydney Airport revealed a number of text messages received by Schalberg from 'R' between 1 September 2007 and 8 September 2007. (It is alleged that 'R' is 'Rusty' Setser using a mobile telephone number 1314671054). Those text messages referred to sending cash and amounts of $20,000.

24. On 12 September 2007 Melissah Lloyd  transferred AUD4,775 to BRANDT in the USA via Western Union.

25. On 19 September 2007 Jesse Polock transferred AUD8,000 to BRANDT in the USA via Western Union.

3

26. On 27 September 2007 and 28 September 2007 Schalberg transferred a total of AUD41,810 to BRANDT in the USA in six separate transactions via various banks.

27. On 16 October 2007 Setser arrived in Sydney on United Airlines flight UA839 from Los Angeles. After disembarking, Setser was subjected to scrutiny by the Department of Immigration and Multicultural Affairs (DIAC) and Customs officers. Setser advised that he was in Australia to surf and see his friend Wayne (Cleveland). Due to visa issues, Setser's visa was cancelled by DIAC officers and he was refused immigration clearance. Setser subsequently departed Sydney on 18 October 2007 on United Airlines flight UA840 to Los Angeles.

28. A download of Setser's mobile telephone obtained by Customs officers revealed a series of text messages between Cleveland (referred to as 'Oz Wano Boy'), Setser, BRANDT (referred to as 'Brandi B') and another associate.

29. Between 4 October 2007 and 14 October 2007 (Los Angeles time) the following text messages were exchanged:

> 3.36pm on 4 October 2007 – Cleveland to Setser
> 'U fly out on the 14th and arrive Syd the 16th reference number vdj506.7zu7jh. Receipt No. 7zu72006hrcpt0234.'

> 2.44pm on 6 October 2007 – Cleveland to Setser
> 'Havent got new phone yet, but did you get all the flight details.'

> 2.48pm on 6 October 2007 – Cleveland to Setser
> 'Yep. Returning on the 12th Nov.'

> 8.43pm on 10 October 2007 – Cleveland to Setser
> 'How r ya. Whats doing.'

> 8.49pm on 10 October 2007 – Cleveland to Setser
> 'Sweet.'

> 9.53pm on 10 October 2007 – Cleveland to Setser
> 'Grab as many as you can.'

> 10.42pm on 11 October 2007 – Cleveland to Setser
> 'Get what u can keep them separate its bone dry bring at least 2'.

> 10.57pm on 11 October 2007 – Cleveland to Setser
> 'Make sure of the weight there all been way under. 1st 1 was 100 under then 89. Looks bad'

> 6.38am on 12 October 2007 – Cleveland to Setser
> 'Get what u can but keep it separated'.

> 8.22am on 14 October 2007 – Setser to BRANDT
> 'Ma I am going down south to get boardbag! Love u.'

> 9.28am on 14 October 2007 – Setser to Ryan Hakman
> 'Hack do you have a boardbag I could buy or barrow. I have two 6 going to OZ today please don't say a word about it to anyone please thank.'

4

9.30am on 14 October 2007 – Ryan Hakman to Setser
*'I don't sorry.'*

4.55pm on 14 October 2007 – Cleveland to Setser
*'Just check in! Brother! All sweet!'*

4.58pm on 14 October 2007 – Cleveland to Setser
*'Good c ya 2morrow.'*

4.59pm on 14 October 2007 – Cleveland to Setser
*'Good c ya 2morrow. How many boards.'*

9.25pm on 14 October 2007 – Cleveland to Setser
*'R we sweet.'*

9.54pm on 14 October 2007 – Setser to Cleveland
*'Fuck yeah? U the man brother! Your new name shot caller in my book! Anyway should I grab a cab to the hotel! I don't expect u to pick me up brother!'*

9.55pm on 14 October 2007 – Cleveland to Setser
*'Yeah grab a cab and call me when ya there.'*

9.57pm on 14 October 2007 – Cleveland to Setser
*'Sweet.'*

9.59pm on 14 October 2007 – Cleveland to Setser
*'Thank u 2. no I in team.'*

10.00pm on 14 October 2007 - Setser to Cleveland
*'That's it! Real quick right side left one.'*

10.01pm on 14 October 2007 - Cleveland to Setser
*'Yep'.*

30. About 10.00pm on 14 October 2007 (Los Angeles time), Setser departed Los Angeles on United Airlines flight UA839. This corresponds with the text messages exchanged between Setser and Cleveland above. It is alleged that these text messages relate to Setser obtaining narcotics for Cleveland and Setser placing the narcotics into a toilet located on the right side of the aircraft, that being the left toilet of the two toilets located on the right side.

31. CCR records reveal that three minutes after the last of those text messages, Cleveland sent a text message to Nicholson.

32. On 4 November 2007, BRANDT arrived in Sydney on American Airlines flight AA7302 (Qantas flight QF50) from Los Angeles.

33. Records obtained from the Commonwealth Bank of Australia, Bank of China, Westpac Bank, Travelex and the ANZ bank show that between 4 and 7 November 2007, BRANDT made eight remittances totalling AUD71,650 to her own account in the USA.

34. BRANDT departed Sydney on 7 November 2007 on American Airlines flight AA7363 (Qantas flight AF15). On her outgoing passenger card, BRANDT indicated that she was carrying AUD10,000 or more in cash.

5

35. On 20 November 2007, Geoffrey Borg (Borg) attended Anywhere Travel agency and booked to depart Sydney on United Airlines flight UA840 to Los Angeles on 22 November 2007. Borg booked to return on United Airlines flight UA839 departing Los Angeles on 30 November 2007 and arriving in Sydney on 2 December 2007. Borg also booked to stay from 22 to 30 November 2007 at the Holiday Inn, Marina Del Rey, Los Angeles.

36. On 21 November 2007, Borg attended Anywhere Travel agency and paid AUD2,143 on his VISA card for the airline tickets.

37. On 21 November 2007, Macarthur Smith (Smith) attended Newtown Flight Centre and booked and paid to depart Sydney on United Airlines flight UA840 to Los Angeles on 26 November 2007. Smith booked to return on United Airlines flight UA839 departing Los Angeles on 30 November 2007 and arriving in Sydney on 2 December 2007.

38. On 21 November 2007, Smith attended Anywhere Travel agency and booked to stay from 26 to 30 November 2007 at the Holiday Inn, Marina Del Rey, Los Angeles.

39. On 22 November 2007 (Sydney time), Borg departed Sydney on United Airlines flight UA840 to Los Angeles. On 22 November 2007 (Los Angeles time), Borg checked into room 332 at the Holiday Inn, Marina Del Rey.

40. On 24 November 2007 (Sydney time), Polock purchased an airline ticket from Eastgardens Flight Centre for Setser to depart on United Airlines flight UA839 from Los Angeles on 30 November 2007 and arrive in Sydney on 2 December 2007.

41. CCR records show that between 12.17am and 1.51am on 26 November 2007 (7.17am to 8.51am on 25 November 2007 Los Angeles time) BRANDT made three telephone calls to the Holiday Inn, Marina Del Rey, interspersed with six telephone calls to Setser.

42. Records obtained from the Holiday Inn show that at about 2.34pm on 26 November 2007 (9.34am on 25 November 2007 Los Angeles time), a telephone call was made from Room 332, Holiday Inn Marina Del Rey (occupied by Borg) to Australian mobile telephone 614220969. It is alleged that this is in fact mobile telephone number 0422096938, subscribed to Borg's de-facto wife, Carolyn Milne.

43. On 26 November 2007 (Sydney time), Smith departed Sydney on United Airlines flight UA840 to Los Angeles. On 26 November 2007 (Los Angeles time), Smith checked into Room 316 at the Holiday Inn, Marina Del Rey.

44. On 28 November 2007 (Sydney time), Setser made a number of online Visa applications to travel to Australia which were rejected by DIAC.

45. On 29 November 2007 BRANDT purchased an air ticket to fly to Australia on United Airlines flight UA839 departing Los Angeles on 30 November 2007 and arriving in Sydney on 2 December 2007.

46. On 30 November 2007 (Los Angeles time), Borg, Smith and BRANDT departed Los Angeles on United Airlines flight UA839 to Sydney.

47. On 2 December 2007 BRANDT, Borg and Smith arrived in Sydney from Los Angeles on flight UA839. BRANDT indicated on her incoming passenger card that she was to stay at the Swiss Grand Hotel for six days on a holiday to visit friends.

48. In early December 2007 Nicholson asked a fellow Gate Gourmet employee, Nicholas Athanitis to "strip" a United Airlines aircraft (service it for Gate Gourmet). On 2 December 2007 Nicholson said to another fellow Gate Gourmet employee, Te Waha Kingi: "Come on let's go strip a United flight". Kingi agreed and drove out on a truck to do the job but Nicholson got a message to return back to base. On 2 December 2007 Athanitis sat in a Gate gourmet truck waiting to go on to the United Airlines plane. As he sat there he saw Customs officers with a dog waiting to go onto the airbridge. Ten minutes later Nicholson approached and said: "We can't get on the plane. Go back to work".

49. At this time, Nicholson was employed by Gate Gourmet as the Operations Coordination Manager – Inflight for the Jetshop arm of the business. The Jetshop arm of the business provides catering services for Jetstar Airlines. It was unusual for Nicholson to be waiting to service the United Airlines flight UA839 because the Jetshop operations of the business are separate from the Unit operations which service the catering requirements of other airlines.

50. About 8.50am on 2 December 2007, Customs officers conducted the search of United Airlines flight UA839 and located the blocks of cocaine in the rubbish bin of a toilet at the rear of the aircraft.

51. United Airlines records show that at about 8.50am on 2 December 2007, Nicholson departed the tarmac in the vicinity of United Airlines flight UA839.

52. About 9.15am on 2 December 2007, BRANDT departed Sydney Airport and travelled to the Swiss Grand Resort and Spa, Bondi Beach. On 2 and 3 December 2007 BRANDT made a number of telephone calls from her room at the Swiss Grand Hotel.

53. Qantas Airways records show that on 3 December 2007 a booking for BRANDT was made for her to depart Sydney on flight QF0011 on the same date.

54. CCTV footage shows that at about 8.57am on 3 December 2007, Cleveland entered the foyer of the Swiss Grand Resort and Spa, appeared to speak to reception staff and walked towards the hotel elevators.

55. About 9.40am on 3 December 2007, AFP surveillance observed BRANDT and Cleveland walk through the foyer of the Swiss Grand Resort and Spa and depart the hotel separately.

56. Later on 3 December 2007, BRANDT departed Sydney on Qantas flight QF11 to Los Angeles.

57. Cleveland was followed by AFP officers to 45 French Street, Maroubra.

58. Subsequent forensic testing of the inside and outside of the cocaine wrappings indicated the presence of Borg's DNA on seven of the packages containing cocaine imported on 2 December 2007.

7

59. As a result of these activities, the AFP obtained telecommunications interception warrants to lawfully intercept a number of telephones identified as being used by syndicate members, including:

- Mobile telephone number 0425845019 subscribed to Gate Gourmet and used by Nicholson
- Mobile telephone number 0420210364 subscribed in the name Luke Bains and used by Cleveland
- Landline telephone number 0293451977 subscribed to Melissah Lloyd
- Mobile telephone number 0450546759 subscribed in the name Mohmad Bhan and used by Cleveland
- Mobile telephone number 0416450151 subscribed in the name Jose Alquillera
- Mobile telephone number 0404916730 subscribed in the name John Smith and used by Cleveland
- Mobile telephone number 0402315375 subscribed in the name Wayne Williams
- Mobile telephone number 0415782433 subscribed in the name Craig Ao and used by Nicholson
- Mobile telephone number 0404612637 subscribed in the name Kevin Burgess and used by Nicholson
- Mobile telephone number 0424311066 subscribed in the name Jue Tower and used by Cleveland.

60. Lawful interception of mobile telephones used by Cleveland showed communications with Setser.

61. About 7.58pm on 2 March 2008, telephone service 18186416077 (identified by the AFP to be used by Setser) sent the following text message to Cleveland on mobile telephone number 040210364 – '*What's up brother ? Is this still your ph #... If so contact me !*'.

62. About 1.24pm on 5 March 2008, Cleveland sent the following text message to Setser – '*Ill call u when I can.still hot*'

63. Between 9.07pm on 15 March 2008 and 1.40am on 16 March 2008, Cleveland and Setser exchanged the following text messages:

Setser to Cleveland

'*What u up to brother ? Check ?n in !*'

Cleveland to Setser

'*Not much buddy,just taking it easy at the moment.il keep in contact with u.where just cruzin at the moment.*'

Setser to Cleveland

'*You don?t know how u just made my day ! Good to here from u big brother ! Hope your fam and are hanging in there ! Call or text whenever ! Much respect bro !*'

64. About 9.22am on 27 April 2008, Setser sent the following text message to Cleveland –

8

*'How u been ? Just check in n again ? Anyway hope we can get going soon again !
Russ'*

65. About 7.36am on 5 May 2008, Setser sent the following text message to Cleveland –
*'What up buddy ? Talk to me are we any where close to getting to go again ?'*

66. About 2.36pm on 20 May 2008, Setser rang Cleveland and said he had wanted to talk to
Cleveland for so long. Cleveland asked Setser if anything had happened with his missus
(BRANDT) because they knew, because she left straight away. Cleveland thought they
may have had a little look there. Setser said his girlfriend would never do that to them
and Cleveland stated it was major news. Cleveland said that everyone was staying real
quiet and that his phone was red hot. Cleveland said that everything was still sweet but
they were just quiet. Cleveland said they were on her and he thought she might have
got pulled in there. She was in the paper and everywhere. Because she left the next
day they were onto it. Setser asked if there were any names involved and Cleveland
said no but they knew. Setser said that one of the two of "our friends" was so careless
and not really with the program. Cleveland told him everyone was hurting here but he
had to relax for a bit and hang tight. Cleveland said he hadn't seen the boys for nearly
six months and that everyone vanished because it was so major. (On 5 December 2007,
following the seizure of the first importation, the Daily Telegraph newspaper published an
article which linked the seizure of cocaine to the "Bra Boys" crime group, Sydney Airport
workers such as cleaners or caterers, and a female American passenger (BRANDT) who
had since flown out of Australia).

67. About 8.59am on 5 June 2008, Setser sent the following text message to Cleveland –
*'What up brother ! Good talking to u last month ! Anyway hit me up when it is time to rock
amd roll ! Russ'*

68. About 11.27am on 24 September 2008, Cleveland sent the following text message to
Setser – *'How r ya buddy,hope ya good.just cuzin here.hope ya safe.im ready.il give u
another number.dont 4get u still owe 20.we have 2 sort that out before anything,if not,its
all over..thanks buddy.'*

69. It is alleged that Cleveland was indicating to Setser that he was ready to recommence
activity and reminded Setser that he still owed Cleveland A$20,000.

70. About 4.18pm on 1 October 2008, Cleveland rang Bruce Irons (Irons) and Irons said he
had talked to their friend Rusty (Setser) who was concerned about what Cleveland
thought of him. Cleveland said that he had sent Setser a text last week but hadn't yet
had a reply. Irons told Cleveland that Setser was no longer with his girlfriend Brandi
(BRANDT). Setser told Irons that BRANDTt was solid the whole time and didn't fuck up
once.

71. About 8.33am on 19 December 2008, Setser sent the following text message to
Cleveland – *'How u brother ! Need to talk i have something that I NEED TO RUN BY
YOU A PACKAGE OF BOARDS THAT WILL BLOW YOUR MIND AND YOU WILL NOT
HAVE TO WORRY ABOUT'*

72. About 10.24am on 19 December 2008, Setser sent the following text message to
Cleveland – *'How u brother ! Need to talk i have something that I NEED TO RUN BY
YOU A PACKAGE OF BOARDS THAT WILL BLOW YOUR MIND AND YOU WILL NOT
HAVE TO WORRY ABOUT ANY KIND OF PAYMENT UNTILL THEY ARRIVE AND
ARE ON THE RACK ! SOMETHING TO THINK ABOUT ! THE FOAM IS HANDS DOWN*

9

*THE BEST ON THE MARKET ! IT WILL ALL SPEAK FOR IT SELF ALL I NEED IS TO TALK TO U TO WORK OUT DETAILS ! JUST GIVE ME A CHANCE AMD THESE BOARDS WILL BLOW YOUR MIND'*

73. Between 9.50am and 2.46pm on 31 December 2008, Setser and Cleveland exchanged the following text messages:

Setser to Cleveland

*'What up brother ! I have been working for a very big company that deals with several different beauty products and i know that it would go over very well'*

Cleveland to Setser

*'Mate sounds good,send him over asap.im just cruzin.hope its good bra. im keen as.lets do it.'*

Setser to Cleveland

*'U fucking rule ! Bro so stoked to here from u ! We nee to get new pre paids so we can talk ! When i get one i will hit u with the number !'*

Cleveland to Setser

*'Sweet sounds good,just let me know.im keen as bra,been quiet here.'*

74. Between 9.12pm and 11.24pm on 11 January 2009, Setser sent the following two text messages to Cleveland:

*'Buddy u need to get a pre paid phone and text or e mail me the number so i can call u asap i have pretty much everything worked out really been working hard on these boards bro and I know they are going to work so good'*

*'Just want to run the dmentions by u on that other line u get I Fucjing really positive that these boards are going to work good the foam quality is insai'*

75. About 6.12pm on 28 March 2009, a person using telephone service 17148567537 (alleged to be Setser) and Cleveland exchanged the following text messages:

Setser to Cleveland

*'What up brother i appolgize about laggin been out of town working I am*

*getting on a mission to put it together over tgd next cople weeks hit me up*

*when u can'*

10

Cleveland to Setser

*'Sounds good bra,lets get it on.'*


Setser to Cleveland

*'Fuck yeah I am so hungry'*


76. About 2.51pm on 2 April 2009, Cleveland and the person alleged to be Setser exchanged the following text messages:

Setser to Cleveland

*'Yo my girl friend over there i told you about moved from sydney to byron bay she still works for the same hotel chain just up there now if i send her the boards is it going to be a problem for you to send someone up to get them . Let of know if it is a wall chace .'*


Cleveland to Setser

*'No worries at all buddy.im starving.'*


## Charge 2 - Dealing with the Proceeds of Crime Worth $100,000 or more

77. The Operation Loment investigation established that between July 2007 and November 2007 a series of overseas money remittances totalling in excess of AUD250,000 were made by persons in Sydney to Los Angeles. The majority of these remittances were made to BRANDT and Setser. The remittances were made following the arrival of various persons on United Airlines flights from California, USA. It is alleged that the money the subject of those remittances was the proceeds of crime derived from prior undetected importations of narcotics.

78. It is alleged that BRANDT dealt with money totalling AUD130,760 which was remitted to her in the USA from Australia prior to the importation of the cocaine on 2 December 2007, and that this money represented the proceeds of crime derived from prior undetected importations which occurred on 23 July 2007; 16 September 2007, 23 September 2007 and 16 October 2007. These dates coincided with the arrival of Schalberg, Jesse Polock and Setser on United Airlines flights to Sydney. Each of those flights were serviced by Alquillera. It is alleged that narcotics were imported on each of those flights, removed by Alquillera, sold by the syndicate and part of the proceeds remitted to associates in the USA, including BRANDT.

79. During the Operation Loment investigation, the AFP obtained transaction forms from various Western Union Agencies (news agencies or post offices) and banks from which they identified a number of money transfers made to BRANDT which occurred following the arrival in Sydney of certain USA citizens on United Airlines flights.

11

80. On 23 July 2007 Schalberg arrived in Sydney on United Airlines flight UA863 from San Francisco, USA. This aircraft was serviced by Alquillera upon arrival at Sydney International Airport.

81. On 25 July 2007 Polock remitted AUD4,525 each to BRANDT and Setser in the USA via Western Union at the Eastgardens Newsagency.

82. Between 31 July 2007 and 10 September 2007, Schalberg remitted a total of AUD55,250 to Setser in the USA from various Western Union agencies in Sydney.

83. On 10 September 2007 Schalberg departed Sydney on United Airlines flight UA840 to Los Angeles.

84. On 12 September 2007, Melissah Lloyd remitted AUD4,775 to BRANDT in the USA via Western Union at Australia Post, Maroubra.

85. On 12 August 2007 Polock departed Sydney on United Airlines flight UA840 to Los Angeles, USA. On 16 September 2007, Polock returned to Sydney on United Airlines flight UA839 from Los Angeles.

86. Records obtained from United Airlines show that between about 6.25 am to 7.10 am on 16 September 2007, Alquillera attended United Airlines flight UA839 from the tarmac.

87. Western Union records show that on 19 September 2007, Polock remitted AUD8,000 to BRANDT in the USA via Western Union at the Kingsford Newsagency.

88. On 19 September 2007 and 20 September 2007 Polock also made three remittances totalling AUD25,440 to Setser in the USA via three different Western Union agencies.

89. On 23 September 2007 Schalberg and another USA citizen, Kelvin Pickering (Pickering), arrived in Sydney on United Airlines flight UA839 from Los Angeles.

90. United Airlines security records show that between about 6.20 am to 6.55 am on 23 September 2007, Alquillera attended United Airlines flight UA839 from the aircraft door and tarmac.

91. Records obtained from the ANZ Bank, Commonwealth Bank of Australia and Westpac Bank, show that between 27 and 28 September 2007, Schalberg made six remittances totalling AUD41,810 to BRANDT in the USA as follows:

   1. AUD6,968 remitted on 27 September 2007 via Commonwealth Bank of Australia at Bondi Beach
   2. AUD6,968 remitted on 27 September 2007 via ANZ Bank at Bondi Beach
   3. AUD6,968 remitted on 28 September 2007 via Commonwealth Bank of Australia at Bondi Junction
   4. AUD6,968 remitted on 28 September 2007 via Commonwealth Bank of Australia at Bondi Beach
   5. AUD6,968 remitted on 28 September 2007 via ANZ Bank at Bondi Junction
   6. AUD6,970 remitted on 28 September 2007 via Westpac Bank at Bondi Beach

92. On 29 September 2007, Schalberg and Pickering departed Sydney on United Airlines flight UA840 to Los Angeles.

12

93. On 16 October 2007 Setser arrived in Sydney on United Airlines flight UA839 from Los Angeles.

94. Records obtained from United Airlines show that between about 6.20 am to 6.35 am on 16 October 2007, Alquillera attended United Airlines flight UA839 from the aircraft door.

95. On 4 November 2007, BRANDT arrived in Sydney on flight QF50 from Los Angeles. She checked into the Swiss Grand Hotel at Bondi Beach.

96. Between 5 November 2007 and 7 November 2007, BRANDT transferred a total of AUD71,650 to her own account in the USA from various locations around Sydney in the following eight transactions:

   1. AUD10,500 remitted on 5 November 2007 via the Westpac Bank, Bondi Junction;
   2. AUD9,500 remitted on 5 November 2007 via the Commonwealth Bank of Australia, Haymarket;
   3. AUD10,500 remitted on 5 November 2007 via the Bank of China, Haymarket;
   4. AUD8,300 remitted on 6 November 2007 via the Commonwealth Bank of Australia, Haymarket;
   5. AUD8,300 remitted on 6 November 2007 via Travelex HSBC, Haymarket;
   6. AUD7,200 remitted on 7 November 2007 via the Commonwealth Bank of Australia, Haymarket;
   7. AUD8,100 remitted on 7 November 2007 via Travelex HSBC, Haymarket;
   8. AUD9,250 remitted on 7 November 200 via the ANZ Bank, Haymarket.

97. It is alleged that these remittances represented the proceeds of the sale of narcotics imported into Australia on United Airlines flights.

98. BRANDT returned to the USA on 7 November 2007 on American Airlines flight AA7363 (Qantas Flight AF15). On her outgoing passenger card BRANDT indicated that she was carrying AUD10,000 or more in cash.

"C"

The attached one page is the annexure marked "C" referred to in the affidavit of Gregory Adam Hinds sworn at Sydney on the 23rd day of March 2012 before me:

..............................................
Magistrate of the State of New South Wales

Graeme Curran
Magistrate

