ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ROBYN K. BACON (Cal. Bar No. 251048)
Assistant United States Attorney
Violent and Organized Crime Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-4667
    Facsimile:  (213) 894-3713
    E-mail:     robyn.bacon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>BRANDI ANGELA BRANDT<br><br>A Fugitive from the Government of Australia | No. CV 13-3933-JSL-VBK<br><br>UNITED STATES' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING EXTRADITION; EXHIBITS<br><br>Hearing Date: August 22, 2013<br>Hearing Time: 10 a.m.<br>Place: Courtroom of the Honorable<br>     Victor B. Kenton |

1

1    Complainant United States of America, by and through its

2    counsel of record, the United States Attorney for the Central

3    District of California, hereby submits the following Memorandum of

4    Points and Authorities and the attached Declaration of Robyn K.

5    Bacon and exhibits thereto in support of extradition in this matter.

6

7

8    Dated: July 1, 2013            Respectfully submitted,

9                                   ANDRÉ BIROTTE JR.
                                    United States Attorney
10
                                    ROBERT E. DUGDALE
11                                  Assistant United States Attorney
                                    Chief, Criminal Division
12

13                                        /s/
                                    _____
14                                  ROBYN K. BACON
                                    Assistant United States Attorney
15
                                    Attorneys for Plaintiff
16                                  UNITED STATES OF AMERICA

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION.................................................1

II.   STATEMENT OF FACTS..........................................2

      A.   The Fugitive And The Offense Conduct....................2

      B.   Criminal Charges And Arrest Warrant Filed In Australia...6

      C.   Australia's Request For Extradition And Brandt's Arrest
           In This District........................................6

III.  APPLICABLE LAW..............................................7

      A.   General Standards And Procedures Of Extradition Law......7

      B.   Standards Of Treaty Interpretation In Extradition
           Proceedings.............................................9

      C.   Requirements For Certification Of Extraditability.......10

      D.   Inapplicability Of Federal Rules Of Criminal Procedure
           And Evidence............................................14

      E.   Limitations Of Fugitive's Evidence......................16

      F.   Motivation Of And Expected Treatment In Demanding
           Country: The Rule Of Non-Inquiry.......................17

IV.   ARGUMENT....................................................18

      A.   The Court Has Subject Matter Jurisdiction...............19

      B.   The Court Has Personal Jurisdiction Over The Fugitive...19

      C.   The Extradition Treaty Is In Force......................19

      D.   The Fugitive Is Sought For Offenses Covered By The
           Extradition Treaty......................................20

      E.   There Is Probable Cause To Believe That Brandt
           Committed The Offenses Charges..........................22

V.    CONCLUSION..................................................24

1

**TABLE OF AUTHORITIES**

**Federal Cases**

Arnbjornsdottir-Mendler v. United States,
    721 F.2d 679 (9th Cir. 1983).....................................18

Austin v. Healey,
    5 F.3d 598 (2d Cir. 1993)........................................11

Barapind v. Reno,
    225 F.3d 1100 (9th Cir. 2000)..................................7, 8

Bingham v. Bradley,
    241 U.S. 511 (1916).........................................10, 15

Blaxland v. Commonwealth Director of Public Prosecutions,
    323 F.3d 1198 (9th Cir. 2003)....................................8

Charlton v. Kelly,
    229 U.S. 447 (1913).....................................14, 16, 19

Collins v. Loisel,
    259 U.S. 309 (1922).....................................12, 13, 15

Cornejo-Barreto v. Seifert,
    218 F.3d 1004 (9th Cir. 2000).....................7, 8, 10, 18

Cucuzzella V. Keliikoa,
    638 F.2d 105 (9th Cir. 1981)...................................9, 13

Desmond v. Eggers,
    18 F.2d 503 (9th Cir. 1927)......................................16

Eain v. Wilkes,
    641 F.2d 504 (7th Cir. 1981).........................16, 18, 22

El Al Israel Airlines, Ltd. v. Tseng,
    525 U.S. 155 (1999)..............................................10

Emami v. U.S. District Court for N. Dist. Cal.,
    834 F.2d 1444 (9th Cir. 1987).......................13, 15, 22

Factor v. Laubenheimer,
    290 U.S. 276 (1933)...........................................9, 10

Fernandez v. Phillips,
    268 U.S. 311 (1925)..............................................10

Glucksman v. Henkel,
    221 U.S. 508 (1911).........................................14, 18

Hooker v. Klein,
    573 F.2d 1360 (9th Cir. 1978)....................................16

i

**<u>Federal Cases</u>**

<u>In re Kaine</u>,
     55 U.S. 103 (1852)..............................................17

<u>In re Ryan</u>,
     360 F. Supp. 270 (E.D.N.Y.)....................................15

<u>Jhirad v. Ferrandina</u>,
     536 F.2d 478 (2d Cir. 1976)....................................14

<u>Jimenez v. Aristeguieta</u>,
     311 F.2d 547 (5th Cir. 1962)...................................11

<u>Kolovrat v. Oregon</u>,
     366 U.S. 187 (1961)............................................19

<u>Lo Duca v. United States</u>,
     93 F.3d 1100 (2d Cir. 1996).....................................8

<u>Lopez-Smith v. Hood</u>,
     121 F.3d 1322 (9th Cir. 1997).......................8, 10, 16, 18

<u>Mainero v. Gregg</u>,
     164 F.3d 1199 (9th Cir. 1999)........................15, 16, 19

<u>Manta v. Chertoff</u>,
     518 F.3d 1134 (9th Cir. 2008)...................................7

<u>Martin v. Warden</u>,
     993 F.2d 824 (11th Cir. 1993).............................8, 14

<u>Matter of Extradition of Kraiselburd</u>,
     786 F.2d 1395 (9th Cir. 1986)..................................14

<u>Matter of Extradition of Pazienza</u>,
     619 F. Supp. 611 (S.D.N.Y. 1985)...............................12

<u>Matter of Extradition of Strunk</u>,
     293 F. Supp. 2d 1117 (E.D. Cal. 2003)......................11, 19

<u>Matter of the Extradition of Manzi</u>
     888 F.2d 204 (1st Cir. 1989)...............................13, 18

<u>Messina v. United States</u>,
     728 F.2d 77 (2d Cir. 1984).....................................14

<u>Oen Yin-Choy v. Robinson</u>,
     858 F.2d 1400 (9th Cir. 1988)..................................14

<u>Ordinola v. Hackman</u>,
     478 F.3d 588 (4th Cir. 2007)................................9, 18

<u>Ornelas v. Ruiz</u>,
     161 U.S. 502 (1896)............................................14

**Federal Cases**

Pettit v. Walshe,
   194 U.S. 205 (1904)..........................................12

Prasoprat v. Benov,
   421 F.3d 1009 (9th Cir. 2005)...........................passim

Quinn v. Robinson,
   783 F.2d 776 (9th Cir. 1986).....................10, 13, 15, 17

Sayne v. Shipley,
   418 F.2d 679 (5th Cir. 1969).................................15

Shapiro v. Ferrandina,
   478 F.2d 894 (2d Cir. 1973)...................................9

Sidali v. I.N.S.,
   107 F.3d 191 (3d Cir. 1997)..................................17

Sumitomo Shoji America, Inc. v. Avagliano,
   457 U.S. 176 (1982)......................................10, 19

Terlinden v. Ames, 184 U.S. 270 (1902).........................12

United  States v. Tuttle,
   966 F.2d 1316 (9th Cir. 1992)................................12

United States ex rel. Rauch v. Stockinger,
   269 F.2d 681 (2d Cir. 1959)..................................14

United States ex rel. Sakaguchi v. Kaulukukui,
   520 F.2d 726 (9th Cir. 1975).................................14

United States v. Alvarez-Machain,
   504 U.S. 655 (1992)..........................................12

United States v. Khan,
   993 F.2d 1368 (9th Cir. 1993)................................13

United States v. Wiebe,
   733 F.2d 549 (8th Cir. 1984)..................................9

Valencia v. Limbs,
   655 F.2d 195 (9th Cir. 1981).................................13

Ward v. Rutherford,
   921 F.2d 286 (D.C. Cir. 1990).............................11, 19

**Federal Statutes**

18 U.S.C. § 1956.........................................21, 22

18 U.S.C. § 3181............................................19

iii

**<u>Federal Statutes</u>**

18 U.S.C. § 3184.............................................passim

18 U.S.C. § 3186..........................................8, 17

18 U.S.C. § 3190.............................................16

21 U.S.C. § 952...........................................20, 21

**<u>Federal Rules</u>**

Fed. R. Crim. P. 54(b)(5).....................................14

Fed. R. Evid. 1101(d)(3)......................................15

**<u>Other Authorities</u>**

General Order 05-07.......................................11, 19

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

The Government of Australia has formally requested that the United States arrest and extradite the fugitive Brandi Angela Brandt ("Brandt" or "fugitive") so that she may answer to charges of conspiracy to import a commercial quantity of a border controlled drug, namely, cocaine and (2) dealing with the proceeds of crime worth $100,000 or more.  Australia's formal extradition request – supported by appropriate documents, including a copy of the extradition treaty in effect between the United States and Australia – was filed by the United States on June 7, 2013 ("Formal Papers").[1] Included among the Formal Papers is a copy of the extradition treaty currently in effect between the United States and Australia.  US-Austl., May 14, 1974, 27 U.S.T. 957, as supplemented and amended by the Protocol Amending the 1974 Extradition Treaty with Australia, U.S.-Austl., Sept. 4, 1990, S. TREATY DOC NO. 102-23 (1993) (collectively referred to as "Treaty" or "Extradition Treaty").  (Ex. A at 6-45.)

By statute, this Court must now hold a hearing to consider the evidence of criminality presented by Australia and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.  If the Court finds the evidence sufficient, the Court must certify that conclusion to the Secretary of State, who decides whether to surrender the fugitive.  <u>Id</u>.

---

[1]  For the Court's convenience, the United States has filed a sequentially numbered version of the Formal Papers with this memorandum as Exhibit A.  All references to the Formal Papers in this memorandum are to Exhibit A.

1

Because the law regarding extradition is sui generis, differing substantially from ordinary criminal or civil proceedings, the United States offers this memorandum as a guide to the nature of the extradition hearing and the application of its distinctive features to the facts of this case

## II.   STATEMENT OF FACTS

### A.   THE FUGITIVE AND THE OFFENSE CONDUCT

On December 2, 2007, Australian Customs and Border Protection Service ("Customs") seized a package containing 12 blocks of compressed white powder weighing approximately 5.3 kilograms, which was later determined to contain approximately 2.8 kilograms of pure cocaine, from a trash bin on board United Airlines flight UA 839 from Los Angeles to Sydney.  (Ex. A at 70.)  Based on this seizure, the Australian Federal Police ("AFP") began an investigation into the importation into Australia of cocaine via commercial airline flights from the United States.  (Id.)  The investigation revealed that Brandt and others had conspired with an Australian criminal syndicate to obtain cocaine for sale in Australia.  (Id. at 70-72.)  As part of the conspiracy, drug couriers hid cocaine on airplanes traveling from the United States to Australia.  (Id.)  Upon arrival in Australia, the syndicate used employees of Gate Gourmet, an airline catering company, to remove the hidden cocaine.  (Id.)  The syndicate then sold the cocaine in Australia, and syndicate members wired proceeds from the drug sales to BRANDT and other co-conspirators in the United States.  (Id.)

The AFP investigation revealed that between July and November 2007, various members of the conspiracy wired money totaling in excess of A$250,000 from Australia to the United States.  (Id. at

2

80-82.)  The payments originated in Sydney, Australia, and were mostly directed to BRANDT and her co-conspirator and boyfriend, Rusty Setser.  (Id. at 80.)  BRANDT herself received A$130,760 in total, which represents various remittances sent to BRANDT by various co-conspirators while they were in Australia, as well as money BRANDT wired to herself from Australia.  (Id.)  The money is believed to be the proceeds of crime derived from undetected importations of cocaine that occurred on July 23, 2007, September 16, 2007, September 23, 2007, and October 16, 2007, dates which coincide with the arrival of members of the conspiracy, including Brandt, on flights to Sydney which were serviced by an Australian co-conspirator who is also a Gate Gourmet employee.  (Id.)

Australian law enforcement conducted extensive analysis of telephone records, reviewed international money remittance records, and conducted electronic and physical surveillance of a number of persons in Australia and the United States believed to be involved in the conspiracy.  (Id. at 70.)  Specific events involving BRANDT include, but are not limited to, the following:

- On July 23, 2007, co-conspirator C.S. arrived in Sydney from the U.S.  He returned to the U.S. on September 10, 2007.  During the time in which C.S. was in Australia, Western Union records show that C.S. wired money to Setser seven times for a total of A$55,250 and made two payments of A$4,525 each to Brandt and Setser.  (Id. at 72.)

- On August 12, 2007, co-conspirator J.P. flew from Sydney to Los Angeles, returning on September 16, 2007 on United Airlines flight UA839, which was serviced in Sydney by co-conspirator J.A., a Gate Gourmet employee, according to United Airlines

3

records.  On September 12, 2007, before J.P. left Los Angeles, co-conspirator M.L. made a A$4,775 payment to BRANDT.  Then, on September 19 and 20, 2007, after J.P. had returned to Australia, J.P. made three payments to Setser totaling A$25,440 and one payment to Brandt on September 19, 2007 for A$8,000.  Furthermore, text messages from C.S.'s mobile phone include several text messages from R.S. sent between September 1, 2007 and September 8, 2007.  In one message, sent on September 8, 2007, R.S. writes: "Thankyou [sic] brother! Over all job well done! Time to come home and enjoy!  Then u know what all over again!  This time we get ours brother! It is going to be nice can't wait, then we really get to enjoy brother, reward ourselves with a few nice toys whatever that maybe!..." (Id. at 71-72.)

- On September 23, 2007, co-conspirator C.S. arrived in Sydney on United Airlines flight UA839, which was also serviced by co-conspirator J.A.  C.S. returned to the United States on September 29, 2007.  During the six days C.S. was in Australia, bank records show that C.S. made six payments to Brandt in the United States for A$41,810 total.  In addition, on September 27 and 28, co-conspirator B.C. made two payments for A$18,195 total to Setser from Australia via Western Union.  And, on September 28, 2007, co-conspirator C.M. in Australia sent an additional A$8,625 to Setser via Western Union.  (Id. at 80-81.)

- On November 4, 2007, Brandt arrived in Sydney on American Airlines Flight AA 7302.  Before returning to Los Angeles on November 7, 2007, Brandt wired eight payments totaling A$71,650

4

from Australia into her own account in the U.S., according to records obtained from the Commonwealth Bank of Australia, Bank of China, Westpac Bank, Travelex, and the ANZ Bank.  (Id. at 82.)

- On November 20, 2007, and November 21, 2007, co-conspirators G.B. and M.S., respectively, booked seats on United Airlines Flight UA839 to Sydney, scheduled to arrive on December 2, 2007.  On November 24, 2007, co-conspirator J.P. purchased an airline ticket for Setser on the same United Airlines flight. On November 28, 2007, Setser submitted several online applications for a visa to travel to Australia, all of which were rejected by DIAC.  The next day, November 29, 2007, Brandt purchased a ticket on the same United Airlines flight.  On November 30, 2007, G.B., M.S. and Brandt departed Los Angeles for Sydney on Flight UA 839.  (Id. at 75-76.)

- At about 8:50 a.m. on December 2, 2007, Customs officers at Sydney Airport conducted a search of flight UA839 and seized 12 packages containing approximately 2.8 kilograms of pure cocaine.  Subsequent forensic testing of the inside and outside of the cocaine wrappings indicated the presence of G.B.'s DNA on seven of the packages.  At the same time, United Airlines records show co-conspirator C.N., a Gate Gourmet employee, departed the tarmac in the vicinity of United Airlines flight UA839.  Another employee recalls C.N. saying, "Come on, let's go strip a United flight."  C.N. then called the employee back when he saw that the plane was being searched.  C.N.'s usual responsibilities did not include servicing United Airlines airplanes after a flight.  (Id. at 70-76.)

- At 9:15 a.m., Brandt left the Sydney Airport and travelled to the Swiss Grand Resort and Spa in Bondi Beach, New South Wales. On December 3, 2007, at around 8:57 a.m., co-conspirator W.C. entered the foyer of the Swiss Grand Resort and Spa, appeared to speak to reception staff, and walked toward the hotel elevators. At about 9:40 a.m. on December 3, 2007, AFP saw Brandt and W.C. walk through the foyer and leave the hotel separately. Brandt booked a flight back to Los Angeles for the same day. (Id. at 76.)

**B.    CRIMINAL CHARGES AND ARREST WARRANT FILED IN AUSTRALIA**

Brandt was charged in Australia with conspiracy to import a commercial quantity of a border controlled drug, namely, cocaine, in violation of section 307.1 and section 11.5 of the Criminal Code, and dealing with the proceeds of crime worth $100,000 or more, in violation of section 400.4(1) of the Criminal Code. (Ex. A at 49-50). A warrant for her arrest was issued on March 31, 2011 by an authorized officer of the Local Court at Sydney, New South Wales. (Id.)

**C.    AUSTRALIA'S REQUEST FOR EXTRADITION AND BRANDT'S ARREST IN THIS DISTRICT**

In accordance with Article XI of the Treaty, the Embassy of Australia submitted Diplomatic Note No. 115/2012 formally requesting the extradition of Brandt, a United States citizen. (Id. at 4-5.)

On May 29, 2013, Robyn Bacon, Assistant United States Attorney for the Central District of California, filed a Complaint for Arrest Warrant and Extradition, seeking a warrant for Brandt's arrest. An arrest warrant was issued on the same date, and Brandt was arrested in this district by deputies of the United States Marshals Service

on May 30, 2013.   Brandt appeared in court on May 30, 2013, and was ordered detained.[1]   The original Formal Papers bearing ribbons and seals, which are certified by the principal United States diplomat or consular officer in Australia as required by Article XI of the Treaty, as replaced by Article 7 of the 1990 Protocol, were filed on June 7, 2013.   (Dkt. No. 13; Ex. A at 1-5.)

Brandt is currently in federal custody at the Metropolitan Detention Center in Los Angeles.

## III.   APPLICABLE LAW

### A.   GENERAL STANDARDS AND PROCEDURES OF EXTRADITION LAW

"The extradition process is ordinarily initiated by a formal request from a foreign government to the Department of State, which along with the Department of Justice, evaluates whether the request is within the scope of the relevant extradition treaty between the United States and the requesting nation." Barapind v. Reno, 225 F.3d 1100, 1105 (9th Cir. 2000); see also Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008) ("'Extradition from the United States is a diplomatic process' that is initiated when a foreign nation requests extradition of an individual from the State Department." (citation omitted)); Cornejo-Barreto v. Seifert, 218 F.3d 1004, 1009 (9th Cir. 2000).   "Once approved, the United States Attorney for the judicial district where the person sought is located files a complaint in federal district court seeking an arrest warrant for the person sought." Barapind, 225 F.3d at 1105; see also Cornejo-Barreto, 218 F.3d at 1009.

---

[1]   This matter was assigned Central District of California Case No. 13-1473-M, which was later consolidated with Case No. 13-CV-3933. (See Dkt. No. 15.)

7

A hearing is then held before a federal judge to determine whether the offense is extraditable and probable cause exists to sustain the charges.  Barapind, 225 F.3d at 1105; Cornejo-Barreto, 218 F.3d at 1009.  Ultimately, however, it is the Secretary of State, and not the court, who makes the decision regarding whether the fugitive should be surrendered to the requesting country.  18 U.S.C. §§ 3184, 3186; Martin v. Warden, 993 F.2d 824, 828 (11th Cir. 1993); Lo Duca v. United States, 93 F.3d 1100, 1104 (2d Cir. 1996).  The Executive Branch remains primarily responsible for extradition, while the extradition judge is assigned the limited duty of determining whether the evidence is "sufficient to sustain the charge."  18 U.S.C. § 3184; Blaxland v. Commonwealth Director of Public Prosecutions, 323 F.3d 1198, 1208 (9th Cir. 2003) ("American judicial officers conduct a circumscribed inquiry in extradition cases"); Lopez-Smith v. Hood, 121 F.3d 1322, 1326 (9th Cir. 1997) ("Extradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that [a] statute interposes a judicial function.").

At the extradition hearing, the court must consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification, as defined in the treaty, statutes, and case law, have been established.  Prasoprat v. Benov, 421 F.3d 1009, 1014 (9th Cir. 2005) ("The only purpose of the extradition hearing is for the magistrate judge to determine whether the crime is extraditable and whether there is probable cause to support the charge.").  If any explanatory evidence is offered by the fugitive, the court rules on its admissibility.  Once the evidentiary record is complete, the court must make a determination

of extraditability -- written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense as to which extradition is sought.  See Shapiro v. Ferrandina, 478 F.2d 894, 905-06 (2d Cir. 1973).  If the court determines that the fugitive is wanted for an extraditable offense and that there is probable cause to support the charge against him or her, the court must certify to the Secretary of State that the individual is extraditable.  See 18 U.S.C. § 3184; Prasoprat, 421 F.3d at 1014; Ordinola v. Hackman, 478 F.3d 588, 597 (4th Cir. 2007).

If the court certifies the evidence to the Secretary of State, the court must commit the fugitive to the custody of the United States Marshal to await the further determination by the Secretary regarding surrender to the representatives of the requesting state. The court also must provide its certification to the Secretary of State together with a copy of the evidence and a transcript of any testimony presented at the hearing.  18 U.S.C. § 3184; see also Ordinola, 478 F.3d at 597.

B.   **STANDARDS OF TREATY INTERPRETATION IN EXTRADITION PROCEEDINGS**

When interpreting an extradition treaty, the court must construe the treaty's provisions liberally, in a manner favoring the obligation to surrender fugitives.  See Factor v. Laubenheimer, 290 U.S. 276, 293-94, 298, 303 (1933); United States v. Wiebe, 733 F.2d 549, 554 (8th Cir. 1984); Cucuzzella v. Keliikoa, 638 F.2d 105, 107 n.3 (9th Cir. 1981) ("treaties should be construed to enlarge the rights of the parties").  Moreover, the obligation to surrender the fugitive to be tried for his or her alleged offenses "should be

construed more liberally than a criminal statute or the technical requirements of criminal procedure." Factor, 290 U.S. at 298. Accordingly, "[f]orm is not to be insisted upon beyond the requirements of safety and justice," Fernandez v. Phillips, 268 U.S. 311, 312 (1925), and objections that "savor of technicality" do not find favor in extradition proceedings, see Bingham v. Bradley, 241 U.S. 511, 517-18 (1916).

Statements by the United States Department of State as to interpretation of treaties should be given great weight by the court. El Al Israel Airlines, Ltd. v. Tseng, 525 U.S. 155, 168 (1999); Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").

## C.   REQUIREMENTS FOR CERTIFICATION OF EXTRADITABILITY

An extradition certification is proper where:  (1) the extradition judge has authority to conduct the proceeding; (2) the extradition court has jurisdiction over the individual sought; (3) the extradition treaty is in force; (4) the fugitive's crime falls within the treaty's terms; and (5) there is probable cause as to each charge for which extradition is sought.  See 18 U.S.C. § 3184; see also Fernandez, 268 U.S. at 312; Prasoprat, 421 F.3d at 1013; Cornejo-Barreto, 218 F.3d at 1009-10.  If these elements are present, the court must certify the extradition, see Lopez-Smith, 121 F.3d at 1324-26, unless the case falls within an exception explicitly set forth in the treaty, see, e.g., Quinn v. Robinson, 783 F.2d 776, 783 (9th Cir. 1986) (political offense exception in U.S.-United Kingdom extradition treaty).

10

### 1. The Court's Authority to Conduct Extradition Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184.  Consequently, both magistrate judges and district judges may render a "certification" under Section 3184.  See Austin v. Healey, 5 F.3d 598, 601-02 (2d Cir. 1993) (magistrate judge had authorization to conduct the extradition hearing without specific delegation of authority); Jimenez v. Aristeguieta, 311 F.2d 547, 553-55 (5th Cir. 1962) (any judicial officer in class authorized by statute may conduct extradition hearing).

In addition, the United States District Court for the Central District of California, by local rule, has authorized magistrate judges to conduct extradition proceedings.  See General Order 05-07; see also Matter of Extradition of Strunk, 293 F. Supp. 2d 1117, 1119-20 (E.D. Cal. 2003) (both statute and local rule authorized magistrate judge to conduct extradition proceedings); Ward v. Rutherford, 921 F.2d 286, 287 (D.C. Cir. 1990) (both statute and local rule made plain magistrate judge's authority to conduct extradition hearing).

### 2. Jurisdiction Over the Fugitive

It is also well settled that the court has jurisdiction over a fugitive found within its jurisdictional boundaries.  18 U.S.C. § 3184 (court "may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue [its] warrant for the apprehension of the person so charged"); see also Pettit v.

1  <u>Walshe</u>, 194 U.S. 205, 219 (1904); <u>Matter of Extradition of Pazienza</u>,
2  619 F. Supp. 611, 616 (S.D.N.Y. 1985).

3            **3.    Treaty in Full Force and Effect**

4        The extradition statute, 18 U.S.C. § 3184, provides for
5  extradition in instances in which a treaty or convention is in force
6  between the requesting state and the United States.  <u>See, e.g.</u>, <u>Then</u>
7  <u>v. Melendez</u>, 92 F.3d 851, 853-54 (9th Cir. 1996); <u>United States v.</u>
8  <u>Tuttle</u>, 966 F.2d 1316, 1317 (9th Cir. 1992).  In this case, the
9  government has provided a declaration from Susan Benda ("Benda
10  Declaration"), an attorney in the Office of the Legal Adviser of the
11  United States Department of State, attesting that there is a treaty
12  in full force and effect between the United States and Australia.
13  (Ex. A at 1).  The Department of State's determination is entitled
14  to deference from the court.  <u>Terlinden v. Ames</u>, 184 U.S. 270, 288
15  (1902); <u>Then</u>, 92 F.3d at 854.

16            **4.    Crimes Covered by the Treaty**

17        Extradition treaties create an obligation for the United States
18  to surrender fugitives under the circumstances defined in the
19  treaty.  <u>United States v. Alvarez-Machain</u>, 504 U.S. 655, 664 (1992)
20  ("Extradition treaties exist so as to impose mutual obligations to
21  surrender individuals in certain defined sets of circumstances,
22  following established procedures.").

23        This "dual criminality" requirement does not mean that the
24  Australian crimes must be identical to a United States offense; all
25  that is required under extradition law is that the underlying acts
26  be punishable under both legal systems.  <u>See Collins v. Loisel</u>, 259
27  U.S. 309, 312 (1922) ("The law does not require that the name by
28  which the crime is described in the two countries shall be the same;

1    nor that the scope of the liability shall be coextensive, or, in

2    other respects, the same in the two countries.  It is enough if the

3    particular act charged is criminal in both jurisdictions."); Emami

4    v. U.S. District Court for N. Dist. Cal., 834 F.2d 1444, 1450 (9th

5    Cir. 1987) (same); United States v. Khan, 993 F.2d 1368, 1372 (9th

6    Cir. 1993) ("Many cases have held that dual criminality is satisfied

7    even though the names of the crimes and the required elements were

8    different in the two countries."); Cucuzzella, 638 F.2d at 108 ("The

9    crimes need not be identical.").

10        Indeed, Article II (3) of the Extradition Treaty, as modified,

11   provides that an offense is an extraditable offense "whether or not

12   the laws in the Contracting Parties place the offence within the

13   same category of offences or describe the offence by the same

14   terminology."  (Ex. A at 30-31.)

15        In determining whether an offense is punishable under the laws

16   of both countries, courts properly look to the underlying acts to

17   determine whether they violate United States federal law, the law of

18   the state in which the hearing is held, or the law of the

19   preponderance of the states.  See Cucuzzella, 638 F.2d at 107;

20   Matter of the Extradition of Manzi, 888 F.2d 204, 207 (1st Cir.

21   1989).

                5.    **Probable Cause that the Fugitive Committed the
22                    Offense**

23        An extradition hearing is not intended to determine whether the

24   evidence is sufficient to justify conviction, for that determination

25   will be made by the foreign court that handles the case.  See

26   Collins, 259 U.S. at 316; Quinn, 783 F.2d at 815; Valencia v. Limbs,

27   655 F.2d 195, 198 (9th Cir. 1981).  The court need only determine

28

                                      13

whether there is probable cause that the fugitive committed the offense or offenses for which extradition is sought. <u>Ornelas v. Ruiz</u>, 161 U.S. 502, 512 (1896). Addressing this context, the Ninth Circuit has said that "[t]he magistrate's function is to determine whether there is 'any' evidence sufficient to establish reasonable or probable cause." <u>United States ex rel. Sakaguchi v. Kaulukukui</u>, 520 F.2d 726, 730-31 (9th Cir. 1975). As to the form of the evidence, extradition is proper where the standard is met even if the proof "is presented . . . in somewhat untechnical form according to our ideas." <u>Glucksman v. Henkel</u>, 221 U.S. 508, 512 (1911) (affirming extradition despite minor or technical objections).

### D.   INAPPLICABILITY OF FEDERAL RULES OF CRIMINAL PROCEDURE AND EVIDENCE

The Federal Rules of Criminal Procedure do not apply to extradition proceedings. Fed. R. Crim. P. 54(b)(5) ("[t]hese rules are not applicable to extradition and rendition of fugitives"). Nor is a fugitive entitled to other rights normally available in a criminal trial. <u>See, e.g.</u>, <u>Charlton v. Kelly</u>, 229 U.S. 447, 461 (1913); <u>Glucksman</u>, 221 U.S. at 512; <u>United States ex rel. Rauch v. Stockinger</u>, 269 F.2d 681, 687 (2d Cir. 1959). For example, the fugitive has no right to cross-examination if any witnesses testify at the hearing, <u>Messina v. United States</u>, 728 F.2d 77, 80 (2d Cir. 1984), no right to a speedy extradition, <u>see</u> <u>Matter of Extradition of Kraiselburd</u>, 786 F.2d 1395, 1398 (9th Cir. 1986); <u>Martin</u>, 993 F.2d at 825, 829-30; <u>Jhirad v. Ferrandina</u>, 536 F.2d 478, 485 n.9 (2d Cir. 1976), and generally no right to discovery, <u>see</u> <u>Prasoprat</u>, 421 F.3d at 1014; <u>Oen Yin-Choy v. Robinson</u>, 858 F.2d 1400, 1407 (9th Cir. 1988).

14

1    The Federal Rules of Evidence are also inapplicable in

2  extradition proceedings.  Fed. R. Evid. 1101(d)(3) (rules of

3  evidence inapplicable to "proceedings [for] extradition or

4  rendition").  Rather, "[u]nique rules of 'wide latitude' govern

5  reception of evidence in Section 3184 hearings." Sayne v. Shipley,

6  418 F.2d 679, 685 (5th Cir. 1969) (citation omitted).  For example,

7  hearsay is permitted.  Id.; Collins, 259 U.S. at 317, 42 S. Ct. at

8  472; Mainero v. Gregg, 164 F.3d 1199, 1206 (9th Cir. 1999)

9  (extradition case: "it is well settled in this circuit that evidence

10 is not incompetent simply because it is hearsay"); Emami, 834 F.2d

11 at 1451 ("In the Ninth Circuit it has been repeatedly held that

12 hearsay evidence that would be inadmissible for other purposes is

13 admissible in extradition proceedings.").  Indeed, "[a]

14 determination of probable cause in an extradition proceeding may

15 rest entirely upon hearsay." In re Ryan, 360 F. Supp. 270, 273

16 (E.D.N.Y.).

17    Further, extradition treaties do not contemplate the

18 introduction of testimony of live witnesses at extradition

19 proceedings.  "[A]n extradition proceeding is not a trial.  Indeed,

20 the very purpose of extradition treaties is 'to obviate the

21 necessity of confronting the accused with the witnesses against

22 him.'" Mainero, 164 F.3d at 1207 (citation omitted); see also

23 Bingham, 241 U.S. at 517 (requiring "the demanding government to

24 send its citizens to another country to institute legal

25 proceedings[] would defeat the whole object of the treaty"); Quinn,

26 783 F.2d at 815-16 ("Barring hearsay from extradition proceedings

27 would thwart one of the objectives of bilateral extradition treaties

28 . . . .").

1    Documents offered in evidence at an extradition hearing shall

2    be received if they are "properly and legally authenticated."  18

3    U.S.C. § 3190.  Article XI, paragraph 5(a) of the Extradition

4    Treaty, as modified by the 1990 protocol, provides that "documents

5    which accompany an extradition request shall be received and

6    admitted as evidence in extradition proceedings if they are

7    certified by the principal diplomatic or consular officer of the

8    United States resident in Australia." (Ex. A at 36.)  The documents

9    presented by the United States in this case have been certified in

10   that manner.  See Benda Decl., ¶ 6; (Ex. A at 3).

11        **E.   LIMITATIONS OF FUGITIVE'S EVIDENCE**

12        The fugitive's grounds for opposing an extradition request are

13   limited.  The fugitive is not entitled to introduce evidence that

14   contradicts the evidence submitted by the requesting state,

15   establishes an alibi, or presents a defense such as insanity.  See

16   Charlton, 229 U.S. at 462; Hooker v. Klein, 573 F.2d 1360, 1369 (9th

17   Cir. 1978); Desmond v. Eggers, 18 F.2d 503, 505 (9th Cir. 1927).

18   Nor may a fugitive offer evidence to argue that he or she had no

19   motive to commit the crime.  Mainero, 990 F. Supp. at 1221.  Nor is

20   a fugitive's competence to stand trial relevant at an extradition

21   hearing.  Charlton, 229 U.S. at 462; Lopez-Smith, 121 F.3d at 1324-

22   25.  Rather, the fugitive is entitled only to offer evidence that

23   explains or clarifies the proof.  Hooker, 573 F.2d at 1368; Eain v.

24   Wilkes, 641 F.2d 504, 511 (7th Cir. 1981).  As the Ninth Circuit has

25   explained:  "Generally, evidence that explains away or completely

26   obliterates probable cause is the only evidence admissible at an

27   extradition hearing, whereas evidence that merely controverts the

28   existence of probable cause, or raises a defense, is not

16

admissible." <u>Mainero</u>, 164 F.3d at 1207 n.7.  Hence, the court does not weigh conflicting evidence and determine what to credit, "but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." <u>Quinn</u>, 783 F.2d at 815.

**F.   MOTIVATION OF AND EXPECTED TREATMENT IN DEMANDING COUNTRY: THE RULE OF NON-INQUIRY**

Other than the sufficiency of the evidence, all matters that may be raised by the fugitive as defenses to extradition are to be considered by the Secretary of State, not by this Court.  <u>See</u> 18 U.S.C. §§ 3184, 3186.  In making extradition determinations, "[t]he Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations -- factors that may be beyond the scope of the magistrate judge's review." <u>Sidali v. I.N.S.</u>, 107 F.3d 191, 195 n.7 (3d Cir. 1997).  The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the receiving country.  <u>See</u> <u>Prasoprat</u>, 421 F.3d at 1016.  This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State," within the Executive's powers to conduct foreign affairs.  <u>See</u> <u>In re Kaine</u>, 55 U.S. 103, 110 .

Therefore, under this constitutionally-based rule of judicial non-inquiry, a fugitive's contention that the extradition request is politically motivated or that the justice system of the requesting state is unfair should be addressed by the Secretary of State, not the court.  It is not the role of the court to look behind the

extradition request to the motives of the requesting country.  E.g., Ordinola, 478 F.3d at 604 ("the motives of the requesting government are irrelevant to our decision" and "must be addressed to the Secretary of State"); Eain, 641 F.2d at 513 (sole discretion of Secretary of State to determine whether foreign country's request for extradition is a subterfuge).  Likewise, the court should not investigate the fairness of the requesting country's criminal justice system or the treatment that might be accorded the fugitive after extradition.  See Prasoprat, 421 F.3d at 1016 (rule of non-inquiry applies to treatment fugitive is likely to receive upon return); Cornejo-Barreto, 218 F.3d at 1009 n.5 (rule of non-inquiry usually requires extradition courts to refrain from inquiring into foreign justice systems); Lopez-Smith, 121 F.3d at 1327 (courts generally refrain from examining penal systems of requesting nations); Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983) ("The rationale is that such matters are to be determined solely by the executive branch."); accord Matter of the Extradition of Manzi, 888 F.2d at 206.  As Justice Holmes said, "[w]e are bound by the existence of an extradition treaty to assume that the trial will be fair." Glucksman, 221 U.S. at 512.

## IV.   ARGUMENT

In the present case, the elements for extradition have been met.  There is subject matter and personal jurisdiction over the fugitive.  A valid extradition treaty permits extradition for the offenses charged against the fugitive in Australia.  Finally, there is probable cause to believe that the fugitive committed the offenses charged.

**A.   THE COURT HAS SUBJECT MATTER JURISDICTION**

United States Magistrate Judges are authorized to act in extradition matters.  See 18 U.S.C. § 3184; see also General Order 05-07; Matter of Extradition of Strunk, 293 F.Supp.2d at 1119-20; Ward, 921 F.2d at 287.

**B.   THE COURT HAS PERSONAL JURISDICTION OVER THE FUGITIVE**

A magistrate judge in the Central District of California has jurisdiction over Brandt because she is presently in custody in this district.  Mainero, 990 F.Supp. at 1216.  Brandt is "found within [this] jurisdiction," the jurisdictional requirement of 18 U.S.C. § 3184.

**C.   THE EXTRADITION TREATY IS IN FORCE**

There is an extradition treaty in full force and effect between the United States and Australia.  See Benda Decl., ¶ 3; (Ex. A at 1).  See also 18 U.S.C. § 3181 (Historical and Statutory Notes). The State Department's conclusion that the Treaty is in full force and effect, as expressed in the Declaration of Susan Benda, is entitled to considerable deference.  See Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."); accord Sumitomo, 457 U.S. at 184-85; Charlton, 229 U.S. at 468; see also Mainero, 990 F. Supp. at 1216-17 (giving deference to State Department's opinion that extradition treaty was in full force and effect).

**D.   THE FUGITIVE IS SOUGHT FOR OFFENSES COVERED BY THE EXTRADITION TREATY**

As noted earlier in this memorandum, Article II of the Extradition Treaty provides that an extraditable offense under the Extradition Treaty is an offense "if it is punishable under the laws in both Contracting Parties by deprivation of liberty of more than one year... whether or not the laws in the Contracting Parties place the offence within the same category of offenses or describe the offence by the same terminology."  (Ex. A at 30.)

Brandt has been charged in Australia with (1) conspiracy to import a commercial quantity of a border controlled drug, namely, cocaine, in violation of section 307.1 and section 11.5 of the Criminal Code, and (2) dealing with the proceeds of crime worth $100,000 or more, in violation of section 400.4(1) of the Criminal Code.  In order for a person to commit conspiracy, "(a) the person must have entered into an agreement with one or more persons; and (b) the person and at least one other party to the agreement must have intended that an offence would be committed pursuant to the agreement; and (c) the person or at least one other party to the agreement must have committed an overt act pursuant to the agreement."  Australian Criminal Code, § 11.5; (Ex. A at 51).  A person commits the offence of importation of a controlled substance if "(a) the person imports or exports a substance; and (b) the substance is a border controlled drug or border controlled plant; and (c) the quantity imported or exported is a commercial quantity."

Australian Criminal Code, § 307.1; (Ex. A at 51).  Cocaine is a
border controlled drug and 2.0 kilograms or more is a commercial
quantity.  Australian Criminal Code, § 314.4; (Ex A. at 51).  The
maximum penalty for an offense of conspiracy to import a commercial
quantity of a border controlled drug is imprisonment for life or a
fine of $825,000 or both.  Australian Criminal Code, § 307.1(1);
(Ex. A at 51).

A person is guilty of dealing with the proceeds of a crime
worth $100,000 or more if "(a) the person deals with money or other
property; and (b) either (i) the money or property is, and the
person believes it to be, proceeds of crime; or (ii) the person
intends that the money or property will become an instrument of
crime; and (c) at the time of the dealing, the value of the money
and other property is $100,000 or more."  Australian Criminal Code,
§ 400.4(1); (Ex. A at 52-53).  The punishment is up to 20 years
imprisonment.  Id.

in the United States, Brandt's crimes are punishable as, among
other things, Importation of Controlled Substances and Laundering of
Monetary Instruments, in violation of 21 U.S.C. § 952 and 18 U.S.C.
§ 1956, respectively.  Under § 952, it is "unlawful to import into
the United States from any place outside thereof" certain controlled
substances, including cocaine.  See 21 U.S.C. § 952(a), 812(c)
Schedule II (a)(4).  Importation of 500 grams or more of cocaine
carries a maximum penalty of 40 years imprisonment.  21 U.S.C. §

21

960(a)(1), (b)(2)(B)(ii).  A person violates 18 U.S.C. § 1956 if the person "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity..." 18 U.S.C. § 1956(a)(1)(A)(i).  Laundering of monetary instruments is punishable by up to 20 years imprisonment.  Id.

**E.   THERE IS PROBABLE CAUSE TO BELIEVE THAT BRANDT COMMITTED THE OFFENSES CHARGES**

The Article XI, paragraph 3 of the Extradition Treaty requires that an extradition request be supported by "a description of the facts, by way of affidavit, statement, or declaration, setting forth reasonable grounds for believing that an offence has been committed and that the person sought committed it."  Ex. A at 34-35.  This language means that the federal probable cause standard is the applicable criterion.  See Emami, 834 F.2d at 1447; Eain, 641 F.2d at 507-08.

The facts summarized above and set forth in the extradition request submitted by Australia establish probable cause to believe that Brandt committed the crimes charged.  The investigator's affidavit also outlines the evidence in support of each count.  (See Ex. A at 70-82.)  The evidence shows that from about July 24, 2007 to December 2, 2007, in Sydney, Australia and elsewhere, Brandt conspired with others to import over two kilograms of cocaine into Australia and that from July 24, 2007 to November 7, 2007, Brandt,

1   in Sydney and elsewhere, Brandt dealt with approximately A$130,760

2   in proceeds from a crime by sending and receiving drug proceeds from

3   Australia.

4       These facts and the evidence that supports them appear to

5   satisfy the elements of conspiracy to import a border controlled

6   substance and dealing with the proceeds of a crime worth more than

7   $100,000 under Australian law and importation of a controlled

8   substance and laundering of monetary instruments under United States

9   law.

10      Thus, there is probable cause to believe that Brandt committed

11  the crimes charged.  There is also probable cause to believe that

12  the person in these proceedings is Brandi Angela Brandt, the person

13  named in the Australian arrest warrant.  This is based on the

14  following: (1) the person in these proceedings has admitted her true

15  name to be Brandi Angela Brandt at multiple court appearances; (2)

16  the photographs that are included in the Formal Papers plainly

17  depict the person who is involved in these proceedings; and (3) the

18  date of birth and height included in the Formal Papers also are

19  consistent with the appearance of the person in these proceedings.

20  (See Ex. A at 60-61, 65-66, 84.)

21  //

**V.    CONCLUSION**

For the foregoing reasons, the United States requests the certification of the fugitive, BRANDI ANGELA BRANDT, for extradition to Australia because each of the elements required for extradition has been met.


Dated: July 1, 2013                    Respectfully submitted,

                                       ANDRÉ BIROTTE JR.
                                       United States Attorney

                                       ROBERT E. DUGDALE
                                       Assistant United States Attorney
                                       Chief, Criminal Division


                                       _____/s/_____
                                       ROBYN K. BACON
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

EXHIBIT A



DISTRICT OF COLUMBIA, ss:

## DECLARATION OF SUSAN BENDA

I, Susan Benda, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C.  This office has responsibility for extradition requests within the Department of State, and I am familiar with the extradition case of Brandi Angela Brandt.  I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. In accordance with the provisions of the extradition treaty and protocol in full force and effect between the United States and Australia, the Embassy of Australia has submitted Diplomatic Note No. 115/2012 formally requesting the extradition of Brandi Angela Brandt.  A copy of the diplomatic note is attached to this declaration.

3. The relevant and applicable treaty provisions in full force and effect between the United States and Australia are found in the Treaty on Extradition between the United States of America and Australia of May 14, 1974, which entered into force on May 8, 1976 (TIAS 8234), and the Protocol Amending the Treaty on Extradition between the United States of America and Australia of May 14, 1974, signed on September 4, 1990, which entered into force on December 21, 1992.  A copy of the Treaty and Protocol are attached to this declaration.

4. In accordance with Article XVIII of the 1974 Extradition Treaty, as replaced by Article 14 of the 1990 Protocol, the Government of the United States represents the interests of Australia in any proceedings arising out of a request for extradition made by Australia, and Australia provides reciprocal representation on behalf of the United States in proceedings in Australia arising out of extradition requests made by the United States.

000001

1206007911-1

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

...tify that Susan Benda, whose name is subscribed to the document hereunto annexed, was at the ti... ...cribing the same Attorney Adviser, Office of the Legal Adviser, Department of State, United States of... ...nd that full faith and credit are due to her acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*

In testimony whereof, I, Hillary Rodham Clinton, Secretary of State, have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Assistant Authentication Officer, of the said Department, at the city of Washington, in the District of Columbia, this twenty-second day of June, 2012.

*Issued pursuant to ...V, State ... 15 1789, 1 Stat. 68-69; 22 ... 657; 2 ... 2651a; 5 USC 301; 28 USC ... t. seq.; ... 1443(f); RULE 44 Federal ... Civil P... ...e.*

_____
Secretary of State

By _____

Assistant Authentication Officer,
Department of State

000002

-2-

5.  The offenses for which extradition is sought are covered under Article II of the 1974 Extradition Treaty, as replaced by Article 1 of the 1990 Protocol.

6.  The documents submitted by the Embassy of Australia in support of the extradition request were certified on April 30, 2012, by Jeffrey L. Bleich, Ambassador of the United States of America to Australia, in accordance with 18 U.S.C. § 3190.  At the time of his certification, Ambassador Bleich was the principal diplomatic officer of the United States in Australia.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on June ___, 2012.

SUSAN BENDA

Attachments:
1. Copy of Note
2. Copy of Treaty
3. Copy of Protocol



AUSTRALIA

Note No. 115/2012

The Embassy of Australia in Washington, D.C. presents its compliments to the United States

Department of State and has the honour to present a request for the extradition of Brandi Angela

BRANDT, a citizen of the United States of America, born on ██████████████

BRANDT'S extradition is sought so that she may be prosecuted in Australia for the following

offences:

- conspiracy to import a commercial quantity of cocaine contrary to section 307.1(1) and

  section 11.5 of the *Criminal Code Act 1995* (Cth) (Criminal Code), and

- dealing with money to the value of $130,760.00 that was proceeds of crime contrary to

  section 400.4(1) of the Criminal Code.

These offences are punishable under Australian law by imprisonment of more than one year.

This request is made in accordance with the *Treaty on extradition between Australia and the*

*United States of America* (as amended by the *Protocol amending the treaty on extradition*

*between Australia and the United States of America*) (the Treaty).

The duly authenticated documentation required in support of this extradition request is enclosed.

Pursuant to Article XVII of the Treaty, Australia requests the surrender, to the extent permitted

by the law of the United States of America, of all articles, documents, and evidence in the United

States connected with the offences for which BRANDT'S extradition is sought.

The following Australian official may be contacted in connection with this request for

extradition:

>       Ms Veronica Blanpain
>       Extradition Unit
>       International Crime Cooperation Central Authority
>       Attorney-General's Department
>       3-5 National Circuit
>       BARTON  ACT  2600
>       AUSTRALIA
>
>       Ph:  + 61 2 6141 3228
>       Fax:  + 61 2 6141 5457
>       Email: veronica.blanpain@ag.gov.au

The Government of Australia thanks the United States of America for its assistance in this

matter.

The Embassy of Australia in Washington, D.C. avails itself of this opportunity to express to the

United States Department of State the assurances of its highest consideration.



WASHINGTON DC

04 May 2012

# AUSTRALIA

## Extradition

*Treaty signed at Washington May 14, 1974;*
*Ratification advised by the Senate of the United States*
*of America December 1, 1975;*
*Ratified by the President of the United States of*
*America December 16, 1975;*
*Ratified by Australia December 22, 1975;*
*Ratifications exchanged at Canberra April 8, 1976;*
*Proclaimed by the President of the United States of*
*America May 5, 1976;*
*Entered into force May 8, 1976.*

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Treaty on Extradition between the United States of America and Australia was signed at Washington on May 14, 1974, the original of which Treaty is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty;

The Treaty was ratified by the President of the United States of America on December 16, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Australia;

The respective instruments of ratification were exchanged at Canberra on April 8, 1976;

It is provided in Article XXI of the Treaty that the Treaty shall enter into force thirty days after the exchange of instruments of ratification;

Now, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, to the end that it shall be observed and fulfilled with good faith on and after May 8, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

(957)                                                    TIAS 8234

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this fifth day of May in the year of our Lord one thousand nine hundred seventy-six [SEAL] and of the Independence of the United States of America the two hundredth.

GERALD R. FORD

By the President:
JOSEPH JOHN SISCO
*Acting Secretary of State*

Case 2:13-cv-03933-JSL-VBK Document 23 Filed 07/01/13 Page 40 of 116 Page ID #:148

TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA AND AUSTRALIA

The United States of America and Australia, desiring to
make more effective the cooperation of the two countries for
the reciprocal extradition of offenders, agree as follows:

## ARTICLE I

Each Contracting Party agrees, under the conditions and circumstances established by this Treaty, reciprocally to deliver up persons found in its territory who have been charged with or convicted of any of the offenses mentioned in Article II of this Treaty committed within the territory of the other Contracting Party, or outside that territory under the conditions specified in Article IV of this Treaty.

## ARTICLE II

(1)   Persons shall be delivered up according to the provisions of this Treaty for any of the following offenses provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year or by death:

1.   Murder or willful murder; assault with intent to commit murder.

2.   Manslaughter.

3.   Aggravated or willful wounding or injuring; assault occasioning actual bodily harm.

4.   Unlawful throwing or application of any corrosive or injurious substances upon the person of another.

5.   Rape; indecent assault, including unlawful sexual acts with or upon children.

6.   Illegal abortion.

7.   Procuring, or trafficking in, women or young persons for immoral purposes; living on the earnings of prostitution.

8.   Abandoning or exposing a child when the life of that child is or is likely to be injured or endangered.

Case 2:13-cv-03933-JSL-VBK   Document 23   Filed 07/01/13   Page 42 of 116   Page ID #:150

9.  Bigamy.

10.  Kidnapping; child stealing; abduction; false imprisonment.

11.  Robbery.

12.  Burglary; housebreaking or any similar offense.

13.  Larceny.

14.  Embezzlement.

15.  Obtaining any property, money or valuable securities by false pretenses or other form of deception.

16.  An offense against the law relating to bribery.

17.  Extortion.

18.  Receiving any property, money or valuable securities knowing the same to have been unlawfully obtained.

19.  Fraud by an agent, bailee, banker, factor or trustee, by a director or officer of a company or by a promoter of a company, whether existing or not.

20.  An offense relating to counterfeiting or forgery.

21.  Perjury; subornation of perjury; conspiring to defeat the course of justice.

22.  Arson.

23.  An act done with the intention of endangering the safety of any person traveling upon a railway or in any aircraft or vessel or other means of transportation.

24.  Any seizure or exercise of control, by force or violence or threat of force or violence, or by any other form of intimidation, of an aircraft.

25.  Piracy, by statute or by law of nations; revolt on board a vessel against the authority of the master of the vessel.

26.   Malicious injury to property.

27.   An offense against the bankruptcy laws.

28.   An offense against the laws relating to narcotics,
      dangerous drugs or psychotropic substances.

29.   Dealing in slaves.

(2)   Extradition shall also be granted for any other offenses
that are made extraditable under the extradition laws of Australia
and which are felonies under the laws of the United States of America.

(3)   Extradition shall also be granted for any offense against
a federal law of the United States of America of which one of the
above-mentioned offenses is a substantial element, even if trans-
porting or transportation or the use of the mails or of interstate
facilities is also an element of the specific offense.

(4)   Extradition shall also be granted for aiding, abetting,
counseling or procuring the commission of, being an accessory
before or after the fact to, or attempting or conspiring to commit,
any of the offenses mentioned in the preceding paragraphs of this
Article.

(5)   If extradition is requested for any offense mentioned
in a preceding paragraph of this Article and that offense is
punishable under the laws of both Contracting Parties by a term
of imprisonment exceeding one year or by death, that offense shall
be extraditable under the provisions of this Treaty whether or not
the laws of both Contracting Parties would place that offense within
the same category of offenses made extraditable by that preceding
paragraph of this Article and whether or not the laws of the requested
State denominate the offense by the same terminology.

Case 2:13-cv-03933-JSL-VBK   Document 23   Filed 07/01/13   Page 44 of 116   Page ID #:452

## ARTICLE III

(1)   For the purposes of this Treaty, the territory of a Contracting Party means all the territory under the jurisdiction of that Contracting Party, including airspace and territorial waters, and also includes –

    (a)   any vessel registered in any territory under the jurisdiction of that Contracting Party; and

    (b)   any aircraft registered in any such territory provided that the aircraft is in flight when the relevant offense is committed.

(2)   For the purposes of this Treaty –

    (a)   the territory under the jurisdiction of a Contracting Party includes the Territories for the international relations of which that Contracting Party is responsible;

    (b)   an aircraft shall be considered in flight from the moment when the power is applied for the purpose of take-off until the moment when the landing run ends.

## ARTICLE IV

When the offense for which extradition has been requested has been committed outside the territory of the requesting State –

    (a)   if the United States of America is the requested State – the executive authority of the United States of America; or

    (b)   if Australia is the requested State – the Attorney-General of Australia,

shall have the power to grant the extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances.

Case 2:13-cv-03933-JSL-VBK   Document 23   Filed 07/01/13   Page 45 of 116   Page ID #:153

ARTICLE V

(1)   Neither of the Contracting Parties shall be bound to deliver up its own nationals under this Treaty but the executive authority of each Contracting Party shall have the power to deliver them up if, in its discretion, it considers that it is proper to do so.

(2)   For the purposes of this Article -

(a)   a reference to the executive authority of a Contracting Party shall, in the case of Australia, be construed as a reference to the Attorney-General of Australia;

(b)   Australian protected persons shall be deemed to be nationals of Australia; and

(c)   the nationality of a person shall be determined to be that which he held at the time when he was charged with the offense for which his extradition is requested.


ARTICLE VI

Extradition shall be granted only if the evidence is found sufficient, according to the laws in the territory where the person whose extradition is requested is found, either to justify his trial or committal for trial if the offense with which he is charged or its equivalent had been committed in that territory or to prove that he is the identical person convicted by the courts of the requesting State.

Case 2:12-cv-03933-JSL-VBK   Document 23   Filed 07/01/13   Page 46 of 116   Page ID #:154

### ARTICLE VII

(1)  Extradition shall not be granted in any of the following circumstances:

(a)  when the person whose extradition is requested is being proceeded against, has been tried and discharged or punished, or has been pardoned, in the territory of the requested State for the offense for which his extradition is requested;

(b)  when the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State; or

(c)  when the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of a political character.

(2)  If any question arises whether a case comes within the provisions of subparagraph (c) of paragraph (1) of this Article, the requested State shall decide that question.

### ARTICLE VIII

If, under the law of the requesting State, an offense for which the extradition of a person is requested, or any other offense for which he may be detained or tried under paragraph (1) of Article XIV, is subject to a penalty of death but the law of the requested State does not provide for such a penalty in a similar case, the requested State may recommend to the requesting State that any punishment imposed for any of those offenses be a less severe punishment.

ARTICLE IX

When the person whose extradition is requested is being
proceeded against or is serving a sentence in the territory of
the requested State for an offense other than that for which
extradition has been requested, his surrender may be deferred
until the conclusion of the proceedings and the full execution
of any punishment that may be or may have been imposed on him.

ARTICLE X

The determination that extradition based upon the request
therefor should or should not be granted shall be made in
accordance with the law of the requested State and the person whose
extradition is sought shall have the right to use such remedies
and recourses as are provided by that law.

ARTICLE XI

(1)   The request for extradition shall be made through the
diplomatic channel.

(2)   The request shall be accompanied by a description of
the person sought, a statement of the facts of the case, the text
of the applicable laws of the requesting State including the law
defining the offense, the law prescribing the punishment for the
offense and the law relating to the limitation of the legal
proceedings.

(3)   When the request relates to a person who has not yet been
convicted, it must also be accompanied by a warrant of arrest issued
by a judge or other judicial officer of the requesting State and
by such evidence as, according to the laws of the requested State,

Case 2:13-cv-03933-JSL-VBK Document 23 Filed 07/01/13 Page 48 of 116 Page ID #:456

would justify his trial or committal for trial if the offense had
been committed there, including evidence proving the person requested
is the person to whom the warrant of arrest refers.

(4)  When the request relates to a person already convicted, it
must be accompanied by the judgment of conviction and sentence, if any,
passed upon him in the territory of the requesting State, by a statement,
if applicable, showing how much of the sentence has not been served
and by evidence proving that the person requested is the person to
whom the judgment refers.

(5)  The warrant of arrest and deposition or other evidence,
given under oath or affirmed, and the judicial documents establishing
the existence of the conviction, or certified copies of those
documents, shall be admitted in evidence in the examination of the
request for extradition when -

(a)  in the case of a request by Australia - those
documents or certified copies bear the signature, or are
accompanied by the attestation, of a judge, magistrate or
officer of Australia or are authenticated by the official
seal of the Attorney-General and, in any case, are certified
by the principal diplomatic or consular officer of the United
States of America in Australia; or

(b)  in the case of a request by the United States of
America - the warrant, if any, bears an original signature,
or the other documents are certified, by a judge, magistrate
or officer of the United States of America and, in any case, are
authenticated by the oath of a witness or sealed with the official

seal of the Department of State on behalf of the Secretary of
State or of the Department of Justice on behalf of the
Attorney General.

### ARTICLE XII

(1)  In case of urgency a Contracting Party may apply for the
provisional arrest of the person sought pending the presentation of
the request for extradition through the diplomatic channel.

(2)  The application shall contain a description of the person
sought, an indication of intention to request the extradition of
the person sought and a statement of the existence of a warrant of
arrest or a judgment of conviction against that person, and such
further information, if any, as would be necessary to justify the
issue of a warrant of arrest had the offense been committed, or the
person sought been convicted, in the territory of the requested
State.

(3)  On receipt of such an application the requested State
shall take the necessary steps to secure the arrest of the person
claimed.

(4)  A person arrested upon such an application shall be set at
liberty upon the expiration of forty-five days from the date of his
arrest if a request for his extradition accompanied by the documents
specified in Article XI has not been received.

(5)  Paragraph (4) of this Article shall not prevent the
institution of proceedings with a view to extraditing the person
sought if the request is subsequently received.

Case 2:13-cv-03933-JSL-VBK   Document 23   Filed 07/01/13   Page 50 of 116   Page ID #:158

ARTICLE XIII

(1)   If the requested State requires additional evidence or information to enable it to decide on the request for extradition, that State may request that such evidence or information be furnished within such period as it specifies.

(2)   If the person sought is under arrest and the additional evidence or information submitted as aforesaid is not sufficient or if such evidence or information is not received within the period specified by the requested State, he shall be discharged from custody.

(3)   The discharge of a person from custody under paragraph (2) of this Article shall not bar the requesting State from submitting another request in respect of the same offense.

ARTICLE XIV

(1)   A person extradited under this Treaty may be detained, tried or punished in the territory of the requesting State for any offense mentioned in Article II for which the person could be convicted upon proof of the facts upon which the request for extradition was based.

(2)   Except as provided in paragraph (1) of this Article, a person extradited under this Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted, or be extradited by that State to a third State, unless –

(a)   he has left the territory of the requesting State after his extradition and has voluntarily returned to it;

(b)  he has not left the territory of the requesting

State within thirty days after being free to do so; or

(c)  the offense concerned is one for which the requested

State has consented to his detention, trial or punishment or

to his extradition to a third State and is an offense mentioned

in Article II.

(3)  A request for the consent of the requested State under

subparagraph (c) of paragraph (2) of this Article shall be

accompanied by such information and documents as are requested

by that State.

(4)  This Article does not apply to offenses committed after the

extradition.


ARTICLE XV

A requested State, upon receiving two or more requests for

the extradition of the same person either for the same offense, or

for different offenses, shall determine to which of the requesting

States it will extradite the person sought, taking into consideration

the circumstances and particularly the possibility of a later

extradition between the requesting States, the seriousness of each

offense, the place where the offense was committed, the nationality

and residence of the person sought, the dates upon which the requests

were received and the provisions of any extradition agreements

between the requested State and the other requesting State or States.

000019

Case 2:13-cv-03933-JSL-VBK   Document 23   Filed 07/01/13   Page 52 of 116   Page ID #:160

ARTICLE XVI

(1)  The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2)  Where extradition of a person for an offense is granted, the person shall be conveyed by the appropriate authorities of the requested State to a port or airport in the territory of that State agreed between that State and the requesting State.

(3)  If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as is prescribed by the laws of that State, he may be set at liberty, and the requested State may subsequently refuse to extradite that person for the same offense.

(4)  Australia is not required to extradite a person before the expiration of fifteen days after the date on which he has been held judicially to be liable to extradition, or, if proceedings for a writ of habeas corpus have been brought, before the expiration of fifteen days after the final decision of the competent court has been given.


ARTICLE XVII

(1)  To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles found in the requested State that have been acquired as a result of the offense or may be required as evidence shall, if the requesting State so requests, be surrendered if extradition is granted.

(2)  Subject to the qualifications of paragraph (1) of this Article, the above-mentioned articles shall, if the requested State so requests, be surrendered to the requesting State even if the extradition, having been agreed to, cannot be carried out owing to the death or escape of the person sought.

(3)  Where the law of the requested State or the rights of third parties so require, any articles so surrendered shall be returned to the requested State free of charge if that State so requests.

ARTICLE XVIII

(1)  Expenses related to the transportation of the person sought to the requesting State shall be paid by the requesting State.

(2)  The requested State shall make all necessary arrangements for, and meet the cost of, the representation of the requesting State in any proceedings arising out of a request for extradition.

(3)  No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the requested State against the requesting State.

ARTICLE XIX

(1)  The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel.

(2)  In the case of a national of the requested State, the request shall establish that conditions are present which would warrant extradition of the person by the State of transit.

Case 2:13-cv-03933-JSL-VBK   Document 23   Filed 07/01/13   Page 54 of 116   Page ID #:162

(3)  The request may be refused if reasons of public order are opposed to the transit.

(4)  Permission for the transit of a person surrendered shall include authorization for accompanying officials to hold that person in custody or request and obtain assistance from authorities in the State of transit in maintaining custody.

(5)  The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

ARTICLE XX

This Treaty applies to offenses mentioned in Article II committed before, on or after the date on which this Treaty enters into force, provided that no extradition shall be granted for an offense committed before that date which was not an offense under the laws of both Contracting Parties at the time of its commission.

ARTICLE XXI

(1)  This Treaty is subject to ratification and the instruments of ratification shall be exchanged in Canberra as soon as possible.

(2)  This Treaty shall enter into force thirty days after the exchange of instruments of ratification. [1]

(3)  This Treaty may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

(4)  This Treaty shall terminate and replace, as between the Contracting Parties to the present Treaty, the Treaty on Extradition between the United States and Great Britain of December 22, 1931, [2] as made applicable to Australia.

---

[1] May 8, 1976.
[2] TS 849; 47 Stat. 2122.

Case 2:13-cv-02922-JSL-VBK   Document 23   Filed 07/01/13   Page 55 of 116   Page ID #:163

IN WITNESS WHEREOF the undersigned, being duly authorized

thereto by their respective Governments, have signed this Treaty.

DONE at Washington this fourteenth day of May, 1974.


FOR THE UNITED STATES OF AMERICA:


FOR AUSTRALIA:

| 102d CONGRESS  2d Session | SENATE | TREATY DOC.  102–23 |
| --- | --- | --- |

# PROTOCOL AMENDING THE 1974 EXTRADITION TREATY WITH AUSTRALIA

---

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE PROTOCOL AMENDING THE TREATY ON EXTRADITION BE-TWEEN THE UNITED STATES OF AMERICA AND AUSTRALIA, SIGNED AT SEOUL ON SEPTEMBER 4, 1990



FEBRUARY 19, 1992.—Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1992

59–118

000024

## LETTER OF TRANSMITTAL

———

THE WHITE HOUSE, *February 19, 1992.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Protocol Amending the Treaty on Extradition between the United States of America and Australia, signed at Seoul on September 4, 1990. I also transmit for the information of the Senate the report of the Department of State with respect to the Protocol.

The Protocol supplements and amends the Treaty on Extradition between the United States of America and Australia, signed at Washington on May 14, 1974. It is designed to update and standardize the conditions and procedures for extradition between the United States and Australia. Most significant, it removes an outdated list of extraditable offenses from the 1974 Treaty and expands upon the dual criminality approach contained in that Treaty. The Protocol also provides a legal basis for temporarily surrendering prisoners to stand trial for crimes against the laws of the requesting State. The provisions in this Protocol follow generally the form and content of extradition treaties recently concluded by the United States.

This Protocol will make a significant contribution to international cooperation in law enforcement. I recommend that the Senate give early and favorable consideration to the Protocol and give its advice and consent to ratification.

GEORGE BUSH.

(III)

## LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, February 13, 1992.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Protocol Amending the Treaty on Extradition between the United States of America and Australia, signed at Seoul on September 4, 1990. I recommend that this Protocol be transmitted to the Senate for its advice and consent to ratification.

The provisions of this Protocol follow generally the form and content of extradition treaties recently concluded by the United States. It represents a concerted effort by the Department of State and the Department of Justice to modernize the legal tools available for the extradition of serious offenders such as narcotics traffickers and terrorists.

Upon entry into force, this Protocol will supplement and amend the 1974 Treaty on Extradition between the United States of America and Australia, signed at Washington on May 14, 1974.

Article 1 of the Protocol replaces Article II of the 1974 Treaty in its entirety. It rearticulates the dual criminality approach contained in the 1974 Treaty which is used to determine whether a particular offense is extraditable and eliminates the outdated list of extraditable offenses contained in the 1974 Treaty. This modern extradition practice emphasizes extradition based on underlying criminal conduct rather than the particular designation of the offense contained in our respective criminal codes. A dual criminality clause permits extradition for any conduct that is punishable in both States by imprisonment or other detention for at least one year. Inclusion of a dual criminality clause obviates the need to renegotiate or supplement the Treaty as offenses, such as computer-related crimes or money laundering, become punishable under the laws of both States.

Article 1 of the Protocol also requires extradition for conspiring, attempting or participating in the commission of an offense under the Treaty, as amended.

An offense is extraditable under Article 1 of the Protocol, notwithstanding any interstate transportation or mail-use elements required to establish U.S. Federal jurisdiction. This provision will allow the United States to obtain extradition for such offenses even though Australian law does not include analogous jurisdictional elements for similar underlying criminal behavior.

Article 1 further requires extradition for extraterritorial offenses so long as the law of the requested State would provide for extra-

(V)

000026

VI

territorial jurisdiction under similar circumstances. The requested State is also given the discretion to grant extradition for extraterritorial offenses in all other cases.

Article 2 of the Protocol deletes Articles III and IV of the 1974 Treaty concerning territorial jurisdiction which is now covered in more general terms under Article I of the Protocol.

Article 3 of the Protocol replaces Article V(2) of the 1974 Treaty. The Article, as amended, would continue to permit the requested State to grant or deny extradition of its nationals but, in cases where extradition is denied, would provide a mechanism for the requesting State to require submission to prosecution by the requested State, to the extent permitted by its laws, of all offenses for which extradition has been sought.

Article 4 of the Protocol deletes Article VI of the 1974 Treaty concerning the standard of proof required to support extradition. This concept is now covered by Article 7 of the Protocol.

Article 5 of the Protocol replaces Article VIII of the 1974 Treaty and permits the requested State to deny extradition for a capital offense, if the requesting State fails to provide sufficient assurance that the death penalty will not be imposed or carried out.

Article 6 of the Protocol replaces Article IX of the 1974 Treaty. It allows the requested State to postpone extradition proceedings or surrender if the fugitive who is the subject of an extradition request is being prosecuted or is serving a sentence in the requested State. Under this provision the requested State has the discretion to grant extradition and surrender the fugitive temporarily to the requesting State for the purpose of early prosecution in that State. This provision will allow a person serving a long sentence in the requested State to be tried promptly in the requesting State and returned to the requested State to complete his sentence. This alternative of temporary surrender is routinely included in our modern extradition treaties.

Article 7 replaces Article XI of the 1974 Treaty and specifies the procedures by which extradition is to be accomplished. The procedures provided therein are similar to those found in other modern extradition treaties.

Articles 8 replaces Article XII of the 1974 Treaty. It provides for the provisional arrest and detention of a fugitive for no more than 60 days pending receipt of a fully documented extradition request in conformance with Article XI of the Treaty, as amended. The discharge of a fugitive from custody does not prejudice subsequent rearrest and extradition upon later receipt of the extradition request and supporting documents.

Article 9 of the Protocol supplements and amends Article XIII of the 1974 Treaty. It continues the mechanism for the submission of additional information whenever the requested State considers the information provided with the request to be insufficient. Article XIII, as amended, would also permit expedited surrender without formal proceedings where the person sought consents to surrender after having been advised by the competent authority of his or her right to formal extradition proceedings.

Article 10 replaces Article XIV of the 1974 Treaty concerning the rule of speciality. This article provides, subject to specific exceptions, that a person extradited under the Treaty, as amended, may

VII

not be detained, tried, or punished for an offense other than that for which extradition has been granted without the consent of the requested State; nor may he be extradited without the consent of the requested State to a third State for any offense committed before his surrender. This limitation only applies until such time as the person leaves the territory of the requesting State and voluntarily returns or fails to leave within 15 days of being free to do so.

Article 11 of the Protocol replaces Article XV of the 1974 Treaty and sets forth a non-exclusive list of factors to be considered by the requested State in determining to which State to surrender a person sought by more than one State.

Article 12 of the Protocol replaces Article XVI of the 1974 Treaty. It requires the requested State to notify the requesting State promptly of its decision on extradition and, if it denies extradition, in whole or in part, to provide an explanation as well as copies of judicial decisions upon request. If extradition is granted, the fugitive must be removed from the territory of the requested State within the time prescribed by the law of the requested State, or the person may be released from custody and a subsequent request for his extradition may be refused.

Article 13 of the Protocol replaces Article XVII of the 1974 Treaty and provides for the seizure and ultimate surrender to the requesting State of all items connected with the offense for which extradition is sought. This obligation is subject to the rights of third parties. Before surrender, the requested State may require assurances that the objects be returned.

Article 14 of the Protocol replaces the text of Article XVIII of the 1974 Treaty and provides that the requested State shall represent the requesting State in any proceedings in the requested State arising from a request for extradition and bear all costs other than those arising from the translation of documents and transportation of the fugitive.

Article 15 replaces Article XIX of the 1974 Treaty and governs the transit through the territory of one of the contracting States of a person being surrendered to the other contracting State by a third State.

Article 16 of the Protocol stipulates that the Protocol applies to offenses committed before as well as after its entry into force.

Article 17 provides that the Protocol will enter into force immediately upon the exchange of written notification that both Parties have complied with their respective requirements for entry into force.

A Technical Analysis explaining in detail the provisions of the Protocol is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Protocol by the Senate at an early date.

Respectfully submitted,

LAWRENCE S. EAGLEBURGER.

PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA
AND
AUSTRALIA
OF MAY 14, 1974

The United States of America and Australia;

Desiring to make more effective the Extradition Treaty between
the Contracting Parties signed at Washington May 14, 1974
(hereinafter referred to as "the Treaty");

Have agreed as follows:

(1)

000029

## ARTICLE 1

The text of Article II of the Treaty is replaced by the following:

"(1)  An offence shall be an extraditable offence if it is punishable under the laws in both Contracting Parties by deprivation of liberty of more than one year, or by a more severe penalty.  However, if the request for extradition relates to a person convicted of such an offence who is wanted for the enforcement of a sentence of imprisonment, the executive authority of the requested State shall have authority to refuse extradition if a period of less than six months of imprisonment remains to be served.

(2)  The following offences shall be extraditable if they meet the requirements of paragraph (1): conspiring to commit, attempting to commit, aiding or abetting, counselling or procuring the commission of, or being an accessory after the fact to, any offence described in that paragraph.

(3)  For the purpose of this Article, an offence shall be an extraditable offence:

(a) whether or not the laws in the Contracting Parties place the offence within the same category of offences or describe the offence by the same terminology; and

3

- 3 -

(b) whether or not the offence is one for which
United States federal law requires proof of
interstate transportation, or use of the mails,
or of other facilities affecting interstate or
foreign commerce, such matters being merely for
the purpose of establishing jurisdiction in a
United States federal court.

(4)  If the offence has been committed outside the
territory of the requesting State, extradition shall be
granted if the laws in the requested State provide for the
punishment of an offence committed outside of its territory
in similar circumstances.  If the laws in the requested
State do not so provide, the executive authority of the
requested State may, in its discretion, grant extradition.

(5)  Subject to the laws in the requested State, if
extradition has been granted for an extraditable offence,
it shall also be granted for any other offence specified in
the request even if the latter offence is punishable by
deprivation of liberty of one year or less, provided that
all other requirements of extradition are met."


ARTICLE 2

Article III and Article IV of the Treaty are deleted.

4

- 4 -

ARTICLE 3

The text of paragraph 2 of Article V of the Treaty is replaced
by the following:

"If the requested State refuses to extradite a national of that
State on the basis of nationality it shall, if the requesting
State so requests and the laws of the requested State allow,
submit the case to the competent authorities in order that
proceedings for the prosecution of the person may be undertaken
in respect of all offences for which the extradition has been
requested."

ARTICLE 4

Article VI of the Treaty is deleted.

ARTICLE 5

The text of Article VIII of the Treaty is replaced by the
following:

"If, under the law of the requesting State, an offence for
which the extradition of a person is requested is subject to a

5

- 5 -

penalty of death, the requested State may refuse the
extradition unless the requesting State gives an undertaking
that the death penalty will not be imposed or, if imposed, will
not be carried out."


ARTICLE 6


The text of Article IX of the Treaty is replaced by the
following:

"(1) If the extradition request is granted in the case of a
person who is being prosecuted or is serving a sentence in
the territory of the requested State, the requested State
may temporarily surrender the person sought to the
requesting State for the purpose of prosecution.  The
person so surrendered shall be kept in custody in the
requesting State and shall be returned to the requested
State after the conclusion of the proceedings against that
person, in accordance with conditions to be mutually
determined in writing between the Contracting Parties.
(2)  The requested State may postpone the extradition
proceedings against, or the surrender of, any person who is
being prosecuted or who is serving a sentence in that

6

- 6 -

State.  The postponement may continue until the prosecution of the person sought has been concluded and any sentence has been served."

ARTICLE 7

The text of Article XI of the Treaty is replaced by the following:

"(1)  All requests for extradition shall be made through the diplomatic channel.

(2)  The request for extradition shall be supported by:

(a) documents, statements, or other types of information which describe the identity and probable location of the person sought;

(b) a description of the conduct constituting the offence;

(c) a statement of the law describing the essential elements of the offence for which extradition is requested; and

(d) a statement of the law describing the punishment for the offence and the law relating to the limitation of legal proceedings.

(3)  A request for the extradition of a person who is sought for prosecution or who has been found guilty in his absence shall also be supported by:

7

- 7 -

(a) a copy of the warrant or order of arrest issued in the requesting State for the arrest of the person for the offence;

(b) a copy of the charging document, if any; and

(c) a description of the facts, by way of affidavit, statement, or declaration, setting forth reasonable grounds for believing that an offence has been committed and that the person sought committed it.

(4) A request for extradition of a person who has been found guilty of the offence for which extradition is sought, other than a person who has been found guilty in his absence, shall also be supported by:

(a) a copy of the judgment of conviction, if available, or a statement by a judicial authority that the person has been found guilty;

(b) information establishing that the person sought is the person to whom the finding of guilt refers;

(c) a copy of the sentence imposed, if the person has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

(d) if the person has been found guilty but no sentence has been imposed, a statement affirming that it is intended to impose a sentence.

- 8 -

(5)  The documents which accompany an extradition request shall be received and admitted as evidence in extradition proceedings if:

(a) in the case of a request from the United States, they

(i) purport to be signed or certified by a judge, magistrate, or officer in or of the United States; and

(ii) purport to be authenticated by the oath or affirmation of a witness or to be sealed with an official or public seal of the requesting State or of a Minister of State, or of a Department or officer of the Government of the requesting State;

(b) in the case of a request from Australia, they are certified by the principal diplomatic or consular officer of the United States resident in Australia, as provided by the extradition laws of the United States; or

(c) they are certified or authenticated in any other manner accepted by the law of the requested State."

### ARTICLE 8

The text of Article XII of the Treaty is replaced by the following:

9

- 9 -

"(1)   In case of urgency, either Contracting Party may request the provisional arrest of the person sought pending presentation of the request for extradition.  A request for provisional arrest may be transmitted through the diplomatic channel or directly between the Department of Justice in the United States and the Attorney-General's Department in Australia.  The facilities of the International Criminal Police Organisation (Interpol) may be used to transmit such a request.

(2)   The application for provisional arrest shall contain:

    (a) a description of the person sought;

    (b) the location of the person sought, if known;

    (c) a brief statement of the facts of the case, including, if possible, the time and location of the offence;

    (d) a description of the laws violated or alleged to have been violated and, where applicable, the penalty which may be imposed;

    (e) a statement of the existence of a warrant of arrest or finding of guilt or judgment of conviction against the person sought; and

    (f) a statement that a request for the extradition of the person sought will follow.

(3)   On receipt of the application, the requested State shall take appropriate steps to secure the arrest of the person sought.  The requesting State shall be notified

‡ 10

- 10 -

without delay of the disposition of its application, and the reasons for any denial.

(4) A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of arrest pursuant to the application of the requesting State if the executive authority of the requested State has not received the formal request for extradition and the supporting documents required in Article XI.

(5) The fact that the person sought has been discharged from custody pursuant to paragraph (4) of this Article shall not prejudice the subsequent rearrest and extradition of that person if the extradition request and supporting documents are received at a later date.

ARTICLE V

Article XIII of the Treaty is amended by deleting the words "evidence or" wherever they occur in Article XIII(1) and Article XIII(2), and by adding the following:

"(4) If the person sought, after being personally advised by the competent authority of the requested State of his right to formal extradition proceedings, consents to

11

- 11 -

surrender to the requesting State, the requested State may
surrender the person as expeditiously as possible and
without further proceedings."

ARTICLE 10

The text of Article XIV of the Treaty is replaced by the
following:

"(1)  A person extradited under this Treaty may not be
detained, tried, or punished in the requesting State except
for:

(a) the offence for which extradition is granted
or any other offence of which the person could be
convicted on proof of the conduct constituting
the extradition offence provided that the offence
carries the same or a lesser punishment;

(b) any offence committed after the extradition;
or

(c) any offence for which the executive authority
of the requested State consents to the person's
detention, trial or punishment.  For the purposes
of this subparagraph, the requested State may
require the submission of the documents specified
in Article XI.

(2)  A person extradited under this Treaty by a Contracting
Party may not be extradited to a third State for an offence

12

- 12 -

committed prior to his surrender unless that Contracting Party consents.

(3) Paragraphs (1) and (2) of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of that person to a third State, if:

      (a) that person leaves the territory of the requesting State after extradition and voluntarily returns to it; or

      (b) that person does not leave the territory of the requesting State within fifteen days of the day on which the person is free to do so."

ARTICLE 11

The text of Article XV of the Treaty is replaced by the following:

"If the requested State receives requests from the other Contracting Party and from any other State or States for the extradition of the same person, either for the same offence or for a different offence, the executive authority of the requested State shall determine to which State it will surrender the person.  In making its decision, the requested State shall consider all relevant factors, including but not limited to:

  (a) whether the requests were made pursuant to treaty;

  (b) the place where each offence was committed;

13

- 13 -

(c) the respective interests of the requesting States;

(d) the gravity of the offences;

(e) the nationality of the victim;

(f) the possibility of further extradition between the requesting States; and

(g) the chronological order in which the requests were received from the requesting States."


ARTICLE 12

The text of Article XVI of the Treaty is replaced by the following:

"(1)  The requested State shall promptly notify the requesting State of its decision on the request for extradition.

(2)  If the request is denied in whole or in part, the requested State shall provide information as to the reasons for the denial of the request.  The requested State shall provide copies of pertinent judicial decisions on request.

(3)  If the request for extradition is granted, the competent authorities of the Contracting Parties shall arrange for the time and place of the surrender of the person sought.

(4)  If the person sought is not removed from the territory of the requested State within the time prescribed by the law of that State, that person may be discharged from

14

- 14 -

custody, and the requested State may subsequently refuse
extradition for the same offences."

ARTICLE 13

The text of Article XVII of the Treaty is replaced by the
following:

"(1)  To the extent permitted under its laws, the requested
State may seize all articles, documents, and evidence
connected with the offence in respect to which extradition
is or is to be sought and surrender those items to the
requesting State if extradition is subsequently granted.
The items mentioned in this Article may be surrendered even
when extradition cannot be effected due to the death,
disappearance, or escape of the person sought.

(2)  The requested State may require that the surrender of
any property be subject to satisfactory assurances from the
requesting State that the property will be returned to the
requested State as soon as practicable.  The requested
State may also defer surrender of any property if it is
needed as evidence in the requested State.

(3)  The rights of third parties in any property shall be
duly respected."

15

- 15 -

## ARTICLE 14

The text of Article XVIII of the Treaty is replaced by the following:

"(1) The requested State shall advise, assist, and otherwise represent the interests of the requesting State in any proceedings arising out of a request for extradition.

(2) The requesting State shall bear the expenses related to any translation of documents and the transportation of the person surrendered. The requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

(3) Neither State shall make any pecuniary claim against the other arising out of the arrest, detention, examination, or surrender of the person sought under this Treaty."

## ARTICLE 15

The text of Article XIX of the Treaty is replaced by the following:

"(1) Either Contracting Party may authorise transportation through its territory of a person surrendered to the other State by a third State. A request for transit shall contain a description of the person being transported and a brief

16

16

statement of the facts of the case.  A person in
transit shall be held in custody during the
period of transit.

(2)  No authorisation is required where air
transportation is used and no landing is
scheduled on the territory of the other
Contracting Party.  If an unscheduled landing
occurs on the territory of the other Contracting
Party, the other Contracting Party may require
the request for transit as provided in paragraph
1.  That Contracting Party shall detain the
person being transported until the request for
transit is received and the transit is effected,
so long as the request is received within 96
hours of the unscheduled landing."


ARTICLE 16

Notwithstanding Article XX of the Treaty, this Protocol shall
apply in all cases in which the request for extradition is made
after its entry into force regardless of whether the offence
was committed before or after that date.

- 17 -

ARTICLE 17

This Protocol shall enter into force on the date on which the Contracting Parties have exchanged written notification that they have complied with their respective requirements for the entry into force of this Protocol.

IN WITNESS WHEREOF, the undersigned, being duly authorised thereto by their respective Governments, have signed this Protocol.

DONE at Seoul, this 4th day of September, 1990

FOR THE UNITED STATES
OF AMERICA:

FOR AUSTRALIA:

Certificate to be Attached to Documentary Evidence Accompanying
Requisitions in the United States for Extradition

### AMERICAN FOREIGN SERVICE

Canberra, Australia, April 30, 2012

I, Jeffrey L. Bleich, Ambassador of the United States of America at Canberra, Australia hereby certify that the annexed papers, being official documents provided by the Government of Australia proposed to be used upon an application for the extradition from the United States of America of Brandi Angela Brandt, charged with the crimes of conspiring with Wayne Cleveland, Craig Nicholson and divers other persons between about 24 July 2007 and about 2 December 2007 to import a commercial quantity of a substance being a border controlled drug, namely cocaine, contrary to section 307.1(1) and section 11.5 of the *Criminal Code Act 1995* (Cth) (*Criminal Code*) and dealing with money to the value of $100,000 or more, namely $130,760, that was proceeds of crime, believing the said money to be proceeds of crime, between about 24 July 2007 and about 7 November 2007 contrary to section 400.4(1) of the *Criminal Code*, alleged to have been committed in Australia, are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of Australia, as required by Title 18, United States Code, section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed 30th day of April, 2012.

Jeffrey L. Bleich.

Ambassador

Embassy of the United States of America

000046



I, Anastasia Karen Diane Harmer, Assistant Secretary of the International Crime Cooperation Central Authority, International Crime Cooperation Division, Attorney-General's Department, an officer in and of the Commonwealth of Australia, hereby certify that the documents attached to this certificate relate to the request for extradition from the United States of America to the Commonwealth of Australia of Brandi Angela Brandt

AND

I further certify that the seal affixed to this certificate is the seal of the Attorney-General of the Commonwealth of Australia, who is a Minister of State of the Commonwealth of Australia

AND

I further certify that the above-mentioned seal of the Attorney-General authenticates everything attached to this certificate.

Given under my hand and the official seal of the Attorney-General of the Commonwealth of Australia affixed to the tape binding all the attached documents.



Anna Harmer
Assistant Secretary
International Crime Cooperation Central Authority
International Crime Cooperation Division
Attorney-General's Department
an officer in and of the Commonwealth of Australia



**REQUEST FOR THE EXTRADITION TO AUSTRALIA**

**FROM THE UNITED STATES OF AMERICA OF**

**BRANDI ANGELA BRANDT**

I, Jason Dean Clare, Minister for Justice, a Minister of State of the Commonwealth of Australia, on behalf of the Government of Australia, hereby request that Brandi Angela Brandt, who is accused in New South Wales, a State of the Commonwealth of Australia, of the following offences:

- between about 24 July 2007 and about 2 December 2007 at Sydney in the State of New South Wales and elsewhere, Brandt conspired with Wayne Cleveland, Craig Nicholson and divers other persons to import a commercial quantity of a substance being a border controlled drug, namely cocaine, contrary to section 307.1(1) and section 11.5 of the *Criminal Code Act 1995* (Cth), and

- between about 24 July 2007 and about 7 November 2007 at Sydney in the State of New South Wales and elsewhere, Brandt did deal with money to the value of $100,000.00 or more, namely $130,760.00, that was proceeds of crime, believing the said money to be proceeds of crime contrary to section 400.4(1) of the *Criminal Code Act 1995* (Cth)

be returned to Australia to be dealt with according to law.

Dated this  12  day of  *April*        2012.

JASON CLARE MP
MINISTER FOR JUSTICE

CMO 12/130

REQUEST FOR THE EXTRADITION OF

BRANDI ANGELA BRANDT

FROM THE UNITED STATES OF AMERICA

TO AUSTRALIA

AFFIDAVIT OF PROSECUTOR

On the 23rd day of March 2012, I, Kong Hang Huen, Solicitor, of Level 7, 66-68 Goulburn Street, Sydney, in the State of New South Wales make oath and say:

1.     I am employed as a Legal Officer in the Office of the Director of Public Prosecutions for the Commonwealth of Australia.  Subject to the direction and control of the Director, I am responsible for the carriage of the prosecution of Brandi Angela BRANDT (hereinafter referred to as 'BRANDT').

**Qualifications of the Deponent**

2.     I was admitted to practice as a Solicitor of the Supreme Court of New South Wales on 25 August 2006.   New South Wales is a State of the Commonwealth of Australia.  I hold a bachelor of laws degree from the University of Western Sydney.

3.     I have been employed as a Solicitor in the Sydney Office of the Director of Public Prosecutions for the Commonwealth of Australia and have been prosecuting matters on behalf of the Director since February 2010.   My current duties include the prosecution of persons charged with offences against the laws of the Commonwealth of Australia, including but not limited to offences against the *Criminal Code Act 1995* (Commonwealth) ('the *Criminal Code*').  Based on my training and experience, I am well acquainted with the provisions of the *Criminal Code* and other laws of the Commonwealth of Australia relating to criminal law and procedure.

**Offences for which Extradition is Sought**

4.     The extradition of BRANDT from the United States of America is sought for the prosecution of the following offences ('the offences'):

1.     Between about 24 July 2007 and about 2 December 2007 at Sydney in the State of New South Wales and elsewhere, BRANDT conspired with Wayne CLEVELAND; Craig NICHOLSON and divers other persons to import a commercial quantity of a substance being a border controlled drug, namely cocaine, contrary to section 307.1(1) and section 11.5 of the *Criminal Code*.

2.     Between about 24 July 2007 and about 7 November 2007 at Sydney in the State of New South Wales and elsewhere, BRANDT did deal with

money to the value of $100,000.00 or more, namely $130,760.00, that was proceeds of crime, believing the said money to be proceeds of crime contrary to section 400.4(1) of the *Criminal Code*.

**Warrant of Arrest**

5.    On 31 March 2011 a warrant was issued for the arrest of BRANDT by an authorised officer of the Local Court at Sydney, New South Wales.   The warrant remains in force as at the date of this affidavit.

6.    A copy of the warrant is annexed to the affidavit of Federal Agent Gregory Adam Hinds sworn 23 March 2012 ('the Investigator's affidavit') and marked 'Annexure A'.

**Charging Document**

7.    On 27 January 2011 a Court Attendance Notice was issued by Federal Agent Corin Lee Bradfield.   A copy of the Court Attendance Notice is annexed and marked 'Annexure KH1'.

**Summary of the Conduct Constituting the Offences for which Extradition is Sought**

8.    The offences arise out of BRANDT's involvement in a conspiracy to import cocaine into Australia.

9.    On 2 December 2007 Australian Customs Service (ACS) officers at Sydney Airport seized a package containing 12 blocks of the border controlled drug cocaine from a rubbish bin onboard a United Airlines flight UA839 from Los Angeles.   The total weight of the powder in the 12 blocks was 5,393.1 grams (approximately 11.8 pounds).   The weight of the pure cocaine in the 12 blocks was 2,865.1 grams (approximately 6.3 pounds).

10.   Between July 2007 and November 2007 various Australian and American citizens remitted in excess of AUD250000 to the United States in a number of transactions, predominantly to BRANDT and Rusty Setser.   It is alleged that the money the subject of the transactions represented the proceeds of crime.

**Detailed Statement of the Acts and Omissions Alleged against BRANDT in respect of the Offences**

11.   A more detailed description of the conduct constituting the offences for which extradition is sought is annexed to the Investigator's affidavit and marked 'Annexure B'.

000050

**Offence and Penalty Provisions**

<u>Conspiracy to import a commercial quantity of a border controlled drug – ss 11.5 and 307.1(1) of the *Criminal Code*</u>

12.     Section 11.5 of the *Criminal Code* provides:

"11.5(1)   A person who conspires with another  person to commit an offence punishable by imprisonment for more than 12 months, or by a fine of 200 penalty units or more, is guilty of the offence of conspiracy to commit that offence and is punishable as if the offence to which the conspiracy relates had been committed.

(2)   For the person to be guilty:

(a)   the person must have entered into an agreement with one or more persons; and

(b)   the person and at least one other party to the agreement must have intended that an offence would be committed pursuant to the agreement; and

(c)   the person or at least one other party to the agreement must have committed an overt act pursuant to the agreement.

(2A)   Subsection (2) has effect subject to subsection (7A).

(3)   A person may be found guilty of conspiracy to commit an offence even if:

(a) committing the offence is impossible; or

(b) the only other party to the agreement is a body corporate; or

(c) each other party to the agreement is at least one of the following:

(i)     a person who is not criminally responsible;
(ii)   A person for whose benefit or protection the offence exists; or

(d) Subject to paragraph (4)(a), all other parties to the agreement have been acquitted of the conspiracy.

(4)   A person cannot be found guilty of conspiracy to commit an offence if:

(a)   all other parties to the agreement have been acquitted of the conspiracy and a finding of guilt would be inconsistent with their acquittal; or

(b)   he or she is a person for whose benefit or protection the offence exists.

000051

(5)   A person cannot be found guilty of conspiracy to commit an offence if, before the commission of an overt act pursuant to the agreement, the person;

(a)  withdrew from the agreement; and

(b)  took all reasonable steps to prevent the commission of the offence.

(6)  A court may dismiss a charge of conspiracy if it thinks that the interests of justice require it to do so.

(7)  Any defences, procedures, limitations or qualifying provisions that apply to an offence apply also to the offence of conspiracy to commit that offence.

(7A)  Any special liability provisions that apply to an offence apply also to the offence of conspiracy to commit that offence.

(8)  Proceedings for an offence of conspiracy must not be commenced without the consent of the Director of Public Prosecutions.  However, a person may be arrested for, charged with, or remanded in custody or on bail in connection with, an offence of conspiracy before the necessary consent has been given."

13.   Section 307.1(1) of the *Criminal Code* provides:

"A person commits an offence if:

(a) the person imports or exports a substance; and
(b) the substance is a border controlled drug or border controlled plant; and
(c) the quantity imported or exported is a commercial quantity.

Penalty:  Imprisonment for life or 7,500 penalty units, or both."

14.   Section 314.4 of Division 314 of the *Criminal Code* contains a table which lists border controlled drugs and sets out quantities.  Item 35 of that table lists cocaine as a border controlled drug and specifies 2.0 kilograms as the commercial quantity.

15.   Subsection 4AA(1) of the *Crimes Act 1914* (Commonwealth) ('the *Crimes Act*') provides that:

"in a law of the Commonwealth or a Territory Ordinance, unless the contrary intention appears: penalty unit means $110".

16.   The maximum penalty for an offence of conspiracy to import a commercial quantity of a border controlled drug is imprisonment for life or a fine of $825,000 or both.

**Dealing with the proceeds of crime worth $100,000 or more – s.400.4(1) of the** ***Criminal Code***

17.   Section 400.4(1) of the *Criminal Code* provides;

000052

(1) A person is guilty of an offence if:

(a) the person deals with money or other property; and

(b) either:

(i) the money or property is, and the person believes it to be, proceeds of crime; or
(ii) the person intends that the money or property will become an instrument of crime; and

(c) at the time of the dealing, the value of the money and other property is $100,000 or more.

Penalty: Imprisonment for 20 years, or 1,200 penalty units, or both.

...

(4) Absolute liability applies to paragraphs 1(c), (2)(d) and (3)(d).

18.   "*Proceeds of Crime*" is defined in section 400.1 of the *Criminal Code* as:

"*Proceeds of Crime* means any money or other property that is derived or realised, directly or indirectly, by any person from the commission of an offence that may be dealt with as an indictable offence (even if it may, in some circumstances, be dealt with as a summary offence)."

"*Dealing with money or other property*" is defined in section 400.2 of the *Criminal Code* as:

"(1)  For the purposes of this Division, a person *deals with money or other property* if:

(a)   the person does any of the following:

(i)      receives, possesses, conceals or disposes of money or other property;
(ii)     imports money or other property into, or exports money or other property from, Australia;
(iii)    engages in a banking transaction relating to money or other property; and

(b)   the money or other property is proceeds of crime, or could become an instrument of crime, in relation to an offence that is:
(i)      a Commonwealth indictable offence; or
(ii)     or a foreign indictable offence; or
(iii)    ...

In section 400.1 of the *Criminal Code*:

*Commonwealth indictable offence* means an offence against a law of the Commonwealth, or a law of a Territory (other than the Australian

000053

Capital Territory and the Northern Territory), that may be dealt with as an indictable offence (even if it may, in some circumstances, be dealt with as a summary offence).

***Export money or other property***, from Australia, includes transfer money or other property from Australia by an electronic communication.

18. The importation of a border controlled substance, namely cocaine, is an indictable offence against a law of the Commonwealth.

19. The penalty applicable for an offence against section 400.4(1) of the *Criminal Code* involving dealing in money, believing that the money is from the proceeds of a crime and at the time of dealing the value of the money is $100,000.00 or more, is imprisonment for 20 years or 1,200 penalty units ($132,000.00), or both.

20. Section 400.15 of the *Criminal Code* provides:

(1) A person does not commit an offence against this Division unless:

(a) the conduct constituting the alleged offence occurs:
(i) wholly or partly in Australia; or
(ii) wholly or partly on board an Australian aircraft or an Australian ship; or

(b) the conduct constituting the alleged offence occurs wholly outside Australia (but not on board an Australian aircraft or an Australian ship) and the money or other property:
(i) is proceeds of crime; or
(ii) is intended to become an instrument of crime; or
(iii) is at risk of becoming an instrument of crime;
in relation to a Commonwealth indictable offence, a State indictable offence, an Australian Capital Territory indictable offence or a Northern Territory indictable offence; or

(c) the conduct constituting the alleged offence occurs wholly outside Australia and:
(i) at the time of the alleged offence, the person is an Australian citizen; or
(ii) at the time of the alleged offence, the person is a resident of Australia; or
(iii) at the time of the alleged offence, the person is a body corporate incorporated by or under a law of the Commonwealth or of a State or Territory; or

(d) all of the following conditions are satisfied:
(i) the alleged offence is an ancillary offence;
(ii) the conduct constituting the alleged offence occurs wholly outside Australia;
(iii) the conduct constituting the primary offence to which the ancillary offence relates occurs, or is intended by the person to

000054

occur, wholly or partly in Australia or wholly or partly on board an Australian aircraft or an Australian ship.

**Consent to Prosecute for Conspiracy**

21. Section 11.5(8) of the *Criminal Code* requires the consent of the Director of Public Prosecutions before a prosecution for an offence of conspiracy may be commenced.   On 10 November 2010 the Director consented to the prosecution of BRANDT for the offence of conspiracy to import a commercial quantity of a border controlled drug.   A copy of the consent signed by the Director of Public Prosecutions is annexed and marked 'KH2'.

**Essential Elements of the Offence of Conspiracy to Import a Commercial Quantity of a Border Controlled Drug**

22. To establish the commission of the offence against sections 11.5 and 307.1(1) of the *Criminal Code*, the Prosecution must prove the following elements beyond reasonable doubt:

    1. that BRANDT entered into an agreement with one or more other persons to import a border controlled drug;
    2. when BRANDT entered into that agreement she intended that the importation of a border controlled drug would be committed pursuant to the agreement;
    3. at least one other party to the agreement intended that the importation of a border controlled drug would be committed pursuant to the agreement; and
    4. the amount of the border controlled drug which would be imported under the agreement was, in fact, a commercial quantity of the border controlled drug.

23. It is also necessary as a precondition of guilt for the Prosecution to prove beyond reasonable doubt that at least one party to the agreement carried out an overt act in furtherance of the agreement.

**Essential Elements of the Offence of Dealing with the Proceeds of Crime Worth $100,000 or More**

24. To establish the commission of the offence pursuant to section 400.4(1) of the *Criminal Code*, the Prosecution must prove the following elements beyond reasonable doubt:

    1. that BRANDT intentionally received, possessed, concealed or disposed of money;
    2. that the money received, possessed, concealed or disposed of by BRANDT was derived or realised, directly or indirectly, from the commission of an offence against a law of the Commonwealth that may

be dealt with as an indictable offence. The Prosecution must also establish that BRANDT believed the money was derived or realised, directly or indirectly, from the commission of an offence; and

3.  that the money received, possessed, concealed or disposed of by BRANDT, at the time of the conduct in 1 and 2 was valued at $100,000 or more. The Prosecution is not required to establish that BRANDT knew that the money was $100,000 or more as this element of the offence is one of absolute liability, that is, there is no defence of mistake of fact available.

**Reasonable Grounds for Believing that the Offences Have Been Committed**

25.  It is my opinion that the detailed Statement of Conduct, as set out in the Investigator's affidavit and marked 'Annexure B', sets forth reasonable grounds for believing that the offences referred to in the arrest warrant, the elements of which are set out in paragraphs 22 to 24 above, have been committed by BRANDT.

26.  The evidence establishes that BRANDT was a party to the conspiracy to import a commercial quantity of cocaine and that at least the following overt acts, amongst others, were committed in furtherance of the conspiracy:

1.  on 25 July 2007 Jesse POLOCK transferred AUD4,525 to BRANDT in the United States via Western Union;
2.  on 12 September 2007 Melissah LLOYD transferred AUD4,775 to BRANDT in the United States via Western Union;
3.  on 19 September 2007 Jesse POLOCK transferred AUD8000 to BRANDT in the United States via Western Union;
4.  on 27 September 2007 and 28 September 2007, Christopher SCHALBERG transferred a total of AUD41,810 to BRANDT in the United States in six separate transactions via various banks;
5.  on 14 October 2007 Rusty SETSER sent the following text message to BRANDT: "Ma I am going down south to get boardbag! Love u.";
6.  on 4 November 2007 BRANDT arrived in Sydney on flight QF50 from Los Angeles, checking into the Swiss Grand Hotel at Bondi Beach;
7.  between 5 November 2007 and 7 November 2007 BRANDT transferred a total of AUD71,650 to herself in the United States in eight separate transactions via various banks;
8.  on 7 November 2007 BRANDT departed Sydney for Los Angeles on flight QF15;
9.  on 26 November 2007 BRANDT made three telephone calls to the Marina Del Rey Holiday Inn, interspersed with six calls to Rusty SETSER;
10. on 29 November 2007 BRANDT purchased an air ticket to fly to Australia on UA839 departing Los Angeles on 30 November 2007 and arriving in Sydney on 2 December 2007;
11. on 2 December 2007, BRANDT arrived in Sydney from Los Angeles on flight UA839, along with Geoffrey BORG and Macarthur SMITH;

000056

12. BRANDT had indicated on her incoming passenger card that she was to stay at the Swiss Grand Hotel for six days on a holiday to visit friends;

13. on 2 December 2007 and 3 December 2007, BRANDT made a number of telephone calls from her room in the Swiss Grand Hotel;

14. on 3 December 2007 a booking was made for BRANDT to depart Sydney on flight QF0011;

15. on 3 December 2007, BRANDT and Wayne CLEVELAND walked through the foyer of the Swiss Grand Hotel and left separately; and

16. on 3 December 2007 BRANDT was driven to the Sydney Airport where she departed for Los Angeles on flight QF11.

27.     The evidence also establishes that BRANDT dealt with the proceeds of crime in the following transactions:

1. on 25 July 2007 Jesse POLOCK transferred AUD4,525 to BRANDT in the United States via Western Union;

2. on 12 September 2007 Melissah LLOYD transferred AUD4,775 to BRANDT in the United States via Western Union;

3. on 19 September 2007 Jesse POLOCK transferred AUD8,000 to BRANDT in the United States via Western Union;

4. on 27 September 2007 Christopher SCHALBERG transferred AUD6,968 to BRANDT in the United States via the ANZ Bank;

5. on 27 September 2007 Christopher SCHALBERG transferred AUD6,968 to BRANDT in the United States via the Commonwealth Bank of Australia;

6. on 28 September 2007 Christopher SCHALBERG transferred AUD 6,968 to BRANDT in the United States via the Commonwealth Bank of Australia;

7. on 28 September 2007 Christopher SCHALBERG transferred AUD6,970 to BRANDT in the United States via Westpac Bank;

8. on 28 September 2007 Christopher SCHALBERG transferred AUD6,968 to BRANDT in the United States via the ANZ Bank;

9. on 28 September 2007 Christopher SCHALBERG transferred AUD6,968 to BRANDT in the United States via the Commonwealth Bank of Australia;

10. on 5 November 2007 BRANDT transferred AUD9,500 to herself in the United States via the Commonwealth Bank of Australia;

11. on 5 November 2007 BRANDT transferred AUD10,500 to herself in the United States via the Bank of China;

12. on 5 November 2007 BRANDT transferred AUD10,500 to herself in the United States via Westpac Bank;

13. on 5 November 2007 BRANDT transferred AUD8,300 to herself in the United States via Travelex;

14. on 6 November 2007 BRANDT transferred AUD8,300 to herself in the United States via the Commonwealth Bank of Australia;

15. on 7 November 2007 BRANDT transferred AUD7,200 to herself in the United States via the Commonwealth Bank of Australia;

000057

16. on 7 November 2007 BRANDT transferred AUD8,100 to herself in the United States via Travelex; and

17. on 7 November 2007 BRANDT transferred AUD9,250 to herself in the United States via the ANZ Bank.

## Statement of Time Limit on the Institution of Proceedings for the Offences

28.    Section 15B of the *Crimes Act* states (as relevant):

(1) Subject to subsection (1B), a prosecution of an individual for an offence against any law of the Commonwealth may be commenced as follows:

(a) if the maximum penalty which may be imposed for the offence in respect of an individual is, or includes, a term of imprisonment of more than 6 months in the case of a first conviction—at any time

(b) in any other case - at any time within one year after the commission of the offence

29.    Subsection (1B) is not relevant to the prosecution of BRANDT as the maximum penalty for each of the offences for which extradition is sought is imprisonment for more than 6 months.  Therefore, there is no time limit on the institution of proceedings for the offences.

## Status of the *Criminal Code* and the *Crimes Act*

30.    The *Criminal Code* and *Crimes Act* are both Acts of the Parliament of the Commonwealth of Australia and as such are laws of the Commonwealth of Australia and have operation throughout the Commonwealth of Australia including the State of New South Wales.

31.    The provisions of the *Criminal Code* and *Crimes Act* set out above are as they stood in force at the time of the commission of the offences.

## Double Jeopardy

32.    BRANDT has not previously been charged with the offences for which her extradition is sought and is not entitled to be discharged under any rule of law relating to previous acquittal or conviction.

SWORN by the Deponent
at Sydney, in the State of New South Wales
on the 23rd day of March 2012

Kong Hang Huen
Deponent

Before me:    Graeme Curran
Magistrate

Magistrate of the State of New South Wales

**"KH1"**

The attached two pages is the annexure marked "KH1" referred to in the affidavit of Kong Hang Huen sworn at Sydney on the 23rd day of March 2012 before me:

Graeme Curra
Magistrate

.............................................................
Magistrate of the State of New South Wales


AUSTRALIAN FEDERAL POLICE

**Court Attendance Notice**
**(CDPP Copy)**

### Details of Court Listing

The Court Attendance Notice has been listed before the Local Court on:

| Date | 22 March 2011 | Time | 0900 |
|------|---------------|------|------|
| Place | | Downing Center Local Court, 143-147 Liverpool Street, Sydney New South Wales | |

### Details of Defendant

| Defendant | Brandi BRANDT |
|-----------|---------------|
| Address | |
| Date of Birth | | Sex | Female |

### Details of Prosecutor

| Prosecutor | | Commonwealth Director of Public Prosecutio |
|------------|--|---------------------------------------------|
| Department/Organisation | | Commonwealth Director of Public Prosecutio |
| Address | Level 7, 66-68 Goulburn Street, Sydney,, NSW | Telephone | (02) 9321 1100 |
| Date of Issue of Court Attendance Notice | | 27 January 2011 | |

| **Details of Offence** | **Sequence Number** |
|------------------------|---------------------|
| Description of Offence | Brandi Brandt between about 24 July 2007 and about 2 December 2007 at Sydney in the State of New South Wales and elsewhere conspired with Wayne Cleveland, Craig Nicholson and divers other persons to import a commercial quantity of a substance being a border controlled drug, namely cocaine. |
| Time and date of Offence | 24 July 2007 and about 2 December 2007 |
| Place of Offence | Sydney Kingsford Smith Airport, Sydney New South Wal |
| Short Particulars | Conspire with others to import commercial quantity of border controlled drug |
| Statutory Provision Describing Offence | 307.1 Criminal Code Act 1995 by virtue of section 11 .5 the Criminal Code Act 1995. |
| Law Part Code | 58454, 41450 |

**AFP**
AUSTRALIAN FEDERAL POLICE

## Details of Court Listing

The Court Attendance Notice has been listed before the Local Court on:

| | | | |
|---|---|---|---|
| | | Time | 0900 |
| Date | 22 March 2011 | Downing Center Local Court, 143-147 | |
| Place | | Liverpool Street, Sydney New South Wales | |

## Details of Defendant

| | | | |
|---|---|---|---|
| Defendant | | Brandi BRANDT | |
| Address | | | Female |
| Date of Birth | | Sex | |

## Details of Prosecutor

| | | | |
|---|---|---|---|
| Prosecutor | | Commonwealth Director of Public Prosecutions | |
| Department/Organisation | | Commonwealth Director of Public Prosecutions | |
| Address | Level 7, 66-68 Goulburn Street, Sydney, NSW | Telephone | (02) 9321 1100 |
| Date of Issue of Court Attendance Notice | | 27 January 2011 | |

## Details of Offence

| | Sequence Number |
|---|---|
| Description of Offence | Brandi Brandt, between about 24 July 2007 and about 7 November 2007, at Sydney in the State of New South Wales and elsewhere, did deal with money to the value of $100,000.00 or more, namely, $130,760.00, that was proceeds of crime, believing the said money to be proceeds of crime. |
| Time and date of Offence | Between about 24 July 2007 and 07 November 2007 |
| Place of Offence | Sydney, NSW and elsewhere. |
| Short Particulars | Dealing in proceeds of crime – money or property worth $100,000 or more |
| Statutory Provision Describing Offence | s400.4(1)Criminal Code Act 1995 |
| Law Part Code | 50446 |

**"KH2"**

The attached one page is the annexure marked "KH2" referred to in the affidavit of Kong Hang Huen sworn at Sydney on the 23rd day of March 2012 before me:

Graeme Curran

Magistrate

......................................................

Magistrate of the State of New South Wales

COMMONWEALTH OF AUSTRALIA

CRIMINAL CODE 1995

CONSENT UNDER SUBSECTION 11.5(8) TO PROCEEDINGS FOR AN OFFENCE OF CONSPIRACY

I, Christopher Bruce Craigie SC, Director of Public Prosecutions, consent to the commencement of proceedings against **Brandi Angela Brandt** and **Rusty Steven Setser** for an offence of conspiracy under subsection 11.5 (1) of the Criminal Code 1995 and section 307.1(1) of the Criminal Code Act 1995 (Cth) as follows:

PARTICULARS OF OFFENCE:

That between about 24 July 2007 and about 2 December 2007 at Sydney in the State of New South Wales and elsewhere, the above named conspired with each other, Wayne Cleveland, Craig Nicholson and divers other persons to import a commercial quantity of a substance being a border controlled drug, namely cocaine.

Dated this        10th        day of November 2010.

.....................................................

Christopher Bruce Craigie SC
Director of Public Prosecutions

REQUEST FOR THE EXTRADITION OF

BRANDI ANGELA BRANDT

FROM THE UNITED STATES OF AMERICA

TO AUSTRALIA

### AFFIDAVIT OF INVESTIGATOR

1.    On the 23rd day of March 2012, I, Gregory Adam HINDS, Federal Agent of 110 Goulburn Street, Sydney South in the State of New South Wales make oath and say:

   a.   I am a Federal Agent employed by the Australian Federal Police (AFP).  I am attached to the Serious and Organised Crime Section of the AFP, Sydney, New South Wales.  New South Wales is a State of the Commonwealth of Australia.

   b.   I have conduct of the investigation into the alleged offences committed by Brandi Angela BRANDT, referred to below.   Brandi Angela BRANDT is hereinafter referred to as 'BRANDT'.

**Qualifications of the Deponent**

2.    I joined the AFP in 1999.  Since then I have been involved in numerous investigations into offences against laws of the Commonwealth of Australia, including narcotics and money laundering offences against the *Criminal Code Act 1995* (Commonwealth) ('the *Criminal Code*').   During this period I have also been responsible for the preparation of numerous briefs of evidence for the prosecution of such offences by the Office of the Director of Public Prosecutions for the Commonwealth of Australia.

**Offences for which Extradition is Sought**

3.    The extradition of BRANDT from the United States of America is sought for the prosecution of the following offences ('the offences'):

   a.   Between about 24 July 2007 and about 2 December 2007 at Sydney in the State of New South Wales and elsewhere, BRANDT conspired with Wayne Cleveland, Craig Nicholson and divers other persons to import a commercial quantity of a substance being a border controlled drug, namely cocaine, contrary to section 307.1(1) and section 11.5 of the *Criminal Code*.

   b.   Between about 24 July 2007 and about 7 November 2007 at Sydney in the State of New South Wales and elsewhere, BRANDT did deal with money to the value of $100,000.00 or more, namely $130,760.00, that was proceeds of crime,

believing the said money to be proceeds of crime contrary to section 400.4(1) of the *Criminal Code*.

**Warrant of Arrest**

4.    On 31 March 2011 a warrant was issued for the arrest of BRANDT by an authorised officer of the Local Court at Sydney, New South Wales. The warrant remains in force as at the date of this affidavit.

5.    A copy of the warrant is annexed to this affidavit and marked 'Annexure A'.

**Summary of the Conduct Constituting the Offences for which Extradition is Sought**

6.    The offences arise out of BRANDT's involvement in the importation into Australia of a commercial quantity of cocaine.

7.    On 2 December 2007 Australian Customs Service (ACS) officers at Sydney Airport seized a package containing 12 blocks of the border controlled drug cocaine from a rubbish bin onboard a United Airlines flight UA839 from Los Angeles. The total weight of the powder in the 12 blocks was 5,393.1 grams (approximately 11.8 pounds). The weight of the pure cocaine in the 12 blocks was 2,865.1 grams (approximately 6.3 pounds). It is alleged that BRANDT was a party to a conspiracy to import the cocaine to Australia.

8.    Between July 2007 and November 2007 various Australian and American citizens remitted in excess of AUD250,000 to the United States in a number of transactions, predominantly to BRANDT and Rusty Setser. It is alleged that the money the subject of the transactions represented the proceeds of crime.

**Detailed Statement of the Acts and Omissions Alleged Against BRANDT in Respect of the Offences**

9.    A detailed statement of the acts and omissions alleged against BRANDT in respect to the offences is annexed hereto and marked as 'Annexure B'.

**Location of BRANDT**

10.    BRANDT is currently believed to reside at ███████████████████████
███████████████████████.

**Nationality, Description and Identity of BRANDT**

11.    BRANDT was born on ████████████ and is a citizen of the United States of America. She is 43 years of age, 165 cm tall with long brown hair and a fair complexion. BRANDT is the holder of US passport number ████████

12.    Between 5 November 2007 to 7 November 2007, BRANDT made a number of overseas money remittances in Sydney, and whilst these remittances were

conducted, the bio-data page of her passport, which includes her photo, was photocopied.

13.    On 3 December 2007, in the course of conducting surveillance on BRANDT in Sydney, a number of photographs were taken of her by the AFP.

14.    On 15 April 2011, I requested a photograph of BRANDT, born 2 November 1968, from the Drug Enforcement Administration Canberra Country Office in Canberra, Australia.  This was provided on 4 May 2011.

15.    The photograph of BRANDT provided was taken on 2 November 2010 and is annexed and marked as 'Annexure C'.

16.    I have seen the photographs referred to in paragraphs 12-13 and can say that they are photographs of BRANDT, being the same person as that depicted in 'Annexure C'.


SWORN by the Deponent
at Sydney, in the State of New South Wales
on the 23rd day of March 2012

_____
                                                    Deponent

Before me:


_____        Graeme Curran
Magistrate of the State of New South Wales        Magistrate

"A"

The attached one page is the annexure marked "A" referred to in the affidavit of Gregory Adam Hinds sworn at Sydney on the 23rd day of March 2012 before me:

Graeme Curran

Magistrate

.................................................
Magistrate of the State of New South Wales

Warrant ID Number: Year/Batch/Reference Number: 2011 / 59, 2

## ARREST WARRANT
### Criminal Procedure Act 1986

TO all Police Constables in the State of New South Wales.

This is a warrant to arrest :

Defendant:   **Brandi BRANDT**            Date of Birth: ██████
Address:    ████████████             CNI No:
            ████████████

Hearing                          Place of Hearing:    Local Court Level 4 Downing
Date:                                                 Centre
Magistrate:                      Charge (H) Number:
                                 (Note: Only one H number may be included on a single warrant)

| Seq No. | Short Description of Offence | Date of Offence | Place of Offence |
|---|---|---|---|
| 001 | Dealing in proceeds of crime – money or property worth $100,000 or more of crime<br><br>Law Part code 50446 | Between about 24/7/07 and about 7/11/07 | Sydney |
| 002 | Conspire with others to import commercial quantity of border controlled drug<br><br>Law code 58454, 41450 | Between about 24/7/07 and about 2/12/07 | Sydney |

**Reason for arrest:**

Court Attendance Notices have been filed in the Registry for the above offences.  This warrant has been issued by an authorised officer upon application of  Federal Agent Corin Lee Bradfield, Australian Federal Police, 8837 5152  prior to court listing.  This warrant is issued under section 181(2) of the Criminal Procedure Act 1986.
CAN(s) filed at Local Court 4 Downing Centre  Sydney Court House on  31.3.2011.

I COMMAND YOU to apprehend and bring the defendant before a Local Court to answer the said offence.

Dated: 31/3/2011
In the Local Court at Downing Centre
Liverpool St, Sydney
in the said State.

Authorised Officer
(L. Norman)

Local Court

"B"

The attached 13 pages is the annexure marked "B" referred to in the
affidavit of Gregory Adam Hinds sworn at Sydney on the 23rd day of
March 2012 before me:

Graeme Curran
Magistrate

......................................................
Magistrate of the State of New South Wales

**ANNEXURE B**

**STATEMENT OF ACTS AND OMISSIONS ALLEGED AGAINST BRANDI ANGELA BRANDT**

Background

1.  On 2 December 2007 Australian Customs and Border Protection Service (Customs) officers at Sydney Airport seized a package containing twelve blocks of cocaine from a rubbish bin on board United Airlines flight UA839 from Los Angeles. The package contained 5,393.1 grams (approximately 11.8 pounds) of cocaine with a pure weight of 2,865.1 grams (approximately 6.3 pounds).

2.  Following detection of the importation, the Australian Federal Police (AFP) commenced an investigation codenamed Operation Loment. The investigation centred around allegations that employees of an airline catering company, Gate Gourmet, used their access to aeroplanes arriving at Sydney International Airport from the United States to remove narcotics that had been concealed on the planes by couriers travelling on the incoming flights.

3.  Operation Loment involved extensive analysis of telephone Call Charge Records (CCRs), international money remittance records, and electronic and physical surveillance of a number of persons in Australia and the United States suspected of being involved in the importation of cocaine into Australia.

4.  The Australian syndicate members identified included the principal, Wayne Cleveland, Cleveland's stepfather, Wayne Williams, couriers Geoffrey Borg and Macarthur Smith, and Craig Nicholson, Jose Alquillera and Matthew Hay. Nicholson, Alquillera and Hay were employees of the airline catering company, Gate Gourmet, which serviced flights at Sydney airport. Further, it is alleged that Cleveland utilised the assistance of other Australian citizens such as his de-facto wife Melissah Lloyd, Jesse Polock, Benjamin Cicolini and Christopher Meagher to remit overseas the proceeds from the drug imports.

5.  The United States of America (USA) suspects identified included cocaine supplier Rusty Steven Setser (Setser), his partner and money remitter Brandi Angela BRANDT (BRANDT), and money remitters Christopher Schalberg (Schalberg) and Kelvin Pickering (Pickering).

6.  Information lawfully obtained by the AFP as a result of the investigation indicated that between July 2007 and October 2007 at least four importations of narcotics from the United States to Sydney were conducted by the syndicate.

7.  The evidence obtained during the investigation established links between the USA suspects. For example, information provided by BRANDT to the Commonwealth Bank of Australia on money remittance forms and Setser's California drivers licence showed that they both resided (at that time) at ███████████████████████████ Text messages downloaded from Setser's mobile telephone by Customs officers were also indicative of Setser being in a relationship with BRANDT.

8.  Schalberg used an address of ████████████████████████████ as payer on money remittance forms. Setser used that address as consignor on a package he sent to Schalberg in Australia which was examined by Customs. Schalberg also provided an address of ████████████████████████████ to a car rental

service and to the ANZ Bank on a money remittance form.  Analysis of Schalberg's mobile telephone by Customs officers revealed a number of messages to and from 'R' (alleged to be Setser).

9.   Schalberg rented premises at 7/126 Ramsgate Avenue, Bondi, New South Wales, Australia for a six month period from 27 August 2007.  An address of 7/126 Ramsgate Avenue, Tamarama, was also used by Pickering on his incoming passenger card, and on a remittance form when sending money to Schalberg.  Bondi and Tamarama are adjoining suburbs of Sydney.

10.  The investigation established that between July 2007 and November 2007 a number of money remittances were made by persons in Sydney to Los Angeles.  It is alleged that these remittances were made by way of attending either a bank or money transfer agency, handing over the cash and providing instructions and details of the recipient. The majority of these remittances were made to BRANDT and Setser.  The remittances were made following the arrival of various persons on United Airlines flights from California, USA.   The total amount of the transactions involving BRANDT was AUD130,760.  The total amount of the transactions involving Setser was AUD138,205. Schalberg was involved in a number of remittances totalling AUD102,805.

11.  It is alleged that the money the subject of those remittances was the proceeds of crime derived from prior undetected importations of narcotics which occurred on 23 July 2007, 16 September 2007, 23 September 2007 and 16 October 2007. These dates coincided with the arrival of Schalberg, Polock and Setser on United Airlines flights to Sydney. Each of those flights was serviced by Alquillera.

12.  It is alleged that narcotics were imported on each of those flights, removed by Alquillera, sold by the syndicate and part of the proceeds remitted to associates in the USA, including Setser and BRANDT.  This is supported by the following:

    a.   That Nicholson and Alquillera serviced the UA839 flights containing narcotics on 2 December 2007 and 20 September 2009 respectively;
    b.   Call charge records show that between 23 July 2007 and 27 July 2007 there was constant telephone contact between Cleveland, Polock and Schalberg;
    c.   Call charge records show that between 16 September 2007 and 20 October 2007 there was constant telephone contact between Polock, Cleveland, Setser, Nicholson, Williams and Alquillera;
    d.   A text message from 'R' (alleged to be Setser) to Schalberg on 8 September 2007 stating "Thank you brother! Over all job well done! Time to come home and enjoy! Then u know what all over again! This time we get ours brother. It is going to be nice, can't wait, then we really get to enjoy brother, reward ourselves with a few nice toys whatever that maybe! I know what mine r going to be! And u are helping with in our new pad don't trip. From R."
    e.   Text messages between Setser and Cleveland between 4 October 2007 and 14 October 2007 (see paragraph 29 below); and
    f.   A lawfully intercepted conversation where Cleveland states to Nicholson on 29 August 2009 "I just don't want to get silly I don't want to get greedy that's why we've lasted so long mate".

13.  BRANDT and Setser are alleged to have been parties to the conspiracy to import a commercial quantity of a border controlled drug, namely cocaine, which culminated in the importation seized on 2 December 2007.  BRANDT, Setser and Schalberg are also alleged to have committed money laundering offences prior to the importation on 2 December 2007.

000071

14. A number of persons have been arrested, charged, and convicted in Australia with various offences of conspiracy to import cocaine and money laundering as a result of Operation Loment.

<u>Charge 1 – Conspiracy to Import a Commercial Quantity of Border Controlled Drugs</u>

15. At about 8.50 am on 2 December 2007, Customs officers conducted a search of United Airlines flight UA839 at Sydney International Airport and located twelve blocks of compressed white powder in the rubbish bin of a toilet at the rear of the aircraft. Flight UA839 arrived at Sydney from Los Angeles.

16. A short time later, AFP officers attended and seized the blocks of powder. The seizure consisted of a total net weight of off-white powder of 5,393.1 grams (approximately 11.8 pounds). Samples of the powder were analysed by the National Measurement Institute. Percentages of cocaine were detected and a total weight of pure cocaine was calculated as 2,865.1 grams (approximately 6.3 pounds).

17. The AFP investigation into the importation on 2 December 2007 revealed a series of occurrences and activities that preceded the importation.

18. Between July 2007 and November 2007 a series of overseas money remittances, totalling in excess of AUD250,000, were made by various citizens of Australia and the USA from Sydney to persons in the USA. The majority of these remittances were made to BRANDT and Setser in the USA.

19. The United Airlines flights on which the US citizen-targets of the investigation arrived at Sydney International Airport were serviced by Alquillera and Nicholson.

20. On 23 July 2007, Schalberg arrived in Sydney on United Airlines flight UA863 from San Francisco, California, USA and departed on 10 September 2007 on United Airlines flight UA840 to Los Angeles.

21. Records obtained from Western Union show that between 31 July 2007 and 10 September 2007, Schalberg made seven remittances totalling AUD55,250 to Setser in the USA.

22. Western Union records also show that on 25 July 2007 Polock made two remittances of AUD4,525 each to BRANDT and Setser in the USA.

23. A download of Schalberg's mobile telephone by Customs officers obtained on his arrival at Sydney Airport revealed a number of text messages received by Schalberg from 'R' between 1 September 2007 and 8 September 2007. (It is alleged that 'R' is 'Rusty' Setser using a mobile telephone number 1314671054). Those text messages referred to sending cash and amounts of $20,000.

24. On 12 September 2007 Melissah Lloyd transferred AUD4,775 to BRANDT in the USA via Western Union.

25. On 19 September 2007 Jesse Polock transferred AUD8,000 to BRANDT in the USA via Western Union.

3

000072

26. On 27 September 2007 and 28 September 2007 Schalberg transferred a total of AUD41,810 to BRANDT in the USA in six separate transactions via various banks.

27. On 16 October 2007 Setser arrived in Sydney on United Airlines flight UA839 from Los Angeles.  After disembarking, Setser was subjected to scrutiny by the Department of Immigration and Multicultural Affairs (DIAC) and Customs officers.  Setser advised that he was in Australia to surf and see his friend Wayne (Cleveland).  Due to visa issues, Setser's visa was cancelled by DIAC officers and he was refused immigration clearance. Setser subsequently departed Sydney on 18 October 2007 on United Airlines flight UA840 to Los Angeles.

28. A download of Setser's mobile telephone obtained by Customs officers revealed a series of text messages between Cleveland (referred to as 'Oz Wano Boy'), Setser, BRANDT (referred to as 'Brandi B') and another associate.

29. Between 4 October 2007 and 14 October 2007 (Los Angeles time) the following text messages were exchanged:

> 3.36pm on 4 October 2007 – Cleveland to Setser
> *'U fly out on the 14th and arrive Syd the 16th reference number vdj506.7zu7jh. Receipt No. 7zu72006hrcpt0234.'*

> 2.44pm on 6 October 2007 – Cleveland to Setser
> *'Havent got new phone yet, but did you get all the flight details.'*

> 2.48pm on 6 October 2007 – Cleveland to Setser
> *'Yep. Returning on the 12th Nov.'*

> 8.43pm on 10 October 2007 – Cleveland to Setser
> *'How r ya. Whats doing.'*

> 8.49pm on 10 October 2007 – Cleveland to Setser
> *'Sweet.'*

> 9.53pm on 10 October 2007 – Cleveland to Setser
> *'Grab as many as you can.'*

> 10.42pm on 11 October 2007 – Cleveland to Setser
> *'Get what u can keep them separate its bone dry bring at least 2'.*

> 10.57pm on 11 October 2007 – Cleveland to Setser
> *'Make sure of the weight there all been way under.  1st 1 was 100 under then 89. Looks bad'*

> 6.38am on 12 October 2007 – Cleveland to Setser
> *'Get what u can but keep it separated'.*

> 8.22am on 14 October 2007 – Setser to BRANDT
> *'Ma I am going down south to get boardbag! Love u.'*

> 9.28am on 14 October 2007 – Setser to Ryan Hakman
> *'Hack do you have a boardbag I could buy or barrow. I have two 6 going to OZ today please don't say a word about it to anyone please thank.'*

4

9.30am on 14 October 2007 – Ryan Hakman to Setser
*'I don't sorry.'*

4.55pm on 14 October 2007 – Cleveland to Setser
*'Just check in! Brother! All sweet!'*

4.58pm on 14 October 2007 – Cleveland to Setser
*'Good c ya 2morrow.'*

4.59pm on 14 October 2007 – Cleveland to Setser
*'Good c ya 2morrow. How many boards.'*

9.25pm on 14 October 2007 – Cleveland to Setser
*'R we sweet.'*

9.54pm on 14 October 2007 – Setser to Cleveland
*'Fuck yeah? U the man brother! Your new name shot caller in my book!  Anyway should I grab a cab to the hotel! I don't expect u to pick me up brother!'*

9.55pm on 14 October 2007 – Cleveland to Setser
*'Yeah grab a cab and call me when ya there.'*

9.57pm on 14 October 2007 – Cleveland to Setser
*'Sweet.'*

9.59pm on 14 October 2007 – Cleveland to Setser
*'Thank u 2. no I in team.'*

10.00pm on 14 October 2007 - Setser to Cleveland
*'That's it! Real quick right side left one.'*

10.01pm on 14 October 2007 - Cleveland to Setser
*'Yep'.*

30. About 10.00pm on 14 October 2007 (Los Angeles time), Setser departed Los Angeles on United Airlines flight UA839.  This corresponds with the text messages exchanged between Setser and Cleveland above.  It is alleged that these text messages relate to Setser obtaining narcotics for Cleveland and Setser placing the narcotics into a toilet located on the right side of the aircraft, that being the left toilet of the two toilets located on the right side.

31. CCR records reveal that three minutes after the last of those text messages, Cleveland sent a text message to Nicholson.

32. On 4 November 2007, BRANDT arrived in Sydney on American Airlines flight AA7302 (Qantas flight QF50) from Los Angeles.

33. Records obtained from the Commonwealth Bank of Australia, Bank of China, Westpac Bank, Travelex and the ANZ bank show that between 4 and 7 November 2007, BRANDT made eight remittances totalling AUD71,650 to her own account in the USA.

34. BRANDT departed Sydney on 7 November 2007 on American Airlines flight AA7363 (Qantas flight AF15).  On her outgoing passenger card, BRANDT indicated that she was carrying AUD10,000 or more in cash.

000074

35. On 20 November 2007, Geoffrey Borg (Borg) attended Anywhere Travel agency and booked to depart Sydney on United Airlines flight UA840 to Los Angeles on 22 November 2007.  Borg booked to return on United Airlines flight UA839 departing Los Angeles on 30 November 2007 and arriving in Sydney on 2 December 2007.  Borg also booked to stay from 22 to 30 November 2007 at the Holiday Inn, Marina Del Rey, Los Angeles.

36. On 21 November 2007, Borg attended Anywhere Travel agency and paid AUD2,143 on his VISA card for the airline tickets.

37. On 21 November 2007, Macarthur Smith (Smith) attended Newtown Flight Centre and booked and paid to depart Sydney on United Airlines flight UA840 to Los Angeles on 26 November 2007.  Smith booked to return on United Airlines flight UA839 departing Los Angeles on 30 November 2007 and arriving in Sydney on 2 December 2007.

38. On 21 November 2007, Smith attended Anywhere Travel agency and booked to stay from 26 to 30 November 2007 at the Holiday Inn, Marina Del Rey, Los Angeles.

39. On 22 November 2007 (Sydney time), Borg departed Sydney on United Airlines flight UA840 to Los Angeles.  On 22 November 2007 (Los Angeles time), Borg checked into room 332 at the Holiday Inn, Marina Del Rey.

40. On 24 November 2007 (Sydney time), Polock purchased an airline ticket from Eastgardens Flight Centre for Setser to depart on United Airlines flight UA839 from Los Angeles on 30 November 2007 and arrive in Sydney on 2 December 2007.

41. CCR records show that between 12.17am and 1.51am on 26 November 2007 (7.17am to 8.51am on 25 November 2007 Los Angeles time) BRANDT made three telephone calls to the Holiday Inn, Marina Del Rey, interspersed with six telephone calls to Setser.

42. Records obtained from the Holiday Inn show that at about 2.34pm on 26 November 2007 (9.34pm on 25 November 2007 Los Angeles time), a telephone call was made from Room 332, Holiday Inn Marina Del Rey (occupied by Borg) to Australian mobile telephone 614220969.  It is alleged that this is in fact mobile telephone number 0422096938, subscribed to Borg's de-facto wife, Carolyn Milne.

43. On 26 November 2007 (Sydney time), Smith departed Sydney on United Airlines flight UA840 to Los Angeles.  On 26 November 2007 (Los Angeles time), Smith checked into Room 316 at the Holiday Inn, Marina Del Rey.

44. On 28 November 2007 (Sydney time), Setser made a number of online Visa applications to travel to Australia which were rejected by DIAC.

45. On 29 November 2007 BRANDT purchased an air ticket to fly to Australia on United Airlines flight UA839 departing Los Angeles on 30 November 2007 and arriving in Sydney on 2 December 2007.

46. On 30 November 2007 (Los Angeles time), Borg, Smith and BRANDT departed Los Angeles on United Airlines flight UA839 to Sydney.

000075

47. On 2 December 2007 BRANDT, Borg and Smith arrived in Sydney from Los Angeles on flight UA839. BRANDT indicated on her incoming passenger card that she was to stay at the Swiss Grand Hotel for six days on a holiday to visit friends.

48. In early December 2007 Nicholson asked a fellow Gate Gourmet employee, Nicholas Athanitis to "strip" a United Airlines aircraft (service it for Gate Gourmet). On 2 December 2007 Nicholson said to another fellow Gate Gourmet employee, Te Waha Kingi: "Come on let's go strip a United flight". Kingi agreed and drove out on a truck to do the job but Nicholson got a message to return back to base. On 2 December 2007 Athanitis sat in a Gate gourmet truck waiting to go on to the United Airlines plane. As he sat there he saw Customs officers with a dog waiting to go onto the airbridge. Ten minutes later Nicholson approached and said: "We can't get on the plane. Go back to work".

49. At this time, Nicholson was employed by Gate Gourmet as the Operations Coordination Manager – Inflight for the Jetshop arm of the business. The Jetshop arm of the business provides catering services for Jetstar Airlines. It was unusual for Nicholson to be waiting to service the United Airlines flight UA839 because the Jetshop operations of the business are separate from the Unit operations which service the catering requirements of other airlines.

50. About 8.50am on 2 December 2007, Customs officers conducted the search of United Airlines flight UA839 and located the blocks of cocaine in the rubbish bin of a toilet at the rear of the aircraft.

51. United Airlines records show that at about 8.50am on 2 December 2007, Nicholson departed the tarmac in the vicinity of United Airlines flight UA839.

52. About 9.15am on 2 December 2007, BRANDT departed Sydney Airport and travelled to the Swiss Grand Resort and Spa, Bondi Beach. On 2 and 3 December 2007 BRANDT made a number of telephone calls from her room at the Swiss Grand Hotel.

53. Qantas Airways records show that on 3 December 2007 a booking for BRANDT was made for her to depart Sydney on flight QF0011 on the same date.

54. CCTV footage shows that at about 8.57am on 3 December 2007, Cleveland entered the foyer of the Swiss Grand Resort and Spa, appeared to speak to reception staff and walked towards the hotel elevators.

55. About 9.40am on 3 December 2007, AFP surveillance observed BRANDT and Cleveland walk through the foyer of the Swiss Grand Resort and Spa and depart the hotel separately.

56. Later on 3 December 2007, BRANDT departed Sydney on Qantas flight QF11 to Los Angeles.

57. Cleveland was followed by AFP officers to 45 French Street, Maroubra.

58. Subsequent forensic testing of the inside and outside of the cocaine wrappings indicated the presence of Borg's DNA on seven of the packages containing cocaine imported on 2 December 2007.

000076

59. As a result of these activities, the AFP obtained telecommunications interception warrants to lawfully intercept a number of telephones identified as being used by syndicate members, including:

- Mobile telephone number 0425845019 subscribed to Gate Gourmet and used by Nicholson
- Mobile telephone number 0420210364 subscribed in the name Luke Bains and used by Cleveland
- Landline telephone number 0293451977 subscribed to Melissah Lloyd
- Mobile telephone number 0450546759 subscribed in the name Mohmad Bhan and used by Cleveland
- Mobile telephone number 0416450151 subscribed in the name Jose Alquillera
- Mobile telephone number 0404916730 subscribed in the name John Smith and used by Cleveland
- Mobile telephone number 0402315375 subscribed in the name Wayne Williams
- Mobile telephone number 0415782433 subscribed in the name Craig Ao and used by Nicholson
- Mobile telephone number 0404612637 subscribed in the name Kevin Burgess and used by Nicholson
- Mobile telephone number 0424311066 subscribed in the name Jue Tower and used by Cleveland.

60. Lawful interception of mobile telephones used by Cleveland showed communications with Setser.

61. About 7.58pm on 2 March 2008, telephone service 18186416077 (identified by the AFP to be used by Setser) sent the following text message to Cleveland on mobile telephone number 040210364 – *'What's up brother ? Is this still your ph #... If so contact me !'*.

62. About 1.24pm on 5 March 2008, Cleveland sent the following text message to Setser – *'Ill call u when I can.still hot'*

63. Between 9.07pm on 15 March 2008 and 1.40am on 16 March 2008, Cleveland and Setser exchanged the following text messages:

Setser to Cleveland

*'What u up to brother ? Check ?n in !'*

Cleveland to Setser

*'Not much buddy,just taking it easy at the moment.il keep in contact with u.where just cruzin at the moment.'*

Setser to Cleveland

*'You don?t know how u just made my day ! Good to here from u big brother ! Hope your fam and are hanging in there ! Call or text whenever ! Much respect bro !'*

64. About 9.22am on 27 April 2008, Setser sent the following text message to Cleveland –

8

000077

*'How u been ? Just check in n again ? Anyway hope we can get going soon again ! Russ'*

65. About 7.36am on 5 May 2008, Setser sent the following text message to Cleveland – *'What up buddy ? Talk to me are we any where close to getting to go again ?'*

66. About 2.36pm on 20 May 2008, Setser rang Cleveland and said he had wanted to talk to Cleveland for so long.  Cleveland asked Setser if anything had happened with his missus (BRANDT) because they knew, because she left straight away.  Cleveland thought they may have had a little look there.  Setser said his girlfriend would never do that to them and Cleveland stated it was major news. Cleveland said that everyone was staying real quiet and that his phone was red hot.  Cleveland said that everything was still sweet but they were just quiet.  Cleveland said they were on her and he thought she might have got pulled in there.  She was in the paper and everywhere.  Because she left the next day they were onto it.  Setser asked if there were any names involved and Cleveland said no but they knew.  Setser said that one of the two of "our friends" was so careless and not really with the program.  Cleveland told him everyone was hurting here but he had to relax for a bit and hang tight.  Cleveland said he hadn't seen the boys for nearly six months and that everyone vanished because it was so major.  (On 5 December 2007, following the seizure of the first importation, the Daily Telegraph newspaper published an article which linked the seizure of cocaine to the "Bra Boys" crime group, Sydney Airport workers such as cleaners or caterers, and a female American passenger (BRANDT) who had since flown out of Australia).

67. About 8.59am on 5 June 2008, Setser sent the following text message to Cleveland – *'What up brother ! Good talking to u last month ! Anyway hit me up when it is time to rock amd roll ! Russ'*

68. About 11.27am on 24 September 2008, Cleveland sent the following text message to Setser – *'How r ya buddy,hope ya good.just cuzin here.hope ya safe.im ready.il give u another number.dont 4get u still owe 20.we have 2 sort that out before anything,if not,its all over..thanks buddy.'*

69. It is alleged that Cleveland was indicating to Setser that he was ready to recommence activity and reminded Setser that he still owed Cleveland A$20,000.

70. About 4.18pm on 1 October 2008, Cleveland rang Bruce Irons (Irons) and Irons said he had talked to their friend Rusty (Setser) who was concerned about what Cleveland thought of him.  Cleveland said that he had sent Setser a text last week but hadn't yet had a reply.  Irons told Cleveland that Setser was no longer with his girlfriend Brandi (BRANDT).  Setser told Irons that BRANDTt was solid the whole time and didn't fuck up once.

71. About 8.33am on 19 December 2008, Setser sent the following text message to Cleveland – *'How u brother ! Need to talk i have something that I NEED TO RUN BY YOU A PACKAGE OF BOARDS THAT WILL BLOW YOUR MIND AND YOU WILL NOT HAVE TO WORRY ABOUT'*

72. About 10.24am on 19 December 2008, Setser sent the following text message to Cleveland – *'How u brother ! Need to talk i have something that I NEED TO RUN BY YOU A PACKAGE OF BOARDS THAT WILL BLOW YOUR MIND AND YOU WILL NOT HAVE TO WORRY ABOUT ANY KIND OF PAYMENT UNTILL THEY ARRIVE AND ARE ON THE RACK ! SOMETHING TO THINK ABOUT ! THE FOAM IS HANDS DOWN*

9

000078

*THE BEST ON THE MARKET ! IT WILL ALL SPEAK FOR IT SELF ALL I NEED IS TO TALK TO U TO WORK OUT DETAILS ! JUST GIVE ME A CHANCE AMD THESE BOARDS WILL BLOW YOUR MIND'*

73.  Between 9.50am and 2.46pm on 31 December 2008, Setser and Cleveland exchanged the following text messages:

Setser to Cleveland

*'What up brother ! I have been working for a very big company that deals with several different beauty products and i know that it would go over very well'*

Cleveland to Setser

*'Mate sounds good,send him over asap.im just cruzin.hope its good bra. im keen as.lets do it.'*

Setser to Cleveland

*'U fucking rule ! Bro so stoked to here from u ! We nee to get new pre paids so we can talk ! When i get one i will hit u with the number !'*

Cleveland to Setser

*'Sweet sounds good,just let me know.im keen as bra,been quiet here.'*

74.  Between 9.12pm and 11.24pm on 11 January 2009, Setser sent the following two text messages to Cleveland:

*'Buddy u need to get a pre paid phone and text or e mail me the number so i can call u asap i have pretty much everything worked out really been working hard on these boards bro and I know they are going to work so good'*

*'Just want to run the dmentions by u on that other line u get ! Fucjing really positive that these boards are going to work good the foam quality is insai'*

75.  About 6.12pm on 28 March 2009, a person using telephone service 17148567537 (alleged to be Setser) and Cleveland exchanged the following text messages:

Setser to Cleveland

*'What up brother i appolgize about laggin been out of town working i am*

*getting on a mission to put it together over tgd next cople weeks hit me up*

*when u can'*

000079

Cleveland to Setser

*'Sounds good bra,lets get it on.'*

Setser to Cleveland

*'Fuck yeah I am so hungry'*

76. About 2.51pm on 2 April 2009, Cleveland and the person alleged to be Setser exchanged the following text messages:

Setser to Cleveland

*'Yo  my girl friend over there i told you about moved from sydney to byron bay she still works for the same hotel chain just up there now if i send her the boards  is it going to be a problem for you to send someone up to get them . Let of know if it is a wall chace .'*

Cleveland to Setser

*'No worries at all buddy.im starving.'*

<u>Charge 2 - Dealing with the Proceeds of Crime Worth $100,000 or more</u>

77. The Operation Loment investigation established that between July 2007 and November 2007 a series of overseas money remittances totalling in excess of AUD250,000 were made by persons in Sydney to Los Angeles.  The majority of these remittances were made to BRANDT and Setser.  The remittances were made following the arrival of various persons on United Airlines flights from California, USA.   It is alleged that the money the subject of those remittances was the proceeds of crime derived from prior undetected importations of narcotics.

78. It is alleged that BRANDT dealt with money totalling AUD130,760 which was remitted to her in the USA from Australia prior to the importation of the cocaine on 2 December 2007, and that this money represented the proceeds of crime derived from prior undetected importations which occurred on 23 July 2007; 16 September 2007, 23 September 2007 and 16 October 2007.  These dates coincided with the arrival of Schalberg, Jesse Polock and Setser on United Airlines flights to Sydney.  Each of those flights were serviced by Alquillera.  It is alleged that narcotics were imported on each of those flights, removed by Alquillera, sold by the syndicate and part of the proceeds remitted to associates in the USA, including BRANDT.

79. During the Operation Loment investigation, the AFP obtained transaction forms from various Western Union Agencies (news agencies or post offices) and banks from which they identified a number of money transfers made to BRANDT which occurred following the arrival in Sydney of certain USA citizens on United Airlines flights.

000080

80. On 23 July 2007 Schalberg arrived in Sydney on United Airlines flight UA863 from San Francisco, USA. This aircraft was serviced by Alquillera upon arrival at Sydney International Airport.

81. On 25 July 2007 Polock remitted AUD4,525 each to BRANDT and Setser in the USA via Western Union at the Eastgardens Newsagency.

82. Between 31 July 2007 and 10 September 2007, Schalberg remitted a total of AUD55,250 to Setser in the USA from various Western Union agencies in Sydney.

83. On 10 September 2007 Schalberg departed Sydney on United Airlines flight UA840 to Los Angeles.

84. On 12 September 2007, Melissah Lloyd remitted AUD4,775 to BRANDT in the USA via Western Union at Australia Post, Maroubra.

85. On 12 August 2007 Polock departed Sydney on United Airlines flight UA840 to Los Angeles, USA. On 16 September 2007, Polock returned to Sydney on United Airlines flight UA839 from Los Angeles.

86. Records obtained from United Airlines show that between about 6.25 am to 7.10 am on 16 September 2007, Alquillera attended United Airlines flight UA839 from the tarmac.

87. Western Union records show that on 19 September 2007, Polock remitted AUD8,000 to BRANDT in the USA via Western Union at the Kingsford Newsagency.

88. On 19 September 2007 and 20 September 2007 Polock also made three remittances totalling AUD25,440 to Setser in the USA via three different Western Union agencies.

89. On 23 September 2007 Schalberg and another USA citizen, Kelvin Pickering (Pickering), arrived in Sydney on United Airlines flight UA839 from Los Angeles.

90. United Airlines security records show that between about 6.20 am to 6.55 am on 23 September 2007, Alquillera attended United Airlines flight UA839 from the aircraft door and tarmac.

91. Records obtained from the ANZ Bank, Commonwealth Bank of Australia and Westpac Bank, show that between 27 and 28 September 2007, Schalberg made six remittances totalling AUD41,810 to BRANDT in the USA as follows:

    1. AUD6,968 remitted on 27 September 2007 via Commonwealth Bank of Australia at Bondi Beach
    2. AUD6,968 remitted on 27 September 2007 via ANZ Bank at Bondi Beach
    3. AUD6,968 remitted on 28 September 2007 via Commonwealth Bank of Australia at Bondi Junction
    4. AUD6,968 remitted on 28 September 2007 via Commonwealth Bank of Australia at Bondi Beach
    5. AUD6,968 remitted on 28 September 2007 via ANZ Bank at Bondi Junction
    6. AUD6,970 remitted on 28 September 2007 via Westpac Bank at Bondi Beach

92. On 29 September 2007, Schalberg and Pickering departed Sydney on United Airlines flight UA840 to Los Angeles.

000081

93. On 16 October 2007 Setser arrived in Sydney on United Airlines flight UA839 from Los Angeles.

94. Records obtained from United Airlines show that between about 6.20 am to 6.35 am on 16 October 2007, Alquillera attended United Airlines flight UA839 from the aircraft door.

95. On 4 November 2007, BRANDT arrived in Sydney on flight QF50 from Los Angeles. She checked into the Swiss Grand Hotel at Bondi Beach.

96. Between 5 November 2007 and 7 November 2007, BRANDT transferred a total of AUD71,650 to her own account in the USA from various locations around Sydney in the following eight transactions:

    1. AUD10,500 remitted on 5 November 2007 via the Westpac Bank, Bondi Junction;
    2. AUD9,500 remitted on 5 November 2007 via the Commonwealth Bank of Australia, Haymarket;
    3. AUD10,500 remitted on 5 November 2007 via the Bank of China, Haymarket;
    4. AUD8,300 remitted on 6 November 2007 via the Commonwealth Bank of Australia, Haymarket;
    5. AUD8,300 remitted on 6 November 2007 via Travelex HSBC, Haymarket;
    6. AUD7,200 remitted on 7 November 2007 via the Commonwealth Bank of Australia, Haymarket;
    7. AUD8,100 remitted on 7 November 2007 via Travelex HSBC, Haymarket;
    8. AUD9,250 remitted on 7 November 200 via the ANZ Bank, Haymarket.

97. It is alleged that these remittances represented the proceeds of the sale of narcotics imported into Australia on United Airlines flights.

98. BRANDT returned to the USA on 7 November 2007 on American Airlines flight AA7363 (Qantas Flight AF15).  On her outgoing passenger card BRANDT indicated that she was carrying AUD10,000 or more in cash.

000082

**"C"**

The attached one page is the annexure marked "C" referred to in the affidavit of Gregory Adam Hinds sworn at Sydney on the 23rd day of March 2012 before me:

Graeme Curran

Magistrate

.................................................

Magistrate of the State of New South Wales

